**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TAKOTA CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 06-553 |
| | ) | (Judge Bruggink) |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

ROBERT J. SYMON
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150

Counsel of Record for Plaintiff
TAKOTA CORPORATION

May 2, 2008

**TABLE OF CONTENTS**

I. BACKGROUND FACTS .......... 1

II. PROCEDURAL HISTORY .......... 5

III. SUMMARY OF ARGUMENT .......... 5

IV. STANDARD OF REVIEW UNDER RCFC 56(a) .......... 7

V. ARGUMENT .......... 7

A. Plaintiff is Entitled to Summary Judgment Because the Navy Failed to Extend the Contract Completion Date to Account for The Navy's Delay in Responding to Plaintiff's Request for Direction Regarding the Condition of the Seawalls. .......... 7

1. The Contracting Officer Failed to Adjust the Contract Performance Schedule. .......... 7

B. The Navy Waived the Original Contract Completion Date .......... 10

VI. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**


*Advanced Distribution System, Inc. v. U.S.*, 34 Fed. Cl. 598 (1995) .......... 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .......... 7

*Aptus Co. v. U.S.*, 61 Fed. Cl. 638 (2004) .......... 12

*DeVito v. U.S.*, 413 F.2d 1147 (Ct. Cl. 1969) .......... 12

*Indemnity Ins. Co. of North America v. U.S.*, 14 Cl.Ct. 219 (1988) .......... 13, 14

*Lisbon Contractors, Inc. v. U.S.*, 828 F.2d 759 (Fed. Cir. 1987) .......... 7

*Martin J. Simko Const., Inc. v. U.S.*, 11 Cl. Ct. 257 (1986) .......... 12

*McDonnell Douglas Corp. v. U.S.*, 323 F.3d 1006 (Fed. Cir. 2003) .......... 11

*Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387 (Fed. Cir. 1987) .......... 7

*Olson Plumbing & Heating Co. v. U.S.*, 221 Ct.Cl.197 (1979) .......... 14

*Paving and Construction Co. v. U.S.*, 18 Cl.Ct. 129 (1989) .......... 13

*Pelliccia v. U.S.*, 208 Ct. Cl. 278, 293, 525 F. 2d 1035 (1975) .......... 14

*Sergent Mechanical Systems v. U.S.*, 34 Fed. Cl. 505 (1995) .......... 9

*Timberland Paving and Construction Co. v. U.S.*, 18 Cl.Ct. 129 (1989) .......... 13

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TAKOTA CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 06-553 |
| | ) | (Judge Bruggink) |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Takota Corporation ("Takota," or "Plaintiff"), by undersigned counsel and in accordance with Rule 7(b) of the Rules of the United States Court of Federal Claims ("RCFC"), files this Memorandum of Law in support of its Motion for Partial Summary Judgment.

## I. BACKGROUND FACTS[1]

This is an action arising out of the Department of Navy's ("Navy") default termination of Contract No. N62470-05-C-7156 (the "Contract") pursuant to the Contracting Officer's final decision dated May 24, 2006. The Contract called for the extension of two boat ramps and dredging at the Hancock Marina, Marine Corps Air Station Cherry Point, North Carolina. PFOF 1.

In order to perform the required work on the boat ramps in a dry condition, Takota was required to seal off certain areas of the Marina and pump out the water. Takota planned to effect this sealing by the use of temporary cofferdams. The contract documents specifically acknowledged that the existing retaining walls/bulkheads (hereinafter collectively referred to as

[1] In accordance with RCFC 56(h)(1), the Plaintiffs, concurrent with the filing of their Motion for Partial Summary Judgment and this memorandum in support, also file their Proposed Findings of Uncontroverted Fact in Support of Plaintiffs' Motion for Partial Summary Judgment (hereinafter "PFOF").

