**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TAKOTA CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | Civil Action No.: 06-553<br>(Judge Bruggink) |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Takota Corporation, by counsel and in accordance with Rule 56(h) (1) of the Rules of the United States Court of Federal Claims, files these Proposed Findings of Uncontroverted Fact in Support of Plaintiffs' Motion for Summary Judgment, and states as follows:

1. Contract No. N62470-05-C-7156 ("the Contract") was awarded to Takota Corporation ("Takota") on July 22, 2005. The Contract called for the extension of two boat ramps and dredging at the Hancock Marina, Marine Corps Air Station Cherry Point, North Carolina. The contract price was $463,000.00. The contract performance period was anticipated by the Contract to be 150 days and the Contract completion date was set as January 3, 2006.

2. In order to perform the required work on the boat ramps, Takota was required to seal off certain areas of the Marina and pump out the water. Takota planned to affect this sealing by the use of temporary cofferdams. (See Tab 1, ¶ 4, Declaration of Chad Riley). The contract documents specifically acknowledged that the existing seawalls/bulkheads (the "Seawalls") in these areas were in a deteriorated state and that the contractor would have to monitor movement and/or erosion of the Seawalls during construction:

GENERAL NOTES (DWG C-03 – *DEMOLITION PLAN)*:

> 3. Dewatering the lagoon will cause a significant unbalanced load condition of the already deteriorating steel sheet pile bulkhead (seawalls). Contractor shall monitor all existing bulkhead (seawalls) during the dewatering and construction processes. Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction.
>
> CONSTRUCTION SEQUENCE (DWG C-O4 – *SITE PLAN*):
>
> 3. The area enclosed by the coffer dam shall be dewatered prior to construction/demolition by means that prevent/minimize erosion. Bulkheads (seawalls) shall be carefully monitored during dewatering process. Contractor shall provide adequate shoring/bracing for bulkheads (seawalls). Should signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction.

See Tab 2; Contract Plans & Drawings, Sheets C-03 & C-04.

3. To dewater, Takota installed its temporary cofferdams with the edges abutting the bulkheads and the bottom securely anchored. (See Tab 1, ¶ 5 Declaration of Chad Riley). Once Takota started pumping water out of the containment area, it noticed that ground water was flowing into the dewatered area from behind the existing Seawall. *Id*. In essence, water was being forced through fissures and voids that existed between the back side of the Seawalls and the earth, causing erosion to that area plus destabilization of the Seawalls themselves. *Id*. It also prevented the area from becoming fully dewatered. *Id*.

4. Worried that the continued water flow would further erode and destabilize the area behind the Seawalls, possibly leading to their collapse, Takota applied the guidance from the Drawing Notes and ceased dewatering and allowed the condition to stabilize. (See Tab 1, ¶ 6, Declaration of Chad Riley). In accordance with the Contract requirements, on October 28, 2005, Takota notified the Navy that it was suspending operations due to the unsafe condition and asked for direction from the government. (See *Id.*; Tabs 3, 4, and 5).

5. In response to Takota's notice of the condition of the Seawalls, the Navy Project Chief Engineer informed Takota that the problem stemmed from Takota's failure to follow the contract specification by not using sheet piling. (See Tab 6). The Navy immediately retracted this position when the Navy discovered that the referenced specification had mistakenly not been included in the contract documents furnished to Takota. *Id.*

6. When the Navy failed to investigate the condition of the Seawalls, Takota engaged two professional geotechnical engineers from QORE Property Sciences to visit the project site to observe and assess the situation. (See Tab 7). QORE determined, via excavated test pits behind the Seawalls, that the water coming into the construction site from behind the Seawalls was caused by a combination of three elements: (1) the Seawalls' deteriorated state; (2) the previously unknown condition of unsuitable materials used to backfill the Seawalls (e.g., bricks, asphalt, hardened concrete mix) as well as voids; and (3) the increased hydrostatic pressure caused by the damming operation. (*Id.* at p.2). QORE engineers concluded that the effectiveness of the temporary cofferdams was seriously impacted by the condition of the existing Seawalls, especially given the complexity of the materials and voids found behind the walls. *Id.* One of the solutions suggested by QORE in response to the problem was to trench back perpendicularly from the Seawalls and to fill the trench with concrete to establish permanent groundwater cutoff walls. *Id.*

7. On November 22, 2005, Takota sent a letter to the Contracting Officer advising that, as a result of the Navy's inaction addressing the differing site condition notice, Takota would be proceeding with the work by ordering an additional cofferdam to enclose just the boat ramp areas so that Takota could proceed with the work and avoid a substantial claim for

extended overhead costs. (See Tab 8; Tab 1, ¶ 9). Takota also informed the government that it would be treating this work as a constructive change. *Id*.

