# Tab 7

QORE
PROPERTY SCIENCES

DEC 16 2005

RECEIVED DEC 13 2005

November 22, 2005

Takota Corporation
3017 Palms Springs Way
LasVegas, NV 89102

Attention: Mr. Chad Riley

Subject: Preliminary Geotechnical Report
Hancock Marina Boat Ramps
Marine Corps Air Station
Cherry Point, North Carolina
Job No. R-2133; Report No. 122319

Dear Mr. Riley,

Two professional geotechnical engineers of QORE visited the subject project site on November 3, 2005. The purpose of the visit was to observe and assess the existing site conditions that are relevant to the effectiveness of the temporary cofferdams currently in-place to facilitate dewatering of the work sites for Boat Ramp #1 and Boat Ramp #2. These services were performed in accordance with our confirmatory Proposal No. P05-194, dated November 15, 2005. This report presents the findings of the site visit and our preliminary geotechnical recommendations.

## BACKGROUND INFORMATION

Two temporary cofferdams were recently installed to facilitate dewatering of the work sites. The cofferdam for work site #1 is a portable steel A-frame unit that is draped with heavy sheeting and spans from one bulkhead to another within the limits of construction for Boat Ramp #1. The cofferdam for work site #2 is a water-filled flexible tube that, when filled, rests on the bottom of the impoundment area, extends above the water surface, and seals against the bulkhead at two locations within the limits of construction for Boat Ramp #2.

Mr. Riley indicated to us that dewatering of each impoundment was in progress and significant seepage occurred at each work site where the cofferdam systems butted against the existing bulkheads. Divers were employed by Takota Corporation to observe the integrity of the cofferdams and identify potential areas of leaks. The divers concluded that much of the seepage was most likely due to water flow behind the bulkheads around the ends of the cofferdams.

## SITE RECONNAISANCE

On the date of our site visit, dewatering operations had ceased and the water levels in each work site were at normal levels. To facilitate our assessment of the existing conditions, observation pits were excavated along the backside of the bulkheads opposite the butting ends of the cofferdams.

Generalized cross-sections of the bulkheads, including the subsurface conditions observed behind the bulkheads, were prepared on-site and photographs were taken to document the conditions observed. The cross-sections and photographs are attached.

## FINDINGS

Four different types of bulkheads were observed. One type consists of driven sheet piles with a concrete cap. A second type consists of vertical pre-cast concrete tongue & grove panels with a concrete cap. A third type appears to consist of a former sheet pile and cap bulkhead that has been extended higher in elevation by constructing a second concrete cap directly on top of the first. The fourth type of bulkhead consists of pre-cast concrete tongue & grove panels placed on their sides.

In general, the exposed portions of the driven sheets are significantly rusted and delaminating. We understand that divers found similar conditions underwater. The pre-cast concrete panels appear to fit loosely at a number of locations and have open joints due to the loose fit and/or the loss of mortar from the joints.

The sheet piling wall (bulkhead) along the northeast end of impoundment #1 is deflecting inward. This deflection continues along the bulkhead to the location of temporary cofferdam #1. At this point, the bulkhead cross-section changes to the double-cap bulkhead detail and the caps are separated by as much a five inches a result of the deflection. Voids due to ground settlements below the concrete caps, and due to a loss of soils through open joints are present behind the bulkheads. Groundwater quickly filled our observation pit excavated at the double–cap location.

## PRELIMINARY CONCLUSIONS AND RECOMMENDATIONS

We base the following preliminary conclusions and recommendations based on the site conditions observed on the day of our site visit. Our conclusions and recommendations pertain to groundwater seepage into the specified impoundment areas. Necessary measures to depress the groundwater table below the working grades are not addressed at this time.

In our opinion, the complexity of the voids behind the double-cap wall will be difficult to delineate and "seal-off" to improve the effectiveness of temporary cofferdam #1. In addition, dropping the water level in impoundment #1 will induced additional lateral pressures on the deflecting bulkhead that runs along the northeast end of the impoundment. The increased loadings will likely cause further inward deflection of the bulkhead and possible failure of the sheeting. Previous deflections have already cracked and bowed the alignment of the concrete cap along the bulkhead. In our opinion, the temporary cofferdam should be relocated closer to the work site and the size of impoundment #1 should be reduced to an area sufficient in size to allow the specified scope of work to be successfully completed for Boat Ramp #1. We expect the necessary size would be similar to the limits of construction specified for Boat Ramp #2.

At Boat Ramp #2, groundwater seepage would be expected to enter the work site through the open, loose fitting joints in the pre-cast concrete panels of the bulkhead. On a preliminary basis, we expect that trenching back perpendicular from the bulkhead and placing concrete to form permanent

groundwater "cut-off" walls can reduce much of this seepage. Some localized patching of joints and opening in the panels will likely be required, as well.

In summary, we expect that the methods described above will reduce the flow of groundwater and seepage from behind the bulkheads into the impoundment areas. Other methods of dewatering will be necessary at each work site to sufficiently lower and maintain groundwater levels below the working grades as specified. The local geology consists of Coastal Plain sediments of "clean" sands, silts, and clays. The sand sediments can be very permeable. Pumping from sump pits may not be sufficient. Supplemental field and laboratory testing of the local sediments will be required to facilitate the design of an effective dewatering system, such as well-point systems.

## LIMITATIONS OF REPORT

This report has been prepared for the exclusive use of Takota Corporation for specific application to the subject project as described. Our conclusions and recommendations have been prepared using generally accepted standards of geotechnical engineering practice in the State of North Carolina. No other warranty is expressed or implied. QORE is not responsible for the conclusions, opinions, or recommendations of others based on these data.

Our recommendations are preliminary in that only a limited number of observation pits were completed to assess the existing conditions behind the upper portions of the bulkheads. Once the project moves forward, additional field and laboratory testing will be necessary to provide comprehensive recommendations for dewatering the work sites.

## ACKNOWLEDGEMENT

This completes our preliminary geotechnical report. We appreciate the opportunity to be of service to you on this project and look forward to being of a continued service. Please contact us with any questions pertaining to our services or the content of this report.