Seawalls) abutting these areas were in a deteriorated state and that the contractor would have to monitor movement and/or erosion of these walls during construction. PFOF 2. Nothing in the contract documents, however, required Takota to perform any work on these Seawalls to correct this condition or permit the work to proceed.[2] Rather, the Contract placed a notice obligation on the Contractor if safety concerns arose during construction due to the deteriorated state of these Seawalls. Specifically, notes on the Contract drawings state as follows:

> 3. Dewatering the lagoon will cause a significant unbalanced load condition of the already deteriorating steel sheet pile bulkhead (seawalls). Contractor shall monitor all existing bulkhead (seawalls) during the dewatering and construction processes. Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction.
>
> GENERAL NOTES (DWG C-03 – *DEMOLITION PLAN).*
>
> 3. The area enclosed by the coffer dam shall be dewatered prior to construction/demolition by means that prevent/minimize erosion. Bulkheads (seawalls) shall be carefully monitored during dewatering process. Contractor shall provide adequate shoring/bracing for bulkheads (seawalls). Should signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction.
>
> CONSTRUCTION SEQUENCE (DWG C-O4 – *SITE PLAN*).
> PFOF 2.

Based upon the instructions in these notes, Takota understood it was required to monitor the Seawalls during performance. If the integrity of the walls appeared to be in jeopardy, Takota was required to stop work, stabilize the situation, and notify the Contracting Officer before proceeding further. *Id*.

In October 2005, Takota commenced efforts to install two temporary cofferdams with the edges abutting the bulkheads and the bottom securely anchored in order to permit dewatering

[2] To be sure, per Contract Drawing C-04, the actual walls were located entirely beyond the delineated limits of construction for Boat Ramp #1 (the "Lagoon Area') and comprised only a very small portion of the limits of construction area for Boat Ramp #2.

of the marina area. PFOF 3. Once Takota started pumping water out of the containment area, it noticed that ground water continued to flow into the marina from behind the existing Seawalls. In essence, water was being forced through fissures and voids that existed between the back side of the Seawalls and the earth, causing erosion to that area plus destabilization of the Seawalls themselves. It also prevented the area from becoming fully dewatered. *Id*. In accordance with the Contract, Takota notified the Contracting Officer on October 28, 2005 that it was stopping the project due to the conditions relating to the Seawall which presented a safety concern and asked for direction from the government. PFOF 4. Given that the Contract completion date was January 3, 2006, it was critical that the Navy provide immediate direction to Takota on how to handle the situation.

When Takota engaged a geotechnical engineer to investigate the problem, it was learned that the water coming into the construction site from behind the Seawalls was caused by a combination of three elements: (1) the Seawalls' deteriorated state; (2) the previously unknown condition of unsuitable materials used to backfill the Seawalls (e.g., bricks, asphalt, hardened concrete mix) as well as voids; and (3) the increased hydrostatic pressure caused by the damming operation. PFOF 6. Takota subsequently sent a letter to the Contracting Officer advising that, as a result of the Navy's inaction addressing the differing site condition notice, Takota would be proceeding with the work by ordering an additional cofferdam to enclose just the boat ramp areas so that Takota could proceed with the work and avoid a substantial claim for extended overhead costs. PFOF 7. Takota was advised by the Navy in writing that Takota was precluded from proceeding with the work until after any equitable adjustment request associated with remedying the condition of the Seawalls was presented to and approved by the ROICC Office. PFOF 8. Takota and the Navy then discussed several approaches to ameliorate the concern that this

differing site condition created and eventually agreed upon a remedy on December 7, 2005. That corrective action consisted of excavating behind the Seawalls and filling the excavated trench with concrete. PFOF 10. Takota was never told proceeding with the approach was contingent on funding. Indeed, by letter dated January 6, 2006, the Navy confirmed the corrective approach as well as Takota's entitlement to an equitable adjustment for time and cost associated with this issue. PFOF 12. However, when the Navy found out that funding did not exist, the plan was unilaterally scratched by the Navy and a new plan developed. This plan, which was not conveyed to Takota, involved default terminating Takota's Contract. And the plan was finalized when the Navy learned that Takota had submitted a claim based on the condition of the Seawalls. PFOF 16.