8. On November 28, 2005, Takota was advised by the Navy in writing that Takota was precluded from proceeding with the work until after any equitable adjustment request associated with remedying the condition of the Seawalls was presented to and approved by the ROICC Office. (See Tab 9). Takota immediately confirmed in writing to the Contracting Officer that the government was directing Takota to stop work pending submission and review of an equitable adjustment request. See Tab 10; Tab 1 ¶ 10.

9. By e-mail dated December 6, 2005, the Navy's Project Architect communicated to the Navy its comments to Takota's earlier-proposed solutions to the problem. (See Tab 11). The Project Architect stated that Takota's suggestion to add deadman anchors or pump grout behind the seawalls "may have some merit . . . and [that the project Architect] would not object to a reasonable modification to accomplish the work." *Id*. The Navy's Project Architect also agreed that another solution proposed by Takota – damming up directly around the boat ramps long enough to install the new ramps, followed by dredging -- had merit, although concern was expressed that the contractor might "damage work he just placed with the dredging operation." *Id*.

10. On December 7, 2005, the Navy convened a "Mutual Understanding Meeting" with Takota to discuss measures to control the amount of water flow from behind the Seawalls to sustain a dry working environment. See Tab 12; Tab 13. During those discussions, the Navy and Takota agreed that excavating behind the bulkhead and filling the trench with concrete was the approach that would be used to correct the problem. See Tab 13. At that time, there was no dispute that the bulkhead needed to be repaired if the project was to be completed. See Tab 12.

The only issue that remained at the conclusion of the meeting was for the Navy to find additional funds to pay for the additional work that would be required. *Id.*

11. By letter dated December 21, 2005, in response to a request by the Navy for an estimate to perform the corrective work, Takota notified the Contracting Officer that it could not provide a "precise" estimate to perform the repairs necessary to the bulkhead so that dewatering could occur. See Tab 14; Tab 1, ¶12. Takota did inform the Navy that the concrete trench solution would cost at least $300 per cubic yard plus $2,300 per day for a dive team, plus the cost of any materials for the bulkhead repair. *Id*.

12. On January 6, 2006, the Navy confirmed in writing that excavating the bulkhead and filling the trench with concrete was the agreed upon approach to solve the differing site condition problem. See Tab 13. The Navy further stated, with regard to Takota's Contract, that "a suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work." *Id*.

13. Subsequent to the Navy's January 6, 2006 correspondence (Tab 13), the Navy decided not to proceed with the necessary corrective work to the Seawalls when the Navy learned that it did not have the funding to pay for it. See Tab 15; Deposition Testimony of Antoine Crite, page 107, line 6 – page 109, line 13.

14. During the pendency of discussing the Seawall issue with the Navy, Takota submitted a pay application on November 23, 2005, which included $78,500 for the installation of the cofferdams. See Tab 16. Without evidence or explanation, the Navy rejected this portion of Takota's payment application on the basis that the cofferdams failed to function properly. See Tab 17.

15. By letter dated February 1, 2006, Takota submitted a request for a final decision to the Contracting Officer seeking payment of the $78,500 being withheld by the Navy for the cofferdams. See Tab 18.

16. Immediately following receipt of Takota's February 1, 2006 request for a Contracting Officer's final decision, the Navy convened an internal strategy meeting on February 6, 2006. Notes from that meeting indicate that Ken [Wilson], a Navy attorney stated that Takota had filed a claim and that it would go through the claims process, and that, in the meantime, the Navy should issue Takota a termination for default. See Tab 19.

17. The Assistant Resident Officer in Charge of Construction ("AROICC") for the Navy confirmed, during his deposition, that the Navy's decision to terminate for default reached during the February 6, 2006 meeting was based on Takota issuing a claim "because normally when a contractor – issues a claim, they're not going to do any more work for anybody." (See Tab 15, Crite Deposition Transcript, p. 137, lines 8-14).