Sincerely,
**QORE, INC.**

Thomas B. Baird, P.E.
Geotechnical Engineer

NORTH CAROLINA PROFESSIONAL ENGINEER SEAL 023411 DAVID T. CUNNINGHAM 11.30.05

David T. Cunningham, P.E.
Senior Geotechnical Engineer

QORE™ PROPERTY SCIENCES

JOB Hancock Marine Boat Ramps

SHEET NO. 1 OF 1

CALCULATED BY OTC DATE 11-03-05

CHECKED BY DATE

SCALE Marine Corps Air Station Cherry Point, N.C.




PHOTOGRAPH LOCATION PLAN


Photo 1 – East side of Boat Ramp #2 entrance.


Photo 3 – West side of Boat Ramp #2 entrance (digging Section B).


Photo 2 – Vertical pre-cast panels on east side of Boat Ramp #2 (Section A).


Photo 4 – Vertical sheeting on west side of Boat Ramp #2 (Section B).



Photo 5 – Cofferdam of Boat Ramp #1 impoundment looking west.



Photo 7 – Concrete bulkhead at east end of cofferdam (Section D).



Photo 6 – Cofferdam of Boat Ramp #1 impoundment looking east.



Photo 8 – Back of bulkhead at east end of cofferdam (Section D).



Photo 9 – Vertical timber pole at concrete / sheeting transition.



Photo 11- Deflecting sheeting of bulkhead (Section C).



Photo 10 – Back side of concrete bulkhead to sheeting transition.



Photo 12 – Bow in bulkhead due to inward deflection of sheeting.



Photo 13 – Pre-cast panels stacked 2-high to form bulkhead on south side of Ramp #1 entrance (Section F).



Photo 15 – Other pre-cast panels on north side of Ramp #1.



Photo 14 – Vertical pre-cast panels on north side of Boat Ramp #1 entrance (Section G).



Photo 16 – View of Boat Ramp #1 looking south.

QORE™ PROPERTY SCIENCES

JOB Hancock Marina Boat Ramps
SHEET NO. 1 OF 1
CALCULATED BY DTC DATE 11-03-05
CHECKED BY DATE
SCALE Marine Corps Air Station Cherry Point, N.C.




SECTION LOCATION PLAN

ADM 101

JOB Hancock Marina Boat Ramps
SHEET NO. 1 OF 7
CALCULATED BY OTC DATE 11-3-05
CHECKED BY ______ DATE ______
SCALE Marine Corps Air Station Cherry Point, N.C.

QORE™ PROPERTY SCIENCES




SECTION A

Scale: 1" = 10"

QORE™ PROPERTY SCIENCES

JOB
SHEET NO. 2 OF 7
CALCULATED BY DTC DATE 11-3-05
CHECKED BY DATE
SCALE




SECTION B

Scale: 1" = 10"

QORE™ PROPERTY SCIENCES

JOB

SHEET NO. 3 OF 7

CALCULATED BY DTC DATE 11-03-05

CHECKED BY DATE

SCALE




SECTION C

Scale: 1" = 10"

Bottom

QORE™ PROPERTY SCIENCES

JOB

SHEET NO. 4 OF 7

CALCULATED BY DJC DATE 11-3-05

CHECKED BY DATE

SCALE




SECTION D

Scale: 1" = 10"

QORE™ PROPERTY SCIENCES

JOB

SHEET NO. 5 OF 7

CALCULATED BY DTC DATE 11-3-05

CHECKED BY DATE

SCALE




SECTION E

Scale: 1" = 10"

QORE™ PROPERTY SCIENCES

JOB

SHEET NO. 6 OF 7

CALCULATED BY DTC DATE 11-3-05

CHECKED BY DATE

SCALE




SECTION F

Scale: 1" = 10"

QORE™
PROPERTY SCIENCES

JOB

SHEET NO. 7 OF 7

CALCULATED BY DTK DATE 11-3-05

CHECKED BY DATE

SCALE




SECTION G

Scale: 1" = 10"

# Tab 8

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102
Phone 877-871-0145
Fax 800-665-6693

November 22, 2005

Department of the Navy
Marine Corps Air Station
PSC Box 8006
Cherry Point, NC 28533-0006

SUBJ: Stop Work Contract N62470-05-C-7156, Extend Boat Ramps At Hancock Marina

Dear Contracting Officer,

Takota recently sent the Government notice of a differing site condition and have had no response. Given that Takota is under contract to complete the project and time is running, in the absence of direction otherwise, Takota will treat the differing site condition as a constructive change and proceed with the work by ordering additional cofferdam to enclose just the boat ramp areas so that the contract can be completed without a substantial claim for extended overhead costs.

The work will proceed under the direction of, and with guidance from our Geotech Engineer.

Unless Takota receives written direction otherwise, the additional cofferdams will be placed on order on November 28, 2005. If no change order is issued, Takota reserves the right to request under the changes clause all additional unanticipated costs to work around the differing site condition and the impossibility of completing the contract using the cofferdam set-up as shown within the contract documents and as estimated by Takota Corporation. In addition Takota reserves the right to request costs for delay due to the differing site condition.

If you have any questions, please request a meeting. Hopefully we can all avoid dealing with a claim for any and all additional cost that may arise while dewatering the site, due to this changed condition.

Sincerely,

Chad Riley

Project Manager
Takota Corporation
512-845-2665

cc: Mr. Robert J. Symon, Attorney

# Tab 9

## Gillen, Conrad CIV NAVFAC Lant

**From:** Crite, Antoine LTJG NAVFAC Lant
**Sent:** Monday, November 28, 2005 1:17
**To:** 'Chad Riley'
**Cc:** Gillen, Conrad CIV NAVFAC Lant
**Subject:** RE: Hancock Marina

A meeting can be arranged for Wednesday, December 7th at 9:00 am. Is Takota Corporation available?