Under this course, the Navy directed Takota to resume work on March 7, 2006. PFOF 18. Although several months had passed while the parties addressed finding a solution for the conditions relating to the Seawalls, the Contracting Officer did not establish a new completion date. *Id*. Instead, the Contracting Officer informed Takota that the project completion date of January 3, 2006 remained in effect and that the Navy had neither waived that date nor its right to assess liquidated damages. The letter also directed Takota to re-submit many of its earlier submittals (previously approved) because of the passage of time. *Id*. When Takota complied with the Contracting Officer's directive and began re-submitting documents and attempted to have its geotechnical engineers come on site to address the Seawall concern, Takota was instructed that no work was permitted at the site until "all" submittals had been tendered and approved. PFOF's 19 & 21. Eventually, the Contracting Officer executed the plan to terminate Takota's contract for default on May 24, 2006, issuing the termination for failing to perform the

contract within the specified time (i.e., the January 3, 2006 contract completion date). PFOF 25. From hindsight, it is clear that the Navy set up Takota to fail.

## II. PROCEDURAL HISTORY

The Plaintiffs filed this action on July 31, 2006. The complaint seeks to overturn the Navy's default termination of Takota as wrongful and arbitrary due to: the Navy's failure to properly investigate and identify the differing site condition; the Navy's failure to extend the contract completion date to account for the Navy's delay in investigating the differing site condition; and the Navy's failure to extend the contract completion date to account for Takota's efforts to design a remediation plan for the differing site condition – especially since that conduct had been encouraged by the Navy; and bad faith.

## III. SUMMARY OF ARGUMENT

Notwithstanding the arbitrary, capricious and bad faith basis of the default termination established by Plaintiff's Proposed Findings of Uncontroverted Facts, for the purposes of this partial summary judgment motion, Plaintiff simply relies upon the Navy's failure to extend the contract completion date to account for the Navy's delay in furnishing direction and waiver of the original completion date as sufficient basis to grant summary judgment. Plaintiff contends that there is no genuine issue as to any material fact with respect to these issues and that Takota is entitled to a judgment as a matter of law.

To resolve this issue, the Court need not decide whether or not a dangerous or differing site condition existed with respect to the condition of the Seawalls at the marina. Rather, the Court should focus on the manner in which Takota's reporting of the condition was administered by the Navy. Indeed, once Takota provided notification to the Contracting Officer of the dangerous or differing site condition with respect to the Seawalls on October 28, 2005, the Contracting Officer was obligated to provide written direction to Takota as to how to proceed.

That direction undisputedly took approximately four (4) months, until March 7, 2006. This delay was acknowledged by the Navy to be beyond the fault or caused by Takota. Moreover, the amount of time taken by the Contracting Officer to provide direction is not chargeable delay to Takota, given that Takota was precluded by the Navy from proceeding with the work until the issue was resolved. Accordingly, since the Contracting Officer failed to establish a new completion date under the Contract that accounted for the time the Navy took to respond to Takota's request for direction, the Contracting Officer cannot terminate Takota for default for failing to complete the work within the very same timeframe in which Takota was awaiting direction from the Contracting Officer. In short, the Navy cannot penalize Takota for the Navy's own inaction.

Additionally, the Contracting Officer effectively waived the January 3, 2006, completion date when she directed Takota to resume work on March 7, 2006. It was disingenuous for the Contracting Officer to direct Takota to proceed, but not establish a new completion date given that the original contract completion date had long since come and gone while Takota awaited direction. Even the Contracting Officer acknowledged Takota's entitlement to a time extension in subsequent correspondence.

In summary, because the Navy -- which bears the burden to justify the default termination – failed to extend the contract completion date to reflect the four months taken by the Navy to respond to Takota's request for direction, and had effectively waived that completion date when it directed Takota to resume work two months after the completion date had passed, the Court should declare the termination wrongful and grant summary judgment in favor of the Plaintiffs and convert the termination for default into a termination for the convenience of the government.

## IV. STANDARD OF REVIEW UNDER RCFC 56(a)

Summary judgment under RCFC 56(a) is proper where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party has the burden of showing the absence of genuine issues as to any material facts. *Advanced Distribution System, Inc. v. U.S.*, 34 Fed. Cl. 598 (1995). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is considered material by considering the substantive law. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V. ARGUMENT

### A. Plaintiff is Entitled to Summary Judgment Because the Navy Failed to Extend the Contract Completion Date to Account for The Navy's Delay in Responding to Plaintiff's Request for Direction Regarding the Condition of the Seawalls.