18. Notwithstanding the Navy's plan to terminate Takota's contract for default, by letter dated March 7, 2006, the Contracting Officer directed Takota to resume work on the project without direction regarding corrective measures to account for the condition of the Seawalls or establishing a new completion date to account for the suspension of work while the parties had addressed the issue. (See Tab 20). The Contracting Officer informed Takota that the already-passed project completion date (January 3, 2006) remained in effect and that the Navy neither waived that date nor its right to assess liquidated damages. Finally, the letter directed Takota to re-submit many of its earlier submittals, even though previously approved, and refused to permit construction activities pending their approval. *Id.*

19. Takota recommenced performance in compliance with the Contracting Officer's directive. In addition, Takota requested its geotechnical engineer, QORE, to address a solution to the Seawall condition problem so that dewatering could be accomplished that would permit construction activities. (See Tab 1, ¶ 15).

20. On March 24, 2006, less than three weeks following the notice to resume work and provide new submittals, the Contracting Officer wrote to Takota advising that the required submittals had not yet been provided and that the Navy required six of the submittals, including an updated progress schedule, by April 4, 2006 and the remainder by April 18, 2006. See Tab 21. The Contracting Officer threatened Takota with a default termination if it failed to meet either deadline. *Id.* In this letter, the Contracting Officer ignored the fact that the Navy had received on March 24, 2006 Takota's submittal for the Geotechnical Engineer's Report. See Tab 24.

21. On March 29, 2006, following QORE's further on-site inspection for Takota for the purpose of developing its submittal for a dewatering, Takota was chastised by the Contracting Officer for allowing QORE on site to "work" before all re-submittals had been approved, stating that "no actual work onsite can be performed until the required submittals have been submitted and approved and then work will proceed only after their [sic] is a Superintendent and a Quality Control person on site to oversee the work." See Tab 22.

22. On March 30, 2006, Takota faxed and emailed a reply letter to the Contracting Officer, listing each of the requested submittal requirements referenced by the Contracting Officer and indicating whether or not a new submittal would be necessary and would be provided. See Tab 23.

23. On April 20, 2006, the Contracting Officer issued Takota a Show Cause Notice, claiming that Takota had "repudiated performance" of the Contract by virtue of its "limited response to [the Navy's] previous request for critical submittals outlined in subject contract and the language of [Takota's] letters of 29 March 2006 and 30 March 2006 . . . coupled with . . . [Takota's] refusal to resume work to complete the project in a timely manner." See Tab 24. Within the Show Cause Notice, the Contracting Officer told Takota that its progress schedule "needs to be revised to reflect the delay in work between November 2005 and May 2006, and projecting to a new completion date." *Id.*

24. Takota responded to the Contracting Officer's Show Cause Notice on May 2, 2006. See Tab 25. Takota's response included the information that a revised schedule had been submitted showing the submittals and initial work preparation period beginning on March 26, 2006, with substantive project work scheduled to begin in mid May 2006. The new projected completion date was projected by Takota to be July 30, 2006, a period of 145 calendar days from the Contracting Officer's March 7, 2006 direction to proceed. *Id.* at p. 4.

25. Takota's response to the Show Cause Notice also included the information that the following submittals had been addressed by Takota within the Contracting Officer's April 4, 2006 deadline: Submittal No. 10 (list of contact personnel, construction schedule, and list of subcontractors); Submittal No. 11 (QC manager and qualifications and QC plan); Submittal No. 12 (accident prevention plan, activity hazard analysis, site safety manager, and environmental plan); Submittal No. 13 (pre-construction survey report); Submittal No. 14 (demolition plan); and Submittal No. 15 (concrete mix designs). See Tab 25, p. 2.

26. Takota also submitted its dewatering plan to the Navy on May 2, 2006. See Tab 26. On May 23, 2006, Takota sent an email to the AROICC asking him to "Please check the

approval status of submittal number 16 (dewatering plan) which was submitted on 5-2-06." See Tab 27.

27. On May 24, 2006, the Contracting Officer issued a Final Decision terminating Takota's contract for default. See Tab 28. The Contracting Officer stated only the following reason for the termination decision: "This action is taken as a result of your failure to make progress to ensure completion of the contract and failure to perform the contract within the specified time." *Id.*

May 2, 2008

Respectfully submitted,

/s/ Robert J. Symon

ROBERT J. SYMON
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150

*Counsel of Record for Plaintiff*
*TAKOTA CORPORATION*

Of Counsel:

JEREMY BECKER-WELTS
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 393-7150