Very Respectfully,

Antoine Crite
LTJG, CEC, USNR
AROICC / Construction Project Manager
Resident Officer In Charge of Construction
Marine Corps Air Station Cherry Point
Office: 252.466.4755, Fax: 252.466.4746
E-mail: antoine.crite@navy.mil

-----Original Message-----
**From:** Chad Riley [mailto:chad@takota.com]
**Sent:** Monday, November 28, 2005 12:10
**To:** Crite, Antoine LTJG NAVFAC Lant; Temple, Marsha G CIV LANT ROICC Cherry Point
**Cc:** Doug Reitmeyer; Art Caprario; Symon, Robert
**Subject:** RE: Hancock Marina

Please see the attached letter is response to your email below.

Thanks,

Chad Riley

---

**From:** Crite, Antoine LTJG NAVFAC Lant [mailto:antoine.crite@navy.mil]
**Sent:** Monday, November 28, 2005 10:18 AM
**To:** Chad Riley
**Subject:** RE: Hancock Marina

Mr Riley,
Any equitable adjustments made must be presented to the ROICC Office. It is only after it's review and approval can work proceed.

Very Respectfully,

Antoine Crite
LTJG, CEC, USNR
AROICC / Construction Project Manager
Resident Officer In Charge of Construction
Marine Corps Air Station Cherry Point

# Tab 10

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102
Phone 877-871-0145
Fax 800-665-6693

November 28, 2005

Department of the Navy
Marine Corps Air Station
PSC Box 8006
Cherry Point, NC 28533-0006

SUBJ: Stop Work Contract N62470-05-C-7156, Extend Boat Ramps At Hancock Marina

Dear Contracting Officer,

Please advise whether the government is directing Takota to stop work pending the submission and review of an REA related to Takota's claim that a differing site condition exists with respect to the bulkheads on the above project. Otherwise, Takota has the right to proceed with this additional work to mitigate the risk of delay to project completion. Takota is not aware of any provision in the contract that prevents us from proceeding with this work absent the submission of an REA and the government review of the same. If so, please also direct us to this provision.

Takota once again asserts that a meeting is in order to address this problem. Is the government refusing to meet with us on this issue?

Sincerely,

Chad Riley
Project Manager
Takota Corporation
512-845-2665

cc: Mr. Robert J. Symon, Attorney

# Tab 11

**Brown, Chris**

**From:** Brown, Chris
**Sent:** Tuesday, December 06, 2005 6:02 PM
**To:** 'Cleveland GS12 Elliott P'
**Cc:** Harvey, Steven; Leonard, Matt
**Subject:** FW: Marina CHPT
**Attachments:** IMG_0069.jpg; IMG_0071.jpg

Christopher H. Brown, PE, NSPE
Vice President, Office Manager
Dewberry
2301 Rexwoods Drive
Suite 200
Raleigh, NC 27607
919-881-9939
919-881-9923 fax
919-604-1455 cell
cbrown@dewberry.com
www.dewberry.com

---

**From:** Brown, Chris
**Sent:** Tuesday, December 06, 2005 5:56 PM
**To:** 'Cleveland GS12 Elliott P'; Harvey, Steven
**Cc:** Harvey, Steven; Leonard, Matt
**Subject:** RE: Marina CHPT

Padgett –

We have reviewed the attached documents. Takota offers three solutions summarized below:

a. Government to develop plan to make repairs around the seawall.
b. Terminate contract.
No letter – temporarily dewater around the boat ramps only and dredge the basin in the wet.

Takota also indicate that they are "an emerging Hubzone small business"

We will respond to each solution:

a. May have some merit. If the issue is solely cutting off the flow of water behind the sea wall and contractor is willing to make a good faith effort to repair, then we would not object to a reasonable modification to accomplish the work. We would think the mod would be in the several thousand dollars – up to $10k. This could be considered temporary work. Contractor could also place a sheet pile on both sides of the sea wall and seal from there – the geotech they hired suggested this would work in one location. We think the contractor, or his shoring subcontractor, should be able to provide a solution.
b. No comment. This would be at the discretion of the Government.
No letter – has merit. Our concern would be Contractor damaging work he just placed with the dredging operation.

We are not sure why the status of the contractor in regards to "an emerging Hubzone small business" is an issue with the project.

Our previous comments stand. The dewatering is a means and methods issue and totally the responsibility of the contractor. Differential loading – and support - on the sea wall clearly should have been assumed based on a review of the contract documents during bidding.

In addition, we're not sure an assumption of zero bypass behind the sea wall is at all a reasonable assumption.

We have attached a couple of pictures we took last month. We did not have a shot of the large excavations.

Let us know if you have any other comments.

Christopher H. Brown, PE, NSPE
Vice President, Office Manager
Dewberry
2301 Rexwoods Drive
Suite 200
Raleigh, NC 27607
919-881-9939
919-881-9923 fax
919-604-1455 cell
cbrown@dewberry.com
www.dewberry.com

---

**From:** Cleveland GS12 Elliott P [mailto:ClevelandEP@cherrypoint.usmc.mil]
**Sent:** Thursday, November 17, 2005 9:54 AM
**To:** Brown, Chris; Harvey, Steven
**Subject:** FW: Marina CHPT

Gentlemen: Just got this and am forwarding for your review and comment. We rejected the initial claims of "differing site conditions" early last week and have received this in response. We also visited the site and it does not look like the coffer dam methods chosen are working as they should or as we intended. Have passed on the spec sections you provided but have not seen a shoring plan, has one been submitted to you?

Please let me know what you think when you get a chance. Thank you, Padgett.

Padgett Cleveland, P.E.
Project Manager
FACENG Civil Div
252-466-4717
DSN 584-4717

-----Original Message-----
**From:** Crite, Antoine LTJG NAVFAC Lant [mailto:antoine.crite@navy.mil]
**Sent:** Thursday, November 17, 2005 8:26 AM
**To:** ClevelandEP@cherrypoint.usmc.mil
**Subject:** FW: Marina CHPT

Padgett,
Attached is the latest correspondence from Takota Corporation regarding the Marina. What are your thoughts?