#### 1. The Contracting Officer Failed to Adjust the Contract Performance Schedule.

The Navy bears the burden of proof "on the issue of the correctness of its actions in terminating a contractor for default." *Lisbon Contractors, Inc. v. U.S.*, 828 F.2d 759, 764 (Fed. Cir. 1987). In *Lisbon Contractors*, the Federal Circuit explained:

> The default termination order is deemed by the [boards of contract appeal] to be a decision by the contracting officer on a government "claim" against the contractor which, being adverse, the contractor may appeal to the board under the CDA. In view of this background and procedure, the imposition of the burden of proof of default in BCA appeals falls naturally on the government inasmuch as the government is only being made to bear the burden of proof on its own "claim" of default.

*Id.*

The Navy relies on Takota's "failure to perform the contract within the specified time" as the basis for the termination for default. In Unilateral Contract Modification 1, *Notice of Termination – Final Decision*, dated May 24, 2006, the Navy stated as follows:

> This action is taken as a result of your failure to make progress to ensure completion of the contract and failure to perform the contract within the specified time. "

PFOF 27. To sustain its default termination, the Navy must therefore prove that Takota (a) failed to make progress to ensure completion, or (b) failed to perform within the specified time.

The Navy cannot prove its case for one simple reason: any failure by Takota to make progress or to perform the contract by January 3, 2006 was directly caused by the Contracting Officer's failure to provide Takota with direction on how to proceed in the face of a site condition that required Takota to suspend performance. Thus, the Navy's reliance on Takota's failure to meet the January 3, 2006 completion date to justify termination is defective on its face. In fact, Takota was expressly forbidden from taking steps to address the problem without first having presented an equitable adjustment request and having obtained approval by the ROICC Office.[3] In other words, Takota could logically never have completed the project on time because the Navy neither presented Takota with direction to move forward nor allowed Takota to proceed on its own initiative. While the Navy directed Takota to resume the work, it should have established a new completion date. Navy communications clearly acknowledged Takota's entitlement to a time extension. The Navy failed to account for this necessary time extension in

[3] Plaintiff points out that the solutions it had proposed to fix the problem had been agreed to by the Navy's Project Architect as early as December 6, 2005. PFOF 9. The project Architect acknowledged that it "would not object to a reasonable contract modification to accomplish the work." *Id.* Notwithstanding such agreement, the Navy refused to allow Takota to proceed, even on its own initiative, without a prior-approved equitable adjustment.

its final decision to terminate for default and this failure makes the Navy's default decision defective.

Legal precedent also supports Takota's entitlement to a time extension given this scenario. *Sergent Mechanical Systems v. U.S.*, 34 Fed. Cl. 505 (1995), provides a very similar set of facts to the present case *vis a vis* the Contractor's entitlement to a time extension when the Government fails to provide direction. In *Sergent Mechanical*, the contractor had been engaged, in part, to remove a subterranean concrete wave guide trench. Upon excavating the trench, the contractor discovered an appurtenant extension of the trench that more than tripled the noted size and was unaccounted for in the contract documents. Rather than risk proceeding and damaging possible power or communications lines, the contractor stopped work, notified the Contracting Officer of the differing site condition, and awaited guidance for four weeks. At the end of four weeks, no guidance having been received, the contractor proceeded to remove the entire trench without direction from the Air Force. *Id.* at 524-525. The parties ultimately executed a change order for the differing site condition, but the Air Force refused to pay the contractor for any delay costs. *Id*

The Court in *Sergent* determined that the contractor had acted appropriately by suspending work and seeking direction from the Contracting Officer and that the government's delay in providing such direction was the responsibility of the government and not the contractor:

> [T]he contract incorporated FAR 52.236-2, which instructed that Sergent was to "promptly, and *before the conditions are disturbed*, give a written notice to the Contracting Officer of ... subsurface or latent physical conditions at the site which differ materially from those indicated...." (Emphasis added.) In such a case, if the government is untimely in responding to the contractor's concerns, the contract does not specifically assign to the contractor the burden to bear the costs of the government's inaction.
> *Id.* at 526.

The Court's analysis focused on the government's inaction in responding to the contractor's request for direction:

> In the present case the salient facts are that the contractor discovered a differing site condition at a point when, the evidence establishes, no other substantial work at LF-08 was left to be completed. The Air Force provided no guidance as to what was expected under the circumstances of the changed site conditions. Accordingly, the government is liable for the delays preceding the date when Sergent, at its own risk, resumed work at the site.
> *Id.* at 527.