Very Respectfully,

Antoine Crite

# Tab 12

**Crite, Antoine LTJG NAVFAC Lant**

| | |
|---|---|
| **›m:** | Crite, Antoine LTJG NAVFAC Lant |
| **it:** | Friday, January 06, 2006 8:42 AM |
| **.o:** | 'Gainey CIV William N' |
| **Subject:** | RE: Hancock Marina Boat Ramp Replacement Project |

Mr Gainey,
Many apologies; I've been so busy it completely slipped my mind.

Mutual Understanding Meeting Minutes with Takota Corporation
Extend Boat Ramps at Hancock Marina
December 7, 2005

- Introductions
    LTJG Antoine Crite, AROICC
    Conrad Gillen, Engineering Technician
    Marjorie Sadler, Contracting Officer
    Padgett Cleveland, Project Engineer
    Art Caprario, President, Takota
    Chad Riley, Project Manager, Takota
- Read project requirements
- Environmental conditions
    working in a river
    body of water subject to tidal movements
    changes in the water table due to proximity to the ocean
- Assessment: Port-A-Dam (Sheeting) for Ramp One and Hydro Solutions (Bladder Tubes) for Ramp Two
- Takota's dewatering method was chosen to be most cost effective
 Takota did not attend pre-bid site visit; nonetheless, contends that they still would have been unable to determine the
 ent of deterioration to the seawall
 . he Government commented that we were not trying to hide the condition of the seawall, the seawalls were of poor condition and that the worst should be expected -- as
 stated in the contract
- Takota asserts differing site conditions -- it was unknown to them that water would come through the bulkhead
- Takota made no effort to make themselves aware of the conditions; proper consideration was given to the contract
- What will make Sheeting method better? --> Response: pump concrete with seal mix to fill holes
- They abandoned their effort to complete the project -- there was too much water flowing in/out of the ground; erosion made matters worse as they dewatered
- What will make the Bladder method better? --> Response: excavate H-shape trench, fill with concrete
- Are there earlier construction drawings of Hancock Marina?
- Find additional funds to pay for seal along the bulkhead and for additional tarp; the bulkhead must be repaired if project is to be completed

Very Respectfully,

LTJG Antoine Crite
Civil Engineer Corps, USN
AROICC / Construction Project Manager

-----Original Message-----
**From:** Gainey CIV William N [mailto:william.gainey@usmc.mil]
**Sent:** Tuesday, January 03, 2006 9:30
**To:** Crite, Antoine LTJG NAVFAC Lant
**Subject:** Hancock Marina Boat Ramp Replacement Project

LTJG Crite,

When you get a chance, please update me with the status of the referenced project. Last time we spoke, you were preparing for a meeting with the contractor to discuss the project since their damming methods were failing. If you have the minutes from that meeting, please forward them to me. Thanks.

-Will Gainey
EAD 466-5013

****************************
**William N. Gainey, P.E.**
**Environmental Engineer**
**Environmental Affairs Department**
**MCAS Cherry Point NC**
**PSC Box 8006**
**Cherry Point, NC 28533 0006**
**(252) 466-5013**
**DSN 582-5013**
**Fax 466-2000**
**william.gainey@usmc.mil**

| **Tracking:** | **Recipient** | **Read** |
| --- | --- | --- |
| | 'Gainey CIV William N' | Deleted: 1/6/2006 8:44 AM |

# Tab 13

**DEPARTMENT OF THE NAVY**
OFFICER IN CHARGE OF CONSTRUCTION
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION
OFFICER IN CHARGE OF FACILITIES SUPPORT CONTRACTS
MARINE CORPS AIR STATION
PSC BOX 8006
CHERRY POINT, NORTH CAROLINA 28533-0006

January 6, 2005

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102

Subject: Contract N62470-05-C-7156, Extend Boat Ramps at Hancock Marina,
MCAS Cherry Point, North Carolina

Mr Riley:

The meeting held December 7, 2005 did not concern repairing the bulkhead of Hancock Marina. We discussed controlling the amount of water flow to sustain a dry working environment. Excavating behind the bulkhead and filling the trench with concrete was the agreed upon approach. This is the solution the Government Project Engineer, Takota Corporation and myself settled upon at the aforementioned meeting. An engineering design is not necessary or warranted.

The obligation of the Government to make payments required under the provisions of this contract will, at the discretion of the Contracting Officer, be subject to reductions and/or suspensions permitted under the Federal Acquisition Regulation (FAR) and agency regulations including the following per FAR 32.503-6: Reasonable deductions due to defects in material or workmanship. In this particular case, the cofferdams were improperly installed.

The government is well aware that a suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work.

We appreciate your cooperation in accomplishing all contract work in a manner mutually beneficial to both you and the Government.

LTJG Antoine Crite
Civil Engineer Corps, USN
AROICC / Construction Project Manager
Resident Officer In Charge of Construction
Marine Corps Air Station Cherry Point

# Tab 14

# Takota Corporation

3017 Palm Springs Way
Las Vegas, NV 89102
Phone 877-871-0145
Fax 800-665-6693


December 21, 2005

Department of the Navy
Marine Corps Air Station
PSC Box 8006
Cherry Point, NC 28533-0006

SUBJ: Stop Work Contract N62470-05-C-7156, Extend Boat Ramps At Hancock Marina

Dear Contracting Officer,

This letter is to advise you that due to the unknown nature of the bulkhead damage, Takota has not been able to obtain reliable and fixed pricing information to perform the repairs necessary to the bulkhead so that dewatering efforts can be certain to succeed.

Until the nature and extent of the damage is known, a precise estimate cannot be furnished. Takota suggests that the Government issue a "Not to Exceed" Change Order for design efforts. Once a design is in place, the Government can issue a Not to Exceed Change Order for the construction effort, or perhaps, we will be in a better position to price the remedial work.

In the interim, consider the following: Engineered design efforts not contemplated by the contract will cost Takota $90.00/hr. not including associated allocable markups. Please be advised, however, that Takota will not assume any design responsibility or liability if the recommended design does not work. We are essentially dealing with "mud" which is fluid by nature, and not easily controlled. The effort to engineer a solution is something that should be done in collaboration with the Government's engineering team and the outside selected Geotech engineering team.