Similar to the situation in *Sergent Mechanical*, the Notes on Contract Drawings C-03 and C-04 likewise required Takota to "contact contracting officer for further direction" when Takota faced the dangerous situation it encountered when it attempted to dewater the lagoon. This fact cannot be disputed by the Navy. And, similar to *Sergent Mechanical*, because the Contracting Officer was untimely in responding to Takota's request for direction, Takota should not be held accountable for the delays to project completion.

Accordingly, Takota cannot be properly terminated for failing to complete the contract by January 3, 2006 when the Contracting Officer had not accounted for the nearly four months that the Navy delayed providing Takota direction for proceeding with the work.

**B. The Navy Waived the Original Contract Completion Date**

As a preface to this argument, Takota never breached or defaulted on the contract. Rather, Takota followed the contract when it encountered an unstable condition with the Seawall. Takota properly sought direction from the Contracting Officer. When that direction did not appear to be forthcoming, Takota sought to proceed with corrective action on its own initiative, only to be stopped by the Navy. PFOF's 7 & 8. The original contract completion date came and went while Takota waited for the Government to provide direction regarding the Seawall condition. Between January 3, 2006 (the contract completion date) and March 7, 2006 (when work was directed to resume), not once did the Navy complain to Takota of late

performance or question the failure of Takota to perform. Clearly, at that time, the Navy had no intent to enforce the contract completion date. In fact, the Navy did not take action to resume the work until after the Navy learned it did not have funds to repair the Seawalls (PFOF 13) and after the decision had been made to terminate Takota for default because it had filed a claim related to the condition of the Seawalls. PFOF's 16 & 17. Moreover, the Navy had already recognized Takota's entitlement to a time extension to account for delays by the Navy in furnishing Takota direction regarding the Seawall condition. PFOF 12. The contemporaneous record demonstrates that this was also Takota's belief when it submitted a construction schedule depicting a completion date in July 2006. PFOF 24. As the Court can readily see given these circumstances, the Navy's default decision on the basis that Takota failed to meet the original completion date is patently unreasonable.

Assuming, *arguendo*, some legitimacy remained attached to the contract completion date, the termination should also be overturned because the Contracting Officer waived that January 3, 2006 completion date when she waited until March 7, 2006 to issue a directive to resume work. When the government (1) fails to terminate a contract within a reasonable time after discovery of a ground for default termination and (2) the contractor relies to its detriment on the government's failure to terminate, the government waives its right to rely on that ground to justify a subsequent default termination. *McDonnell Douglas Corp. v. U.S.*, 323 F.3d 1006, 1020 (Fed. Cir. 2003) ("For a waiver of default to occur, there must be both a '(1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent'") (citations omitted); *Aptus Co. v. U.S.*, 61 Fed. Cl. 638, 649-650 (2004) ("Waiver operates to deprive the government of its

right to terminate for default when the government fails to terminate a contractor within a reasonable time after the circumstances that form the basis for termination arise, and the contractor relies to its detriment on the forbearance by continuing with performance"); *Martin J. Simko Const., Inc. v. U.S.*, 11 Cl. Ct. 257, 268 (1986) ("[T]he law has recognized that the government may waive its right to terminate a contract for default – [such as] when the government fails to terminate a contract for default within a reasonable time following the contractor's default"); *DeVito v. U.S.*, 413 F.2d 1147, 1154 (Ct. Cl. 1969). The right to terminate, to the extent it may have existed, was undoubtedly waived here.

Initially, Takota points out that all of these cited cases concerned situations factually different from the present one; in the cited cases, the Court based its decisions on actions taken by the Government <u>once the right to terminate a contract for default arose</u>. In the present case, such a right never arose. The Navy has never contended that Takota's suspension of work and waiting for direction from the Contracting Officer on how to proceed was not in accordance with the Contract. The Navy has never contended that the time Takota spent waiting for that direction was Takota's fault. Even during the internal strategy session meeting held by the Navy on February 6, 2006 (where it was determined to terminate Takota because it had requested a Contracting Officer's Final Decision on the payment issue), no one raised any contention that Takota's waiting for direction and inability to proceed on its own initiative were Takota's fault or any sort of basis for termination. PFOF's 16 and 17. The contemporaneous record contains no express or implied Navy complaints that the four month delay between Takota's suspension of work and receipt of the Contracting Officer's direction to proceed was Takota's fault. Accordingly, no right to terminate the contract for default based on the January 3, 2006 contract completion date ever accrued or was viable.