As discussed in our meeting on December 7, 2005, trench laid concrete placed behind the bulkhead in 2 locations on Ramp #2 may be one approach to fix the problem. The cost of concrete procured and pumped into location is being quoted at $300 per cubic yard. In addition, a dive team would have to be on site to repair any voids in the bulkhead as needed to complete the dewatering. This expense is $2,300 a day plus the cost of any materials for any of the bulkhead repair. Obviously, this is just a portion of the costs that will be incurred in an effort to dewater the area so that the project can be done as intended. Takota's allowable and allocable costs will necessarily include, but not be limited to, extended performance costs and other impacts.

Finally, this issue continues to delay Takota and the company is entitled to a time extension until this matter is resolved as well as for any additional time required for performance of the remedial work.

Please contact the undersigned at your earliest convenience on how you wish Takota to proceed.

Thank you,

Chad Riley
Project Manager
Takota Corporation
512-845-2665

cc: Mr. Robert J. Symon, Attorney

# Tab 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

TAKOTA CORPORATION, :

Plaintiff, :

v. : Case No. 06-553C

THE UNITED STATES, : (Senior Judge Burggink)

Defendant. :

----------------------------X

Deposition of ANTOINE CRITE

(Taken by Plaintiff)

Cherry Point, North Carolina

August 23, 2007

Deposition of ANTOINE CRITE, taken by the Plaintiff, at MCAS Cherry Point, Building 163, Cherry Point, North Carolina, on the 23rd day of August, 2007 at 1:15 p.m., before Glynde M. Jones, Notary Public and Court Reporter.

APPEARANCES

For the Plaintiff:

ROBERT J. SYMON, Esq.
Bradley, Arant, Rose & White, LLP
1133 Connecticut Avenue, NW
12th Floor
Washington, DC 20036
(rsymon@bradleyarant.com)

For the Defendant:

PAMELA J. NESTELL, Esq.
Naval Facilities Engineering Command
Litigation Office
720 Kennon Street SE
Room 136
Washington Navy Yard, DC 20374-5051
(pamela.nestell@navy.mil)

Also present:

Chris Newton, Fleet Readiness Center East
MILCON Project Manager



CONTENTS

THE WITNESS: ANTOINE CRITE EXAMINATION
BY MR. SYMON 5

EXHIBITS


| For the Plaintiff | | PAGE |
|---|---|---|
| 15 | Basis of Design | 31 |
| 16 | A/E Contract N62470-98-D-6218 Cost Estimate | 34 |
| 17 | Geotechnical Report | 38 |
| 18 | Photographs | 40 |
| 19 | Photographs | 45 |
| 20 | Photographs | 50 |
| 21 | Memorandum of Call with Attachments | 54 |
| 22 | Preconstruction Plans | 56 |
| 23 | Contractor Production Report | 60 |
| 24 | Contractor Production Report | 62 |
| 25 | 11-22-05 Letter from Mr. Riley | 79 |
| 26 | 11-28-05 Letter from Mr. Riley | 81 |
| 27 | Series of E-mails | 86 |
| 28 | E-mail | 98 |
| 29 | Series of E-mails | 98 |




EXHIBITS (CONT.)


| | | |
|---|---|---|
| 30 | Series of E-mails | 100 |
| 31 | Series of E-mails | 101 |
| 32 | E-mail | 103 |
| 33 | E-mail | 106 |
| 34 | 2-6-06 Handwritten Notes | 110 |
| 35 | 3-7-06 Letter from Ms. Sadler | 115 |




PROCEEDINGS

ANTOINE CRITE

was called as a Witness, and after having first been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows: (1:15 p.m.)

EXAMINATION

BY MR. SYMON:

Q Lieutenant Crite, my name's Bob Symon. I'm counsel for Takota Corporation. I'd like you to state your full name for the record, please.
A My full name is Antoine Crite.
Q And what is your current rank?
A My current rank is lieutenant junior grade.
Q Could you please give your home address for the record, please?
A My home address is 120 Dawn Court, Havelock, North Carolina.
Q Zip code?
A 28532.
Q What is your current position with the Navy?


©2007

Page 106

Q Would you look at Exhibit 11, please? Take a few seconds to review that and refresh your memory. Do you recall this letter, --
A Yes.
Q -- Lieutenant?
A Uh-huh.
Q Exhibit 11 is a letter from you dated January 6th, and your letter says 2005, but I think you'll agree with me it was actually 2006.
A Yeah. That seems to be a typo.
Q And it's to Takota and it says the meeting held December 7th did not concern repairing the bulkhead of Hancock Marina. We discussed controlling the amount of water flow to sustain a dry working environment. Excavating behind the bulkhead and filling the trench with concrete was the agreed upon approach. This is the solution the Government project engineer, Takota Corporation and myself settled upon at the aforementioned meeting. An engineering design is not necessary or warranted.
In the last paragraph, you write the Government is well

Page 107

aware that a suitable time extension is needed and will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work. Do you see that?
A Yes, I do.
Q Based upon this correspondence, would you agree with me that Takota and the Navy had an agreement that it would excavate behind the bulkhead and fill that trench with concrete and that they would submit an REA for the additional time and money associated with that work?
A At the conclusion of this meeting, we agreed that this was a possible approach, and the reason that I told them to submit a cost proposal is to discover the amount that it would take to actually perform this agreed upon approach.
Now, there is no definite way of me knowing that the funding would be available to proceed with this, but, of course, this was the idea that we had. Okay, we have a possible solution. We both agreed upon that this would be a possible solution. At this point, submit a cost proposal. I will go to the funding agency of this base