It is precisely this lack of fault on Takota's part that warrants application of the *DeVito* rule to this construction contract and a finding that the Navy cannot terminate for default where it waived the original contract completion date and failed to set a new one. Admittedly, application of *DeVito's* waiver rule to construction contracts "has only been applied when exceptional or rare circumstances are presented in a construction contract case." *Timberland Paving and Construction Co. v. U.S.*, 18 Cl.Ct. 129, 147 (1989), citing *Indemnity Ins. Co. of North America v. U.S.*, 14 Cl.Ct. 219, 224 (1988). In evaluating for those 'exceptional or rare circumstances,' the Court has clearly couched its analyses in terms of a 'defaulting party' and a 'non-breaching or nondefaulting party.' See generally, *Timberland Paving and Construction Co. v. U.S.*, 18 Cl.Ct. 129, 147 (1989) ("The necessary elements of an election by the <u>nondefaulting party</u> to waive default and delivery under a contract . . .") (emphasis added); *Indemnity Ins. Co. of North America v. U.S.*, 14 Cl.Ct. 219, 224 (1988) (Where the right to terminate has been expressly reserved or when liquidated damages have been imposed by the <u>non-breaching party</u>, . . ., citing *Olson Plumbing & Heating Co. v. U.S.*, 221 Ct.Cl.197, 204 (1979) (emphasis added). In applying the waiver rule of *DeVito*, courts and boards have relied on the principle that a non-breaching [government] party should not be penalized because "the contracting officer should have a reasonable time within which to determine whether a default termination would be in the best interest of the Government as the <u>nondefaulting party</u>." *Pelliccia v. U.S.*, 208 Ct. Cl. 278, 293, 525 F. 2d 1035 (1975) (emphasis added). Similarly, the same principle should apply to Takota: it should not be penalized because the Government failed to perform its job.

The record undisputedly demonstrates that Takota attempted to obtain direction on how to proceed with the work in the face of the seawall condition from the Contracting Officer. When that direction was not forthcoming, Takota sought to proceed on its own initiative, only to

be stopped by the Navy. Thereafter, the original contract completion date came and went, without complaint from the Government about default. To the contrary, three days after the original completion date had passed, the Navy wrote to Takota and stated: "The Government is well aware that a suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work." PFOF 12. The Contracting Officer herself directed Takota to update its progress schedule "to reflect the delay in work between November 2005 and May 2006, and projecting to a new completion date." PFOF 23. So, not only was Takota not a breaching or defaulting party with respect to the completion date, the Navy had admitted that a time extension was due. Clearly the Navy was not the victim in this case.

For Takota, the March 7, 2006 directive to proceed provided the contractor with two valuable pieces of information on which it was entitled to rely: (1) the government had decided to proceed with the work under the assumption that there was no differing site condition; and (2) the government wished to proceed with the work on a revised schedule basis (which would be the only rational conclusion when faced with the Contracting Officer's demand to re-submit various submittals). Takota proceeded to comply with the Contracting Officer's requirements – to include submitting a revised Progress Schedule – in reliance on the government's apparent desire to have the work performed in spite of the earlier delay. In other words, the Navy indicated through its words and actions that, whatever legitimate rights it may have had to hold Takota to the long-past completion date, it was forebearing its purported reserved right to terminate by having Takota take the steps to prepare submittals and perform the work. Takota relied on this forbearance by preparing submittals and continuing with performance. The

government cannot hide its actions behind its reservation of rights. Once Takota embarked on the new plan as set out by the Contracting Officer, the former completion date was waived.

## VI. CONCLUSION

For all the reasons discussed above, the Navy's default termination of Takota should be declared wrongful by the Court and the termination for default converted into a termination for the convenience of the government.

May 2, 2008

Respectfully submitted,

/s/ Robert J. Symon
ROBERT J. SYMON
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150

*Counsel of Record for Plaintiff*
*TAKOTA CORPORATION*

Of Counsel:

JEREMY BECKER-WELTS
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150