Page 108

to see if they have enough money -- well, enough contingency funds to proceed with this approach. If they did not, then we can't do it.
Q Who did you go to?
A I went to EAD, Environmental Affairs Department.
Q What did you find out?
A That they did not have additional funding for it.
Q So they had no money for the work, so now you've got to renege on the deal, right?
A We didn't -- it wasn't a renege on the deal because I told them that I do not know if -- because I tell this to all my contractors. Submit your cost proposal. I will submit the fund request to the appropriate funding agency. If they say they don't have funding, then we can't do the work. This has happened before. This is not new to me, and that's why I explained this to them. That's why I need a --
Q Where does it say in Exhibit 11 that this is all contingent upon funding?
A It doesn't say that in the letter. This

Page 109

was spoken to them directly.
Q Isn't it true that after you found out that you didn't have the funding for this work that you reneged the deal -- reneged on the deal?
A No, because I don't agree that it was a deal, because I told them.
Q What did you tell 'em? I don't see anything in Exhibit 11 other than an agreement that this is a solution, go submit an REA and we'll negotiate what the time extension and dollars will be at a later date. It doesn't say anything about --
A Yes. I agree that it is not written in the letter.
Q In the first full paragraph, you also state at the end an engineering design is not necessary or warranted. Do you see that?
A Yes.
Q Isn't it true that the reason why you didn't want that was because you were concerned that if there was any redesign work you'd have to go through the permitting process all over again?
A No.

 ©2007

Q Let's go to the second page of the strategy meeting.
A Uh-huh.
Q It says Ken blank LANT says they have filed a claim and that will go through claim process. Do you see that?
A Uh-huh.
Q In the next sentence, it says in meantime, issue T for D based on FAR clause. What does that mean to you?
A Really just what it says, that the contractor has issued a claim. It's going to be, I guess, some time for it to go through the claim process, and then up until that time, issue a T for D -- the Government -- issue a T for D --
Q So --
A -- based on FAR clause.
Q So on February 6, 2006, it was the Navy's intention to issue a T for D to Takota?
A By this memo, yes.
Q Do you know whose notes these are?
A No.



Q At that point in time, did you tell Takota you intended to terminate their contract for default?
A No, because I believe at this time as in the e-mail -- stated all correspondence was to go through Steve Ericson.
Q Do you know if Steve Ericson picked up a phone and told Takota that the Government had decided to issue a termination for default?
A I don't know. I don't know if he did or not.
Q Was there any consideration at this time of a time extension to Takota's contract for the time period when all the investigation and back and forth was going on about, you know, whether to go forward with a different method of work where you would dig a trench behind the seawall and pour concrete?
A I think that was discussed and -- at the meeting, and then also I know it was brought up in the February meeting.
Q But ultimately the Navy just decided to issue a T for D?
A It seems.



Q Do you recognize these notes? Are they yours?
A No.
Q Do you recognize the handwriting?
A No.
Q Did the Navy ever issue Takota a time extension?
A No.
MR. SYMON: Mark this next one, please. (Whereupon Exhibit 35 was marked for identification.)
BY MR. SYMON:
Q Okay. Exhibit 35 is a letter dated March 7, 2006 to Takota --
A Uh-huh.
Q -- directing Takota to immediately resume work on the subject contract. Do you see that?
A Yes.
Q In the second paragraph, it says the completion date of this project has passed. The Government has neither waived the completion date nor rights to assess liquidated damage. Takota's further



refusal or failure to prosecute the work required under the contract may result in the Government exercising its right to terminate the right to proceed with the work. Do you see that?
A Yes.
Q This is March 7, 2006.
A Uh-huh.
Q Isn't it true that by this date the Navy had already decided to terminate Takota's contract for default?
A That decision was based off Takota issuing a claim because normally when a contractor -- issue a claim, they're not going to do any more work for anybody.
MR. SYMON: I have no --
A I guess that's probably why it --
MR. SYMON: I have no further questions.
MS. NESTELL: You have no further questions?
MR. SYMON: (Nodded in the negative.)

CERTIFICATE

I, Glynde M. Jones, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of the witness's knowledge touching and concerning the matters in controversy in the cause; that the witness was thereupon examined under oath, and the examination reduced to typewriting under my direction; and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand and seal.

GLYNDE M. JONES, NOTARY PUBLIC

Notary Public Number: 20022120063

**DEPARTMENT OF THE NAVY**
OFFICER IN CHARGE OF CONSTRUCTION
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION
OFFICER IN CHARGE OF FACILITIES SUPPORT CONTRACTS
MARINE CORPS AIR STATION
PSC BOX 8006
CHERRY POINT, NORTH CAROLINA 28533-0006

11000
N62470-05-C-7156
05 December 2005

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102

Ladies and Gentlemen:

Subject: CONTRACT N62470-05-C-7156, EXTEND BOAT RAMPS AT HANCOCK MARINA, MARINE CORPS AIR STATION, CHERRY POINT, NORTH CAROLINA

ROICC CHPT recently received and reviewed your Application of Payment Invoice. With all things considered, including a pending constructive change, line item four (4) is retained, an amount of $78,500.00. Though delivered and visibly installed, it fails to function properly. Payment of the line item, of course, will be processed and rendered if the situation is amended.

We appreciate your cooperation in accomplishing all contract work in a manner mutually beneficial to both you and the Government.

Sincerely,

Antoine Crite
LTJG, CEC, USNR
AROICC / Construction Project Manager
Resident Officer In Charge of Construction
Marine Corps Air Station Cherry Point

# Tab 16

1030 NOV 29 2005

NAVAL FAICLITIES ENGINEERING COMMAN—
CONTRACTOR'S INVOICE

INVOICE DATE: NOVEMBER 23, 2005
INVOICE NUMBER 02

FROM: TAKOTA CORPORATION
3017 PALM SPRINGS WAY
LAS VEGAS NV 89102

POC/Telephone/email for this invoice: ____________

TO: CG MCAS CHERRY POINT
OIC, NAVFAC CONTRACTS
PSC BOX 8006
CHERRY POINT, NC 28533-0006

1. Below is a Statement of Performance under Contract N62470- 05-C-7156 for Extend Boat Ramps at Marine Corps Air Station, Cherry Point, NC 28533-0006.
(Complete Contract Title)

The enclosure provides breakdown of this statement of performance.

| | |
|---|---|
| A. Total value of contract/task order through change | $ 463,000.00 |
| B. Percentage of performance complete 35.19 | |
| C. Value of complete performance | $ 130,000.00 |
| D. Less total of prior payment | $ 0.00 |
| E. Amount of this invoice | $ 130,000.00 |

Signature and Title [signature] President
Signature of Authorized Representative

FIRST ENDORSEMENT 7 DECEMBER 2005

FROM: CG MCAS CHERRY POINT, FACILITIES, OIC NAVFAC CONTRACTS, PSC BOX 8006, CHERRY POINT, NC 28533-0006
TO: DFAS-COLUMBUS

1. Payment is recommended as follows:

| | |
|---|---|
| A. Amount of work complete to (date) | $ 162,945.00 |
| B. Less: | |
| Retention $78,500.00 (LINE ITEM 4) | $ 78,500.00 |
| Other Deductions $ | |
| C. Subtotal | $ 84,445.00 |
| D. Less previous payments | $ 32,945.00 |
| E. Certified amount for payment # 2 | $ 51,500.00 |
| F. Elapsed contract time (if applicable) | |

2. Prompt Payment Certification PAYMENT TERMS: NET 14 DAY PROGRESS PAY

| | |
|---|---|
| A. Responsible Certifying UIC | N62470 |
| B. Invoice Receipt Date | 11/29/05 |
| C. Material/Services Receipt Date | 11/29/05 |
| D. Material/Services Acceptance Date | 11/29/05 |
| E. Date forwarded to paying office | 12/7/05 |

F. The services billed for on this invoice are hereby approved.

3. I certify that the accounting data provided is accurate, funds have been obligated in appropriate accounting system and changes have been applied to the appropriate classification reference number (ACRN), available funds have been decremented for the amount approved for disbursement and will not be de-obligated and the above invoice is correct and proper for payment.

Signature: [signature] Date: 12/7/05
Signature of Authorized Representative
Name and Title: MARSHA TEMPLE, CONTRACT SPECIALIST DSN: 582-5930
Phone and address: ROICC OFFICE, PSC BOX 8006, CHERRY POINT, NC 28533-0006

LINE(S) OF ACCOUNTING TO BE USED FOR THIS INVOICE SDN NO:
M0014605RCF0510
AA 1751106 27A0 000 00146 0 067443 2D 000000 FEFECICF0510 $51,500.00

TRANSMISSION VERIFICATION REPORT

TIME : 12/07/2005 07:48
NAME : OIC NAVFAC CONTRACTS
FAX : 2524665749
TEL : 2524665930
SER.# : BROJ2J697935

| | |
|---|---|
| DATE,TIME | 12/07 07:47 |
| FAX NO./NAME | DFAS COLUMBUS |
| DURATION | 00:00:30 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

103098 NOV 29 2005

NAVAL FAICLITIES ENGINEERING COMMAND
CONTRACTOR'S INVOICE

INVOICE DATE: NOVEMBER 23, 2005
INVOICE NUMBER 02

FROM: TAKOTA CORPORATION
3017 PALM SPRINGS WAY
LAS VEGAS NV 89102

POC/Telephone/email for this invoice: ______

TO: CG MCAS CHERRY POINT
OIC, NAVFAC CONTRACTS
PSC BOX 8006
CHERRY POINT, NC 28533-0006

1. Below is a Statement of Performance under Contract N62470- 05-C-7158 for Extend Boat Ramps at Marine Corps Air Station, Cherry Point, NC 28533-0006.
(Complete Contract Title)

The enclosure provides breakdown of this statement of performance.

A. Total value of contract/task order through change ______ $ 483,000.00
B. Percentage of performance complete 35.19
C. Value of complete performance $ 130,000.00
D. Less total of prior payment $ 0.00
E. Amount of this invoice $ 130,000.00

Signature and Title [signature] President
Signature of Authorized Representative

FIRST ENDORSEMENT 7 DECEMBER 2005

FROM: CG MCAS CHERRY POINT, FACILITIES, OIC NAVFAC CONTRACTS, PSC BOX 8006, CHERRY POINT, NC 28533-0006LUMBUS
TO: ______

1. Payment is recommended as follows:
A. Amount of work complete to (date) ______ $ 162,945.00
B. Less:
Retention $ 78,500.00 (LINE ITEM 4)
Other Deductions $ ______ $ 78,500.00
C. Subtotal $ 84,445.00
D. Less previous payments $ 32,945.00
E. Certified amount for payment # 2 $ 51,500.00
F. Elapsed contract time (if applicable)

CERTIFICATION FOR PROGRESS PAYMENT

I hereby certify, to the best of my knowledge and belief that --

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; and

(3) This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

Arthur Caprario

(NAME) Arthur Caprario

President

(TITLE)

November 23, 2005

(DATE)

# APPLICATION AND CERTIFICATE FOR PAYMENT

PAGE ONE OF TWO PAGES

From Contractor: Takota Corporation, 3017 Palm Springs Way, Las Vegas, NV 89102 (877) 871-0145
TIN: 88-0505848 EFT: Routing 122401778 Account 0120091569 Bank West of Nevada
DUNS: 040189909

TO OWNER:
Department of the Navy
Attn: Connie Turner
Bldg 163 Curtis Road
Marine Corps Air Station
Cherry Point, NC 28533-0006
Phone: 252-466-4751

PROJECT NAME: Extend Boat Ramps @ Hancock Marina, Marine Corps Air Statin, Cherry Point, NC
CONTRACT NO.: N62470-05-C-7156

Application Date: 11/23/05
INVOICE/APPLICATION #: 2
PERIOD TO: 10/31/05
PROJECT NO.: 194

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.

| | | |
|---|---|---|
| 1 ORIGINAL CONTRACT SUM | | $463,000.00 |
| 2 Net Change by Change Orders | | $0.00 |
| 3 CONTRACT SUM TO DATE | | $463,000.00 |
| 4 TOTAL COMPLETED & STORED TO DATE | | $162,945.00 |
| 5 RETAINAGE this period | | |
| a._____% of Completed Work | $ | |
| b._____% of Store Material | $ | |
| Total Retainage (Line 5a + 5b) | | 0.00 |
| 6 TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total) | | $162,945.00 |
| LESS PREVIOUS CERTIFICATES FOR PAYMENT | | 32,945.00 |
| 7 (Line 6 from prior Certificate) CURRENT PAYMENT DUE | | $130,000.00 |
| 8 BALANCE TO FINISH, INCLUDING RETAINAGE 9 (Line 3 less Line 6) | $300,055.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown is herein now due.

CONTRACTOR:

By: [signature] Date: 11/23/2005

Arthur Caprario

**Takota Corporation**
**Our Project No.** 194
**Application for Payment No.** 2
**Application Date:** 11/23/05

**Project Name:** Extend Boat Ramps @ Hancock Marina, Marine Corps Air Statin, Cherry Point, NC
**Contract No.** N62470-05-C-7156

| Line Item No. | Description of Work | Quantity | Percent of project | Scheduled Value | Previous Period | This Period | Stored Materials | Total Complete | % Complete | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bonds | | 1.72% | $7,945.00 | $7,945.00 | $0.00 | | $7,945.00 | 100.00% | $0.00 |
| 2 | Mobilization | | 0.00% | $0.00 | $0.00 | $0.00 | | $0.00 | 100.00% | $0.00 |
| 3 | Demobilization | | 0.00% | $0.00 | $0.00 | $0.00 | | $0.00 | 100.00% | $0.00 |
| 4 | Coffer Dams Delivered and installed | 500 lf | 16.95% | $78,500.00 | $0.00 | $78,500.00 | | $78,500.00 | 100.00% | $0.00 |
| 5 | Coffer Dams removed | 500 lf | 5.29% | $24,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $24,500.00 |
| 6 | Install 5 electrical poles | 5 | 2.16% | $10,000.00 | $0.00 | $10,000.00 | | $10,000.00 | 100.00% | $0.00 |
| 7 | Install 4 new lighting fixtures | 4 | 2.27% | $10,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $10,500.00 |
| 8 | Install 1 new electrical panel | 1 | 1.84% | $8,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,500.00 |
| 9 | trench 700 lf and install new conduit and pull wire | 700 lf | 6.37% | $29,500.00 | $0.00 | $29,500.00 | | $29,500.00 | 100.00% | $0.00 |
| 10 | Dredge approx. 30 tons of material | 30 tons | 2.59% | $12,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $12,000.00 |
| 11 | Install 1700 sy of asphalt | 1700 sy | 8.21% | $38,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $38,000.00 |
| 12 | Install 1700 sy of stone base | 1700 sy | 4.95% | $23,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $23,000.00 |
| 13 | Fine Grade 1700 sy for Asphalt | 1700 sy | 1.73% | $8,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,000.00 |
| 14 | Demo/Cleanup Ramps and Old Ruel Tank Area | | 6.05% | $28,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $28,000.00 |
| 15 | Concrete Ramp Prep of subgrade | | 1.96% | $9,055.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $9,055.00 |
| 16 | Install 200 tons of Rip Rap | 200 tons | 2.38% | $11,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $11,000.00 |
| 17 | Install 280 pieces of steel for concrete ramps | 280 piece | 0.86% | $4,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $4,000.00 |
| 18 | Placing 200 tons of stone on the prep subgrade | 200 tons | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 19 | Setting Forms and Stripping Form for Ramps | | 1.08% | $5,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $5,000.00 |
| 20 | Purchasing, Placing and Finishing Concrete for Ram | 100 yds | 6.70% | $31,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $31,000.00 |
| 21 | Approx. 1220 sf of New Docks installed | 1220 sf | 7.34% | $34,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $34,000.00 |
| 22 | Drive 40 piles for docks | 40 piles | 8.64% | $40,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $40,000.00 |
| 23 | 700 lf of Trubitidity Barrier delivered to site | 700 lf | 5.40% | $25,000.00 | $25,000.00 | $0.00 | | $25,000.00 | 100.00% | $0.00 |
| 24 | 700 lf of Trubitidity Barrier installed | 700 lf | 2.59% | $12,000.00 | $0.00 | $12,000.00 | | $12,000.00 | 100.00% | $0.00 |
| 25 | 700 lf of Trubitidity Barrier removed | 700 lf | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 26 | Demo old wooden Docks and Removal from Site | | 1.84% | $8,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,500.00 |
| 27 | Asbuilts O&M's | | 0.22% | $1,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $1,000.00 |
| | | | | $0.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | Original Contract Amount | | 100.00% | $463,000.00 | $32,945.00 | $130,000.00 | $0.00 | $162,945.00 | 35.19% | $300,055.00 |
| | TOTAL with changes | | 100.00% | $463,000.00 | $32,945.00 | $130,000.00 | $0.00 | $162,945.00 | 35.19% | $300,055.00 |

# CONSTRUCTION INVOICE

FIRST AND FINAL PAYMENTS PROCESS IN FOUR DAYS. INTERIM PAYMENTS PROCESS IN TWO DAYS. KEEP IT MOVING. **HAND CARRY TO THE NEXT PERSON.** PLACE IN THE MIDDLE OF DESK, NOT IN AN "IN" BASKET.

Contract No. 05-C-7156

Contractor Dakota

Invoice No 1

Time and Date Received

1030 NOV 29 2005

ROUTING ORDER:

Initial - Time/Date

(1) ADMIN logs in — 1045 11-29-2005

(2) Inspector Gillen
Verify Completed Work/Sign Monthly Estimate

(3) AROICC/AREICC Crite — AC 12/5/05
Verify Administrative Requirements:
Progress Schedule, Amount of Retention

(4) Invoice Prepared — Cpt 12/7/05

(5) Contract Specialist — Mgt 12/7
Sign Invoice and Letter

(6) Invoice Processed

Date Stamp and Mail Invoice
File route sheet in Contract Payment File

Remarks:

BOD Date

CCD Date

LD's

Retainage $ 78,500.00