# Tab 17

**Symon, Robert**

**From:** Doug Reitmeyer [doug@takota.com]
**it:** Monday, January 16, 2006 1:56 PM
**.:** antoine.crite@navy.mil
**Cc:** Art Caprario; Chad Riley; jan@takota.com; gerrym@portadam.com; SBannert@HydrologicalSolutions.com; Symon, Robert
**Subject:** FW: Govt determinations - Takota Corporation project - Attachment of another bulkhead/seawall project being performed by Takota

**Attachments:** Proper bulkhead construction.doc

Proper bulkhead construction.d...

Dear LTJG Antoine Crite:

As I understand our conversation this past Thursday, the Government is taking the position that neither of the cofferdams was installed correctly. And on that basis, the Government has refused to make any payment to Takota for all the work that was done attempting to dewater the lagoons, even though the lagoons have bulkheads with obvious defects. Takota is relying on the Government's position that the cofferdams were installed incorrectly and refusing to pay the companies that supplied and installed them, just as the Government has refused to pay Takota for this work. This does not mean that Takota agrees with the Government's position.

.. ther, you made the statement that the bulkheads had "deadman" anchors and recently replaced cables or tie-backs holding the existing bulkhead so there should not be concern of potential bulkhead failure. Your stated conclusion is interesting given the following:

1. The Portadam divers said that the existing metal bulkhead was so deteriorated at the bottom that they could grab it and it would just break off into their hands.

2. Takota made numerous requests for either drawings, details, plans or specs for the existing bulkheads and was told that there are not any.

3. There are at least several different types of materials that make up various sections of the bulkhead including steel sheet piling (extremely deteriorated), wood piles (extremely deteriorated), cast in place concrete, precast beams, precast flat panels and precast tongue-in-groove concrete sections, some of which have gaps up to 5" between them.

4. At ramp 2 – The West side bulkhead is made up of steel sheet piles. The East side bulkhead is made up of vertical precast concrete panels. Behind the precast of the East side there was a large void where the soils had already been washed away. It was obvious that had Takota keep the pumps running, all the soils behind the precast would have quickly been washed away.

So my question to you is simple: Exactly who are these "experts" you are relying on when make the statement that the cofferdams were not installed correctly? Takota requests specifically the names and phone numbers of the expert or experts so that Takota's attorney can take their deposition and/or seek sworn statements of determination. Hydrosolutions and Portadam, two of the best known companies in the business, are

demanding payment now and they are going to want to know who the "experts" are that the Government believes know more than the engineers at their respective companies when it comes to cofferdam installation.

will await the conference call that you wanted to put off until this week with your engineering staff to discuss the technical issues involved in following the Government's direction. Hopefully, the Government experts will also provide direction that will prevent further damage to the existing facility and various bulkheads.

In the meantime, the Government has the responsibility under fundamental principles of contract law to mitigate damages. In that regard, please tell us exactly which, if not all, of the following items should be immediately discontinued:

Scotsman trailer $300/month plus tax

Rental on boat $1,000/mo. plus tax to maintain turbidity barrier

Rental of Hydrosolutions dam $16,000/month plus tax

Portadam $5,140/month, but if continued, the 3rd month and every month thereafter $3,425 (plus tax)

Delay costs of overhead $193.14/day

Project Superintendent $4,300 x 1.25 labor burden, total $5,375/month

Interest on the unpaid bills because the Government failed to make payment for the work that was completed.

Sincerely, Doug Reitmeyer

# Tab 18

TAKOTA CORPORATION
3017 Palm Springs Way
Las Vegas, NV 89102
Phone 1-877-871-0145, Fax 1-800-665-6693

February 1, 2006
Faxed to (252) 466-5749, emailed and sent by US Mail

**Department of the Navy**
Marsha Temple, Contracting Officer
**Marine Corps Air Station**
**Bldg 163 Curtis Road**
**Cherry Point, NC 28533-0006**

Re: Contract N62470-05-C-7156, Extend Boat Ramps at Hancock Marina, MCAS Cherry Point, North Carolina

Subj: ***Request for Contracting Officer's Final Decision***

Dear Marsha Temple:

This letter concerns the Navy's improper withholding of $78,500.00 due under Takota Corporation's ("Takota") pay application dated November 1, 2005.

Apparently, the Navy contends that this amount is not due because it contends the cofferdam installation is defective. However, to date, the Navy has failed to furnish Takota any information in support of this allegation, despite repeated requests.

As stated in the attached letter (Exhibit A) dated January 11, 2006 to LTJG Antoine Crite by our attorney, Mr. Robert J. Symon, Takota discovered, after installation of the cofferdam for Dock "A", a differing site condition with respect to the existing bulkheads.

Below waterline examination by divers, photos, and an independent report by a geotechnical engineer amply prove that these bulkheads have deteriorated to a state that the cofferdams installed by Takota cannot accommodate a dry working area because of the amount of water flowing through them.

Thus, the failure of the dams is predicated on no fault of Takota. Indeed, Takota is not aware of any defective material and/or workmanship with respect to the installation of the coffer dams.

The Navy has not reasonably justified the withholding of $78,500.00 owed Takota and therefore, such amount should be immediately released to Takota. If not, Takota requests that the Contracting Officer issue a final decision with respect to this payment demand within sixty (60) days of receipt of this letter.

Additional damages beyond this request are being accrued as the Navy has failed to provide direction regarding the ongoing rental and site costs that Takota is suffering. If those damages are not relieved by change order, then additional claims will be filed to cover those costs as well.

If you have any questions, please call me directly at 702-253-2717.

Sincerely,
TAKOTA CORPORATION

Arthur Caprario, President

Enclosures
cc: Robert J. Symon, Esq.
Chad Riley, Project Superintendent
Doug Reitmeyer, Project Manager



238

# Tab 19

File 5823
2/6/06
Page 1 of 2

Strategy Mtg (2 pm)

Steve
Asco
Crite

Danny
Margie
Marsha

Phil
Conrad (late arrival / left early)

# Permit Issue

Corps permit expires May 2006
What is involved in renewal? ← FED to answer

13 Nov Gov't direction — use sheet piling in lieu of other temporary measures

15 Nov Field Observation Report QORE (geotech) sided w/ Ktor

## Timeline

Awarded 23 July — Arrive on site 3 Oct
Stopped 20 October
Gov't response 2 Nov Gov't AE determine no reason not to dewater (no differing site conditions) → Sent Gov't response by email

Ktor should perform & then claim
Not walk off site

3 Nov Contractor Geotech Visits & Gov't received response

13 Nov
15 Nov

Mtg w/ Ktor 7 Dec Method laid out to continue

First Assertion Water entering thru /Seawall/ Bulkhead/ Date 27 Oct ± ?
2nd Assertion /Bulkhd/ Seawall will fail if he dewaters " ?

Danny took pics showing almost no water in basin w/ no /bulkhd/ Seawall failure

2/6/06
page 2 of 2

Strategy Mtg

Ken ________ LANT
says they have filed a claim
& that will go thru claim process

In meantime, issue T for D (based on FAR clause)

Cancel Tele Conference because we have claim

Drawback → Still have to get work done

→ No other alternatives to proceed & get work w/ this Contractor because
(1) Let them go too far with methodology they used (sheet & sheet dewatering)
(2) Let them stop work w/o using T for D (~~Show cause~~) (cure notice) to get them back to work
(3) We have claim from them in our hands

Marjie thinks his claim will be easy to deny

Possible Longer Term → Rfer can take his claim & T for D to next higher level

# Tab 20

**DEPARTMENT OF THE NAVY**
OFFICER IN CHARGE OF CONSTRUCTION
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION
OFFICER IN CHARGE OF FACILITIES SUPPORT CONTRACTS
MARINE CORPS AIR STATION
PSC BOX 8006
CHERRY POINT, NORTH CAROLINA 28533-0006

11000
March 07, 2006

Takota Corporation
3017 Palm Springs Way
Las Vegas, Nevada 89102

Gentlemen:

SUBJECT: Notice to Resume Work on N62470-05-C-7156 Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina

Takota is directed to immediately resume work on subject contract. The work stoppage appears related to the dewatering and shoring requirements. Takota is reminded that all contract requirements remain in effect, including, but not limited to, submission of the following submittals: Geotechnical Engineers Report; Dewatering Plan; and Shoring and Sheeting Plan. A list of submittals Takota has not yet submitted, or that must be resubmitted, is attached.

The completion date of this project has passed. The Government has neither waived the completion date, nor its rights to assess liquidated damages. Takota's further refusal or failure to prosecute the work required under the contract may result in the Government exercising its right to terminate the right to proceed with the work. See FAR Clause 52.249-10 Default (Fixed Price Construction).

Please note that the Government cannot make progress payments against lump sum items listed on the schedule of prices. To address the outstanding issue of progress payments for the cofferdams, we request Takota submit a revised schedule of prices to address the cofferdams and any other items listed as lump sum.

Sincerely,

Marjorie Sadler

MARJORIE SADLER
Contracting Officer

Attachment

cc: Robert J. Symon, Esq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue NW 12th Floor
Washington, DC 20036

LIST OF SUBMITTALS

Per Section 01310N, part 1.3.1, updated list of contact personnel.

Start Partnering Level C (Section 01310N, part 1.6).

Per section 01150N, para 3.1, resubmit list of all water craft.

Per section 01150N, para 3.1, request permission from Contracting Officer to use the marina and waterways.

Per Section 01330, part 1.3, maintain submittal register.

Per Section 01450N, part 1.5, submit the QC Manager and his qualifications.

Per Section 01450N, part 1.6, re-submit the QC Plan (note requirement to conduct weekly QC meetings and notify the contracting officer of the time and date per Section 01450, para 1.9).

Per Section 01525, part 1.8, re-submit the Accident Prevention Plan (APP).

Per Section 01525, part 1.9, re-submit the Activity Hazard Analysis (AHA).

Per Section 01525, part 1.13.5, submit crane reports.

Per Section 01525 part 1.2, submit crane critical lift plan

Per Section 01525 part 1.2, submit crane work plan

Per Section 01525 part 1.2, submit proof of qualifications for crane operators

Per Section 01525, part 1.6.1.1, submit name and qualifications of Site Safety and Health Officer (within APP).

Per Section part 1.6.1.2, submit name of their confined space entry person (within APP).

Per Section part 1.6.1.3, submit name of their health hazard control and respiratory protection person (within AHA).

Per Section 01575, part 1.5.1, submit Pre-Construction Survey Report

Per Section 01575 part 1.5.2, submit solid waste disposal permit

Per Section 01575 part 1.5.7, submit erosion and sediment control inspection reports

Per Section 01575, part 1.7.2, obtain licenses and permits pursuant to the permits and responsibilities

Per Section 01575, part 1.3 and 1.9, re-submit the revised environmental plan (Section 01575).

Per Section 01575N part 1.7.3, submit Construction dewatering Plan. If using well points for dewatering - submit well construction and abandonment records and well driller certificates, Section 01575, para 1.7.3

Obtain licenses and permits pursuant to the permits and responsibilities FAR clause - See Section 01575,

Per Section 01575, part 1.9, submit the revise environmental plan - should show dewatering and shoring activities as well as the personnel changes.

LIST OF SUBMITTALS (continued)

Per Section 02220, part 1.3 submit the demolition plan:

Per Section 02300, part 1.3 and 3.6, submit pre-construction submittal for Shoring
Per section 02300, part 1.3 and 3.3.3, submit the Dewatering Work Plan
Per section 02300, part 1.8, submit the Offspoil site
Per section 02300, part 3.6.1, submit Shoring and Sheeting Plan
Per section 02300, part 3.6.2, provide the inspection services and reports for the Geotechnical Engineer

Per Section 02461, para 3.1.2.2, submit pile installation records each day after each pile installation day.

Per Section 02741N, para 1.3.5, re-submit the concrete mix design.

Per Section 03311, para 1.6.3.1, submit concrete mixture test reports.

# Tab 21

DEPARTMENT OF THE NAVY
OFFICER IN CHARGE OF CONSTRUCTION
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION
OFFICER IN CHARGE OF FACILITIES SUPPORT CONTRACTS
MARINE CORPS AIR STATION
PSC BOX 8006
CHERRY POINT, NORTH CAROLINA 28533-0006

11000
March 24, 2006

Takota Corporation
3017 Palm Springs Way
Las Vegas, Nevada 89102

Gentlemen:

SUBJECT: 2nd Notice to Resume Work on N62470-05-C-7156 Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina

Takota was directed by letter dated March 7, 2006 to immediately resume work on the subject contract. Specifically, your firm was instructed to resume work by providing the submittals required under the contract. As of this date, your company has not provided the required submittals. You are directed to provide the Geotechnical Engineers Report, Dewatering Plan, Shoring and Sheeting Plan, Progress Schedule, Quality Control Plan, and the revised Schedule of Prices no later than April 4, 2006 with the remaining submittals due no later than April 18, 2006. Takota's failure to comply with either deadline will further indicate a refusal or failure to prosecute the work required under the contract, and will compel the Government to consider exercising its right to terminate the right to proceed with the work. See FAR Clause 52.249-10 Default (Fixed Price Construction). All contract terms and conditions remain in full force and effect.

Please note that although the completion date of this project has passed, the Government has neither waived the completion date, nor its rights to assess liquidated damages.

Sincerely,

Marjorie Sadler

MARJORIE SADLER
Contracting Officer

cc:

Robert J. Symon, Ewq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue NW 12th Floor
Washington, DC 20036

Guarantee Company of North America
Attn: Mike Bowan
1000 Town Center, Suite 1800
Southfield, Michigan 48075

# Tab 22

**Crite, Antoine LTJG NAVFAC Lant**

| | |
|---|---|
| **m:** | Crite, Antoine LTJG NAVFAC Lant |
| **it:** | Friday, March 31, 2006 3:24 PM |
| **Io:** | Sadler, Marjorie B. CIV LANT ROICC Cherry Point |
| **Subject:** | Cherry Point Marina |

Takota Corporation
3017 Palm Springs Way
Las Vegas, Nevada 89102

SUBJECT: Contract N62470-05-C-7156, Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina

Gentlemen:

We acknowledge receipt of your March 29, 2006 and March 31, 2006 letter confirming your position and intentions regarding the referenced contract. As it stands, you previously proceeded with work without the submission of all the required submittals. Although technically a separate correspondence, the award letter is generally assumed to be the "notice to proceed" unless otherwise stated. The term "notice to proceed" should not be confused with starting construction. Rather it authorizes the Contractor to begin the submittal process and the procurement of materials to be used. Construction, which constitutes physical work of any kind, begins after submittals are approved. Compliance with established administrative procedures must be followed in the execution of the contract. Please refer to our letter dated March 7, 2006 for a list of the required contract submittals.

hen notified of Mr Sydes arrival at MCAS Cherry Point, it was made clear that preparing the required reconstruction submittals and contacting subcontractors would be the extent of his visit until work commenced. We were not properly notified of the Geotechnical Team's arrival for purposes of issuing base badges. Furthermore, as stated under Section 01140N, 1.3 Security Requirements, subparts 1.3.1 and 1.3.2, in order to gain legal access to MCAS Cherry Point and obtain an identification badge each contractor employee is required to submit the following information: 1) documentation of a criminal records check from the state or county covering the previous two years, 2) picture identification, 3) proof of employment. The Geotechnical Team's involvement on 29 March 2006 constitutes work. The Government is eager to complete this project but Base and ROICC policies and procedures will be followed.

Submission of preconstruction submittals is prerequisite to beginning on-site work, of any kind, at any capacity. This is especially true when working in Hancock Creek. As a reminder, in Section 01150N, 3.1 Harbor Waterways, permission to use Hancock Creek waterways must be attained from the Contracting Officer along with a list describing the crafts used, including sizes, types, numbers and boat crews. As discussed with your Project Manager and in accordance with contract clause DFAR 252.236-7002, Obstruction of Navigable Waterways, the turbidity curtains are considered obstructions within navigable waterways and must be mark or buoyed until removed. The contract drawings (Sheet C-06) state that each Standard Containment Systems Light Buoy is to contain an automatic flashing light (on at dusk, off at dawn). If you should have any questions regarding this matter, please, do not hesitate to contact the undersigned.

Marjorie Sadler
Supervisory Contracting Specialist
sident Officer in Charge of Construction
rine Corps Air Station Cherry Point
Phone: (252) 466-4750 Fax: (252) 466-5749
mail: marjorie.sadler@navy.mil

**Sadler, Marjorie B. CIV LANT ROICC Cherry Point**

**From:** Sadler, Marjorie B. CIV LANT ROICC Cherry Point
**Sent:** Wednesday, March 29, 2006 8:18 AM
**To:** 'Doug Reitmeyer'
**Subject:** RE: Getting the job going - Boat Landings at Cherry Point
**Signed By:** marjorie.sadler@navy.mil

Doug:

I have checked with my AROICC and ET who were unaware that Rick and the Geotechnical Engineer were onsite. Please have your people make contact with LTJG Crite of our office so we start back to work on the right foot. I hate to state the obvious but I want there to be no missteps here...no actual work onsite can be performed until the required submittals have been submitted and approved and then work will proceed only after their is a Superintendent, and a Quality Control person on site to oversee the work.

Marjorie Sadler
Supervisory Contracting Specialist
Resident Officer in Charge of Construction
Marine Corps Air Station Cherry Point
Phone: (252) 466-4750 Fax: (252) 466-5749
Email: marjorie.sadler@navy.mil

-----Original Message-----
From: Doug Reitmeyer [mailto:doug@takota.com]
Sent: Monday, March 27, 2006 20:35
To: rick sydes
Cc: Scott Bannert; gerrym@portadam.com; Sadler, Marjorie B. CIV LANT ROICC Cherry Point; Crite, Antoine LTJG NAVFAC Lant; Ericson, Stephen C CIV NAVFAC MidLant; Aseo, Arturo A LCDR NAVFAC Lant; Temple, Marsha G CIV LANT ROICC Cherry Point; Symon, Robert; Chad Riley; art@takota.com; dcunningham@qore.net; jan@takota.com
Subject: RE: Getting the job going - Boat Landings at Cherry Point

Rick,

By copy of this email to the Government, Takota is reserving its right to a differing site conditions claim. Rick is on-site and is addressing the differing site condition and dewatering with the Geotech engineering team.

The way I am seeing the job right now is that the problem is the rubble that is behind the seawall. The rubble is allowing the water that is coming through the deteriorated seawall to travel, washing out the soils behind the seawall and then entering the area that Takota has attempted to dewater. The only way to stop that water is to put something that will block it.

Attached are two drawings that describe placement of concrete barriers behind the seawall. This will become part of the dewatering plan - Cut a total of three trenches - all are to be 18" to 24" wide by 10' to 15' long by 10' deep. Two of them at 90 degree angles to the seawall and one directly behind the seawall and parallel to it where the water was flowing back at an unacceptable rate. Dig out the trenches and immediately fill them with concrete.

Put the above into the equation. Any questions, please give me a call.

Sincerely, Doug Reitmeyer

-----Original Message-----
From: rick sydes [mailto:ricks@takota.com]
Sent: Sunday, March 26, 2006 3:48 PM
To: Doug Reitmeyer
Cc: Art Caprario
Subject:

doug

here is the final draft proposal from QORE which reflects my request as addressed in my earlier email. is this a GO? i need to sign and return to dave and he will need a few days to set up and mobilize the crew. the plan was to get this done this week so we can then work on the dewatering plan.

in addition the draft letter i sent needs to be sent to the CO first, as it is the foundation for the change order i will be requesting along with a copy of this proposal.

let me know
rick


= WATER STOPS
WATER
RAMP
RAMP


B-1
B-2
B-3
B-4
B-5
HA-1
HA-2
HA-3
HANCOCK CREEK

# Tab 23

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102
Phone 702-253-2717, Fax 702-253-0634

March 30, 2006
Faxed to 252-466-4746 and sent by email

Ms. Marjorie Sadler, Contracting Officer
Department of the Navy
Officer in Charge of Construction
Resident Officer in Charge of Construction
Marine Corps Air Station
PSC Box 8006
Cherry Point, NC 28533-0006

Subject: Contract N62470-05-C-7156, Extend Boat Ramps at Hancock Marina
Submittals and your letter dated 7 March 06

Dear Contracting Officer:

In regards to submittal requirements and your of March 7, 2006, please see comments that have been incorporated within the attachment of your letter as follows:

LIST OF SUBMITTALS

1. Per Section 01310N, part 1.3.1, updated list of contact personnel.

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

2. Start Partnering Level C (Section 01310N, part 1.6).

Response: See note at the specification identified. Not an applicable submittal requirement.

3. Per section 01150N, para 3.1, resubmit list of all water craft.

Response: If watercraft are determined to be necessary, Rick Sydes will provide a submittal.

4. Per section 01150N, para 3.1, request permission from Contracting Officer to use the marina and waterways.

Response: This specification requires the contractor to essentially "Obtain permission to use the waterways" which is essentially a request to do the work. When Chad Riley requested a formal

Notice To Proceed letter, he was told (and this was confirmed by email) that Cherry Point only provides an NTP verbally. Mr. Antoine Crite sent an email to Mr. Riley confirming that he had given verbal NTP.

5. Per Section 01330, part 1.3, maintain submittal register.

Response: The original submittal register was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

6. Per Section 01450N, part 1.5, submit the QC Manager and his qualifications.

Response: This was submitted but because things have now changed, it will be resubmitted to update the information.

7. Per Section 01450N, part 1.6, re-submit the QC Plan (note requirement to conduct weekly QC meetings and notify the contracting officer of the time and date per Section 01450, para 1.9).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information. In addition, it will be revised to include the name of our selected registered professional engineer to address the requirements of Specification section 01575N, 1.7.2.

8. Per Section 01525, part 1.8, re-submit the Accident Prevention Plan (APP).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

9. Per Section 01525, part 1.9, re-submit the Activity Hazard Analysis (AHA).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

10. Per Section 01525, part 1.13.5, submit crane reports.

Response: Not applicable at this time. Takota may not use a crane on this project.

11. Per Section 01525 part 1.2, submit crane critical lift plan

Response: Not applicable at this time. Takota may not use a crane on this project.

12. Per Section 01525 part 1.2, submit crane work plan

Response: Not applicable at this time. Takota may not use a crane on this project.

13. Per Section 01525 part 1.2, submit proof of qualifications for crane operators

Response: Not applicable at this time. Takota may not use a crane on this project.

14. Per Section 01525, part 1.6.1.1, submit name and qualifications of Site Safety and Health Officer (within APP).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

15. Per Section part 1.6.1.2, submit name of their confined space entry person (within APP).

Response: This was addressed by the submitted and approved safety plan. For this contract, there is no confined spaces to enter.

16. Per Section part 1.6.1.3, submit name of their health hazard control and respiratory protection person (within AHA).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

17. Per Section 01575, part 1.5.1, submit Pre-Construction Survey Report

Response: Rick Sydes will address this by submittal.

18. Per Section 01575 part 1.5.2, submit solid waste disposal permit

Response: Rick Sydes will ask Waste Industries, the local disposal company, if this is something that they have previously provided Cherry Point.

19. Per Section 01575 part 1.5.7, submit erosion and sediment control inspection reports

Response: According to the referenced specification, the Government was to provide the form to the Contractor at the pre-construction conference. The Government did not do so. Please provide the form to Rick Sydes and he will submit it in accordance with the contract requirements.

20. Per Section 01575, part 1.7.2, obtain licenses and permits pursuant to the permits and responsibilities

Response: The Government provided the permits within the contract documents.

21. Per Section 01575, part 1.3 and 1.9, re-submit the revised environmental plan (Section 01575).

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the information.

22. Per Section 01575N part 1.7.3, submit Construction dewatering Plan. If using well points for dewatering - submit well construction and abandonment records and well driller certificates, Section 01575, para 1.7.3

Response: Not applicable at this time. Takota may not use well points for dewatering. A revised dewatering plan is being developed to address the differing site conditions and will submit it for approval. The Government cannot use the submittal review process to change the contract, i.e., to say that unless the contractor changes the submittal, the Government won't approve it.

23. Obtain licenses and permits pursuant to the permits and responsibilities FAR clause - See Section 01575,

Response: The Government provided the permits within the contract documents.

24. Per Section 01575, part 1.9, submit the revise environmental plan - should show dewatering and shoring activities as well as the personnel changes.

Response: This was submitted and approved on September 27, 2005. Because things have now changed, it will be resubmitted to update the personnel information. However, this specification section makes no mention of dewatering or shoring activities. Unless the Contracting Officer changes the contract, the environmental plan will not address these activities.

25. Per Section 02220, part 1.3 submit the demolition plan:

Response: Rick Sydes will address this by submittal.

26. Per Section 02300, part 1.3 and 3.6, submit pre-construction submittal for Shoring

Response: This was submitted and approved on September 27, 2005 as part of Takota's safety plan. Because things have now changed, it will be resubmitted.

27. Per section 02300, part 1.3 and 3.3.3, submit the Dewatering Work Plan

Response: Rick Sydes will address this by submittal that will take into consideration the differing site conditions as the Government has been previously notified.

28. Per section 02300, part 1.8, submit the Offspoil site

Response: Rick Sydes will address this by submittal.

29. Per section 02300, part 3.6.1, submit Shoring and Sheeting Plan

Response: This was submitted and approved on September 27, 2005 as part of Takota's safety plan. Because things have now changed, it will be resubmitted.

30. Per section 02300, part 3.6.2, provide the inspection services and reports for the Geotechnical Engineer

Response: The Government has the geotechnical reports that Takota has already provided. Rick Sydes will address this by formal submittal of revised reports that take into consideration additional engineering related to solving the problems caused by the differing site conditions.

31. Per Section 02461, para 3.1.2.2, submit pile installation records each day after each pile installation day.

Response: No piles have been installed. Rick Sydes will address this by submittal when the time comes.

32. Per Section 02741N, para 1.3.5, re-submit the concrete mix design.

Response: This was submitted and approved by the Government and Dewberry & Davis on October 5, 2005. What is there to resubmit?

33. Per Section 03311, para 1.6.3.1, submit concrete mixture test reports.

Response: This was submitted and approved by the Government and Dewberry & Davis on October 5, 2005. What is there to resubmit?

I trust you will contact the undersigned if you have any questions.

Very truly yours,

Arthur V. Caprario
President,
Takota Corporation

cc: Rick Sydes
Chad Riley
Doug Reitmeyer

# Tab 24

**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING COMMAND, MID-ATLANTIC

IN REPLY REFER TO:

ROICC
PSC Box 8006
Cherry Point, NC 28533-0006

11000/ROC
N62470-05-C-7156
April 20, 2006

Takota Corporation
3017 Palm Springs Way
Las Vegas, Nevada 89102

Gentlemen:

SUBJECT: SHOW CAUSE - N62470-05-C-7156 Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina

In our letters of 7 March 2006 and 24 March 2006, you were directed to immediately resume work on subject contract. More specifically, by 4 April 2006, you were directed to provide the following critical path submittals: Geotechnical Engineers Report, Dewatering Plan, Shoring and Sheeting Plan, Progress Schedule, Quality Control Plan and the revised Schedule of Prices with all remaining submittals to be provided by 18 April 2006. We have received no response from you on the remaining submittals that were due 18 April 2006. With regards to the submittals that were to be provided by 4 April 2006, the status is as follows:

(1) Geotechnical Engineers Report: Acknowledge receipt on 24 March 2006; Government review and approval pending, Contractor did not submit previously.

(2) Dewatering Plan: Required by Section 01575N, Part 1.7.3 and Section 02300, Part 1.3 and 3.3.3, to date has not been received.

(3) Shoring & Sheeting Plan: Required by Section 02300, Part 1.3 & 3.6; Safety Plan was submitted and approved on 27 September 2005. While your safety plan does make reference to the EM-385-1-1 USACOE Safety Manual, "bracing and shoring will be in accordance with the requirement as stated on EM-385-1-1", this does not constitute a shoring and sheeting plan, in the detail and specificity required by Section 02300 nor does it represent the scope and magnitude of this phase of the contract.

(4) Progress Schedule: Required by Section 01200N, Part 1.3.1. Schedule was previously submitted and approved, however schedule needs to be revised to reflect the delay in work between November 2005 and May 2006, and projecting to a new completion date.

(5) Quality Control Plan: QC Plan was submitted and approved on 27 September 2005. A revised QC Plan was received on 4 April 2006 and is being reviewed to ensure Contractor has updated information to reflect changes in personnel and certifications.

(6) Schedule of Prices: Required by the Price & Payment Procedures Section 01200, Part 1.3.1. You previously submitted a Schedule of Prices and following lengthy discussions

regarding your refusal to use the prescribed format for Schedule of Prices outlined by our office it was approved on 25 October 2005 with a cover letter reminding you that "no payment would be made for lump sum items until all work has been accomplished and inspected." The Government has afforded you the opportunity to submit a revised Schedule of Prices on numerous occasions including our meeting on 28 February 2006. This opportunity was offered in good faith by the Government so that we may explore legitimate opportunities to make progress payments for services rendered. By your letters of 7 March 2006 and 24 March 2006, you have declined the opportunity to submit a revised Schedule of Prices.

As you recall, ROICC Cherry Point hosted a meeting on 28 February 2006 with all construction, contracting and engineering subject matter experts of Takota Corporation, ROICC Cherry Point, Facilities Engineering Department, MCAS Cherry Point, and NAVFAC Atlantic. The intent of the meeting was to discuss relevant issues associated with subject contract and provide an opportunity to come to a mutual understanding and find solutions to complete this contract. The Government met in good faith and continually referenced specific contract requirement that had/have not been met by Takota. It became readily apparent to all in attendance at this meeting that Takota representatives had no intention of working towards mutual resolution, but rather to repeatedly state their unsubstantiated position of differing site conditions to the point of being antagonistic and combative. After two hours, CDR Chris Newton, the Resident Officer in Charge of Construction and facilitator of the meeting, terminated the meeting due to NO positive progress.

Please note that we reject your position that a differing site condition exists and do not concur with any and all statements (both directly stated, written or implied) to substantiate that position. In accordance with Section 00700 Contract Clauses, FAR 52.223-1 Disputes, you submitted a claim that has been forwarded to the Contracting Officer for a Final Decision. The Contracting Officer's Final Decision on your claim will be issued April 28, 2006.

In addition to the very serious issues outline above, the safety of your construction site at Hancock Boat Ramps needs to be immediately addressed. As your project manager, Mr. Rick Sydes, is well aware, on 5 April 2006, two (2) panels of your Aqua-barrier system freed themselves from your construction site and were adrift in Hancock Creek for approximately 8 hours. These large panels eventually wrapped themselves around the entrance channel marker to Hancock Creek and completely blocked the channel causing a serious hazard to navigation. Our office immediately contacted Mr. Sydes and directed him to take immediate action to retrieve the panels. While his initial actions seemed earnest, in the end, your company had no plan for such a contingency and was unable to retrieve the panels in a timely fashion. It was only due to dedicated efforts of the ROICC staff and military personnel at the Navy Boat Docks that the navigation hazard was recovered. Additionally, extensive coordination with the U. S. Coast Guard was required. You are hereby reminded of your contractual responsibilities outlined in Section 01150N, Part 3.1.1 DFARS Clause 252.236-7002 Obstruction of Navigable Waterways. Equally important, in accordance with the EM385-1-1, you are reminded of your responsibilities to maintain a safe and secure worksite to prevent unsafe conditions from developing.

Your limited response to our previous request for critical submittals outlined in subject contract and the language in your letters of 29 March 2006 and 30 March 2006 indicate a lack of

understanding of the requirements in this contract. Moreover, your request for a Termination for Convenience as stated in your letters of 10 January 2006 and 29 March 2006, coupled with your failure to provide the required submittals and refusal to resume work to complete the project in a timely manner indicate you have repudiated performance.

Since you have repudiated performance of Contract N62470-05-C-7156 the Government is considering terminating the contract for default pursuant to Section 00700, FAR 52.249-10 Termination for Default. Pending a final decision in this matter, it will be necessary to determine whether failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to myself with ten (10) days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

Any assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purposes of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

Sincerely,

Marjorie Sadler

MARJORIE SADLER
Contracting Officer

cc:

Guarantee Company of North America
Attn: Mike Bowan
1000 Town Center, Suite 1800
Southfield, Michigan 48075

Small Business Administration
6302 Fairview Road, Suite 300
Charlotte, North Carolina 28210-2227

# Tab 25

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102
Phone 1-877-871-0145, Fax 800-665-6693

May 2, 2006
Hand delivered

Department of the Navy
Marjorie Sadler, Contracting Officer
Marine Corps Air Station
PSC Box 8006
Cherry Point, NC 28533-0006

RE: Contract N62470-05-C-7156 Extend Boat Ramps at Hancock Marina
Response to Show Cause dated 4-20-06

Dear Ms. Sadler:

This letter constitutes the response of Takota Corporation ("Takota") to your Show Cause letter dated April 20, 2006. As you are aware, Takota contends that this project has been delayed due to a differing site condition and we reserve our right to submit a claim. Dealing with this condition and coordinating the necessary additional work is having and will continue to have a negative impact on the construction schedule. Nevertheless, here is the status of the outstanding submittals in response to your notice.

The borings/samples necessary to obtain the lab testing required to develop the dewatering plan were taken on March 28, 2006. This information was not provided within the contract documents. As was addressed in Takota's March 24, 2006 letter to you, Takota informed you that as soon as the dewatering plan was developed and approved, we would immediately remobilize our forces. That is still the case.

QORE Engineering (Takota's geo technical engineering subcontractor) just completed the dewatering plan for Takota on May 2, 2006 and it will be submitted to the Navy within the next couple of days. A temporary shoring and sheeting plan based upon the findings of the soil borings/lab test and the dewatering plan will not be required.

While the Navy is correct that a revised progress schedule was not resubmitted, Takota did submit a new schedule along with the other submittals on April 4, 2006. [refer to submittal number 10. item no. 2] In addition, a revised schedule which more accurately reflects the findings of the dewatering plan is attached.

Four listed submittals, the solid waste permit, the list of watercraft, the offsite spoils, the installation of piles, are still outstanding and will be submitted prior to when the need is determined. These particular submittals have no immediate impact on the current work or progress of the work.

Critical submittals were addressed as requested by April 4 2006. [refer to submittals nos. 10, 11 12, 13, 14, 15.] Those submittals contained the following information:

Submittal No. 10
A] list of contact personnel
B] construction schedule
C] list of subcontractors

Submittal No. 11
A] QC manager and qualifications
B] QC plan

Submittal No. 12
A] accident prevention plan
B] activity hazard analysis
C] site safety manager
D] environmental plan

Submittal No. 13
A] pre-construction survey report

Submittal No. 14
A] Demolition plan

Submittal No. 15
A] concrete mix designs

Takota is proceeding as stated in our March 24, 2006 letter to you but circumstances dictate and warrant the delays. Indeed, you were informed at that time [reference paragraph two] that Takota's performance "is going to be delayed and impacted by efforts to resolve the differing site condition so that, hopefully, dewatering efforts will succeed when we re-start pumping."

With regards to your statement of "antagonistic and combative" behavior by Takota at a meeting on February 28, 2006 to discuss the differing site condition, Takota greatly disagrees with this characterization. Consider the circumstances; Takota was informed after representatives traveled from all over the country that no differing site condition existed and that the Navy was unwilling compromise on this position. Furthermore, in return for dropping the claim, the Navy offered to pay Takota amounts undisputedly due. When Takota refused to submit to this tact, the meeting was abruptly adjourned by the Navy.

This "show cause" letter has ignored all the items/issues previously stated in our March 24, 2006 response to you. In addition, being one day late on the dewatering plan which you were notified to expect on the 19th of April as per our revised schedule submitted to you on April 4, 2006 [and without comment by the government to date, I might add] does not warrant a "show cause" letter on the 20th of April.

Regardless of the Navy's mistaken belief, Takota is proceeding as outlined in this and prior correspondence with the intent of completing this project as previously addressed. Our site supervisor is now back on site and work shall be progressing as noted in the attached schedule. In

addition Mr. Rick Sydes, Takota's project manager, is also onsite to get things underway as efficiently as possible.

As regards the schedule of values, you have not provided a single contractual justification for not paying each line item in accordance with the payment clause of the contract – the clause that states that the Government will pay the contractor on a percentage completion basis. By suggesting that the Navy will only pay a line item when it is 100% complete is an unauthorized change to the Federal Acquisition Regulation (FAR) regarding payments to contractors for work complete. If the Navy continues to refuse to make proper payments, Takota will file claims for Prompt Payment Act interest.

With regards to your concerns regarding the Aqua Barriers which came loose I wish to make the following comments:

- As you are aware, heavy winds and rains passed through the area which pushed the aqua barriers into the water way.
- It should also be noted that these aqua barriers did not "come loose", but were deliberately untied by unknown persons.
- After Takota retrieved and re-secured the aqua barriers they have since been once again deliberately untied and the ropes removed by unknown persons. The ropes were completely removed in 3 separate locations. Takota has once again re-secured the aqua barriers with the hope that additional vandalism/actions will not continue to take place.

Finally, Takota is not in the habit of engaging in a letter writing campaign. Notwithstanding the Navy's refusal to address the differing site condition problem, Takota is doing so under protest and managing the problem in a timely fashion given its resources. If you have any concern, Takota requests that you contact the undersigned to discuss the issues rather than drafting written correspondence which take resources away from the "real" problem on this project (i.e., redesigning the project to deal with a differing site condition).

Signed by Rick Sydes, Project Manager for

Arthur V. Caprario, President
Takota Corporation

cc: Rick Sydes
Doug Reitmeyer
File T194

Attachments: Revised schedule

EXTEND BOAT RAMPS HANCOCK MARINA
CHERRY POINT N.C.

| ID | Task Name |
|---|---|
| 1 | remobilization |
| 2 | samples/test/borings[CO] |
| 3 | submit dewatering plan |
| 4 | repair seawall breach[CO] |
| 5 | install survey nails |
| 6 | install sw benchmark |
| 7 | install piezometers |
| 8 | procure deadmen |
| 9 | install sw eyebolts |
| 10 | procure well point sub |
| 11 | design well point system |
| 12 | install well point system |
| 13 | reinstall turbidity curtains |
| 14 | reinstall cofferdams |
| 15 | dewater work area |
| 16 | dredge sumps areas |
| 17 | |
| 18 | sawcut/demo ramps |
| 19 | grade/place stone for base |
| 20 | set forms |
| 21 | place/tie steel |
| 22 | place/finish concrete |
| 23 | strip forms |
| 24 | place riprap |
| 25 | |
| 26 | remove old docks |
| 27 | drive piles |
| 28 | build dock platforms |
| 29 | |
| 30 | remove contain walls/piers |
| 31 | fill area w/dirt |
| 32 | seed area |
| 33 | |
| 34 | trench conduits |
| 35 | prep poles w/conduit lights |
| 36 | set poles |
| 37 | pull wires |
| 38 | test lights |
| 39 | |
| 40 | site work |
| 41 | install asphalt |
| 42 | final inspection |




Project: SCH Cp revised reflect geo de
Date: Mon 5/1/06

Task | Split | Progress | Milestone | Summary | Project Summary | External Tasks | External Milestone | Deadline

# Tab 26

**CONTRACTOR'S SUBMITTAL TRANSMITTAL**

LANTDIV NORFOLK 4-4355/3 (Rev. 11-99)

CONTRACT NO. N62470-05-C-7156 | TRANSMITTAL NO. 16 | 5/2/2006

M CONTRACTOR TAKOTA CORPORATION

EXTEND BOAT RAMPS AT HANCOCK MARINA CHERRY POINT, NC

MARJORIE SADLER

**CONTRACTOR USE ONLY**

*List only one specification division per form.*

*List only one of the following categories on each transmittal form, and indicate which is being submitted*

[ ] Contractor Approved [ X ] Government Approval [ ] Variation for Government Approval

**REVIEWER USE ONLY**

***ACTION CODES*
*A-Approved*
*D-Disapproved*
*AN-Approved as noted*
*RA-Receipt Acknowledged*
*C-Comments*
*R-Resubmit*

| ITEM NO. | PROJ. SPEC. SECT. & PARA. and/or PROJ. DWG. NO. ** | ITEM IDENTIFICATION (Type, size, model no., Mfg. name, dwg. or brochure number) | NO. OF COPIES | ACTION CODES ** | REVIEWER'S INITIALS CODE AND DATE |
|---|---|---|---|---|---|
| 1 | 01575N/02300 | DEWATERING PLAN | 5 | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

TRACTOR'S COMMENTS

COPY OF TRANSMITTAL AND SUBMITTALS TO ROICC

CONTRACTOR REPRESENTATIVE (Signature)

DATE RECEIVED BY REVIEWER | FROM (Reviewer) | TO

[ ] Submittals are returned with action indicated. Approval of an item does not include approval of any variation from the contract requirements unless the contractor calls attention to and supports the variation.

[ ] Submittals are forwarded to ROICC with A-E recommendations indicated in REVIEWER USE ONLY section and in comments below on ONE COPY of the transmittal form.

REVIEWER'S COMMENTS

COPIES TO:
ROICC (2)
LANTDIV (1)
A-E (1)

DATE

SIGNATURE

QORE

PROPERTY SCIENCES

May 2, 2006

Mr. Rick Sydes
Takota Corporation
3017 Palms Springs Way
Las Vegas, Nevada 89102

Subject: Report of Supplemental Subsurface Exploration
Hancock Marina Boat Ramps
Marine Corps Air Station
Cherry Point, North Carolina
File No. R-2133; Report No. 123468

Dear Mr. Sydes,

QORE, Inc. completed this supplemental geotechnical exploration report for the subject project in accordance with our Proposal No. P06-038 dated March 24, 2006. QORE previously completed a site visit in November 2005 and prepared geotechnical recommendations pertaining to the existing site conditions that are relevant to the temporary dewatering of the work areas at Boat Ramp #1 and Boat Ramp #2. The report was entitled "Preliminary Geotechnical Report, Hancock Marina Boat Ramps, Marine Corps Air Station, Cherry Point, North Carolina, File No. R-2133, Report No. 123319, dated November 22, 2005".

The purpose of this supplemental exploration was to explore the soil and groundwater conditions at the site and provide subsurface data and geotechnical recommendations to assist Takota Corporation in the preparation of a temporary dewatering plan to execute the work. This report also presents procedures for documenting the existing position of the deflecting seawall, procedures for monitoring the seawall for movements during construction, and procedures for short-term stabilization of the seawall if movements are observed during construction. After you have reviewed our report, we recommend a telephone conference to discuss our recommendations.

## PROJECT INFORMATION

The project entails the renovation and extension of two existing boat ramps at Hancock Marina located at the Marine Corps Air Station in Cherry Point, North Carolina. The scope of the project includes but is not limited to the installation of a temporary cofferdam at Boat Ramp #1 and at Boat Ramp #2, dewatering of each work site, demolition of existing ramps and docks, construction of new ramps and docks, dredging, and re-compaction of the lagoon (basin) bottom within the construction limits of worksite #1.

Two temporary cofferdams were recently installed to facilitate dewatering of the work sites. The cofferdam for work site #1 is a portable steel A-frame unit that is draped with heavy sheeting and spans from one bulkhead to another within the limits of construction for Boat Ramp #1. The cofferdam for work site #2 is a water-filled flexible tube that, when filled, rests on the bottom of the impoundment area, extends above the water surface, and seals against the bulkhead at two locations within the limits of construction for Boat Ramp #2.

Four different types of bulkheads exist. One type consists of driven sheet piles with a concrete cap. The exposed portions of the driven sheets are significantly rusted and delaminating. We understand that divers found similar conditions underwater. A second type consists of vertical pre-cast concrete tongue & grove panels with a concrete cap. The pre-cast panels appear to fit loosely at a number of locations and have open-joints due to the loose fit and/or the loss of mortar from the joints. A third type appears to consist of a sheet pile and cap bulkhead that has been extended higher in elevation by constructing a second concrete cap directly on top of the first. The fourth type of bulkhead consists of pre-cast concrete tongue & grove panels placed on their sides.

The sheet piling wall (bulkhead) along the northeast end of impoundment #1 is deflecting inward. This deflection continues along the bulkhead to the location of temporary cofferdam #1. At this point, the bulkhead cross-section changes to the double-cap bulkhead detail and the caps are separated by as much a five inches a result of the deflection. Voids due to ground settlements below the concrete caps, and due to a loss of soils through open joints are present behind the bulkheads. Groundwater quickly filled an observation pit excavated at the double–cap location.

Dewatering of each work area commenced and significant seepage occurred at each work site where the cofferdam systems butted against the bulkheads. Divers were employed by Takota Corporation to observe the integrity of the cofferdams and identify potential areas of leaks. The divers concluded that much of the seepage was most likely due to water flow behind the bulkheads.

## AREA GEOLOGY

The site is in the Coastal Plain Physiographic Province. The Coastal Plain is underlain with wedge-shaped deposits of Cretaceous and younger sediments that range in thickness from near zero at the contact (the Fall Line) with the Piedmont Physiographic Province along its northwest edge to thousands of feet at the coast. Coastal Plain soils are marine deposits that range in age from as old as 130 million years near the "Fall Line" contact with ancient continental rocks to recent deposits near the coast. They contain various materials including interbedded gravels, sands, silts, and clays, soft to hard limestones, and organics such as peat.

## EXPLORATION METHODS

The subsurface conditions were explored on March 29, 2006 through the completion of five soil test borings along the existing bulkheads (seawalls) in the areas of Boat Ramp #1 and Boat Ramp #2 and three hand auger borings in the lagoon (basin) at Boat Ramp #1. The boring locations were selected by QORE and the approximate boring locations are shown on the attached Boring

Location Plan. The ground surface elevations at the soil test boring locations were interpolated from the existing topography contours shown on the site plan and these approximate elevations are noted on the boring records.

The test borings completed along the existing bulkheads were advanced to depths of about 20 feet below the ground surface using a using a conventional rotary drill rig. Hollow stem augers were employed to case the borings. Soil sampling and testing were performed in general accordance with ASTM D1586 "Standard Test Method for Split-Barrel Sampling and Penetration Testing of Soils". The standard penetration testing was done with a rope and cathead actuated hammer.

The hand auger borings located in the lagoon (basin) at Boat Ramp #1 were advanced to depths of about 5 feet below the water surface. These borings were completed by working off the deck of a pontoon boat. Schedule 40 PVC pipe was driven into the bottom sediments to case the boreholes and expedite sampling of the materials encountered.

Laboratory tests were performed on some of the test boring soil samples to determine their index properties for engineering purposes and aid in classification. These included tests for natural moisture content, percent of particles finer than the U.S. Standard No. 200 mesh sieve, and Atterberg limit determinations. The liquid limit of the suspect organic material was determined a second time, after over drying the sample to a constant weight, to determine if it was organic in nature. The results of these laboratory tests are listed below.

| Boring # | Depth (ft.) | Moisture Content (%) | Atterberg Limits | | | % finer than No. 200 sieve | U.S.C.S. Classification |
|---|---|---|---|---|---|---|---|
| | | | LL (LL dried) | PL | PI | | |
| B-3 | 1 - 2.5 | 17.6 | - | - | - | 31.0 | SM |
| B-3 | 3.5 - 5 | 18.5 | - | - | - | 20.0 | SM |
| B-3 | 8.5 - 10 | 18.6 | - | - | - | 13.0 | SC |
| B-3 | 13.5 - 15 | 26.1 | - | - | - | 16.7 | SC |
| B-3 | 18.5 - 20 | 30.4 | - | - | - | 10.0 | SP-SC |
| B-5 | 1 - 2.5 | 10.3 | - | - | - | 17.0 | SM |
| B-5 | 3.5 - 5 | 17.9 | - | - | - | 29 | SC |
| B-5 | 6 - 7.5 | 17.9 | - | - | - | 34 | SC |
| B-5 | 13.5 - 15 | 20.8 | - | - | - | 15 | SC |
| B-5 | 18.5 - 20 | 29.3 | - | - | - | 10 | SP-SC |
| HA -1 | 2 to 3 | 74.6 | 108 (65) | 54 | 54 | - | OH |

A sieve analysis was performed on one sample of the SC soil type and the Grain Size Distribution Test Report for this material is attached. A geotechnical engineer visually classified all the samples and prepared individual Test Boring Records to document the subsurface conditions. The Test Boring Records are attached together with a key to explain the terms used in their preparation.

Probing was conducted along portions of the bulkheads (seawalls) in an effort to identify the embedment depths of the wall members that form the lagoon. A ½ -inch diameter steel rod was

used to probe along the inside of the bulkheads that form the lagoon at Boat Ramp #1 to determine the apparent embedment depths of the sheet piling and concrete panel walls.

## SUBSURFACE CONDITIONS

The Test Boring Records present a detailed description of the subsurface conditions encountered. The stratification lines shown on the boring records represent the approximate boundaries between different soil types. The actual subsurface transitions may differ. The following paragraphs summarize our interpolation of the subsurface conditions encountered.

In general, the exploration revealed fill soils behind the bulkheads, and very soft organic sediments in the bottom of the lagoon (basin). The pond sediments consist of a black and dark gray layer of organic clayey silt (OH) that is about 3 to 3-½ feet thick at the locations explored. These materials are underlain with Coastal Plain sediments that extend to the depths explored. Our probes indicate that the bulkhead members appear to extend to depths of at least 4 feet below the lagoon bottom. The actual embedment depths were not determined.

The fill soils generally consist of very loose to firm silty clayey sand that extends to depths of about 5 to 9 feet below the ground surface at the boring locations. A layer of organic rich peat underlies the fill (as encountered in Borings B-2 thru B-5) and extends to depths of about 8 to 15 feet below the ground surface. The peat layer most likely continues laterally into the lagoon area, as well. The depth, lateral extent, and the thickness of the fill materials and the peat layer may be significantly different at other locations across the site.

The Coastal Plain sediments consist of sand with varying amounts of clay and silt extending to the 20-foot depths explored. The sand strata vary from very loose to very firm in relative density as indicated by penetration resistances (N-values) ranging from 2 to 22 blows per foot (bpf). Based on our laboratory tests and visual classifications, the sands are classified as SC, SM, SP-SC, SP soils types in the Unified Soil Classification System (USCS). Boring B-1 encountered soft clay strata between depths of 8 to 12 feet. Boring HA-1 encountered soft clay strata between depths of 3 to 5 feet below the bottom of the lagoon. The clayey soils are classified as a CL soil type.

Groundwater was measured in the borings completed along the bulkheads at depths of about 3-1/2 to 5 feet below the ground surface at the time of drilling and these levels generally corresponded with the water levels in the adjacent boat ramp areas. We expect that the groundwater table will fluctuate with the adjacent water levels depending on seasonal precipitation and temperature, and with changes made in local drainage patterns and land use. Future levels will likely vary from those identified during this exploration.

## CONCLUSIONS AND RECOMMENDATIONS

Our conclusions and recommendations are made based on our observations of the existing site conditions, our interpretation of the subsurface conditions encountered and their relevance to the planned construction.

In our opinion, dewatering of the each work area should commence with; 1) the placement of survey markers or other devices on the bulkheads to monitor movement either on or behind the bulkheads, 2) construction of groundwater cut-off walls at selected locations behind the bulkheads (at the butting location of each cofferdam), 3) the installation of slotted pipes behind the bulkheads to monitor groundwater levels 4) slowly lowering the water levels in each worksite by pumping from sump pits, and 5) visual monitoring of the bulkheads for signs of horizontal movements and areas of suspect deterioration that could contribute to failure of the bulkhead as the water levels are lowered. If signs of movement or suspect areas of deterioration are observed, the bulkheads should be tied-back with pre-cast concrete dead-man anchors and steel cables (attached to the tops of the bulkheads), and work should stop pending resolution of the problem. Given that the existing soils within the lagoon bottom are unstable, it is not recommended to attempt to use shoring within the lagoon to support walls that may be shifting.

SURVEY MARKERS

Survey markers (fixed control points) should be placed in a straight line on 25-foot centers along the tops of the bulkheads. The markers will serve as a baseline prior to the start of work. A survey instrument should be cited on the marks as work progresses to detect deviations from the straight line if horizontal movements occur. A scale can be placed next to the marks and cited with the instrument to measure the magnitude and the plus/minus direction of the movements that are occurring. Monitoring should be performed on a continuous basis as dewatering progresses and on a part-time spot-check basis, thereafter until construction is complete to provide comprehensive documentation of any movements that may or may not occur.

CUT-OFF WALLS

Groundwater flow along the backside of the bulkhead was observed in a backhoe test pit located adjacent to the north end of temporary cofferdam #1. Due to the rapid inflow of groundwater, excavation and placement of cast-in-place concrete cut-off walls perpendicular to the bulkheads may be too difficult to accomplish. If so, the installation of steel sheet cut-off walls (in lieu of cast-in-place concrete) may be installed adjacent to the backside of the bulkheads opposite the ends of the temporary cofferdams. Some excavation and removal of gravel, brick, concrete, and fill debris, and locating of the existing tie-back cables will be required prior to pushing/driving the sheets in-place. Once the sheets are in-place, some injection grouting of the irregularities between the sheets and the bulkhead will be required to seal-off the flow of groundwater along the backside of the bulkheads.

POTENTIAL USE OF TEMPORARY SLOTTED PIPES OR OTHER WATER LEVEL INDICATORS

Based on our additional findings of the existing site conditions, we expect that groundwater behind the bulkheads will leak through the joints in the pre-cast concrete and or rusted sheetmetal bulkhead members and seep into the work sites. It is our opinion that this seepage should be allowed and promoted to reduce unbalanced hydrostatic pressures that will otherwise develop behind the bulkheads. If the existing steel sheet piling is capable of providing a water barrier, then

drilled holes made in the bottom of the steel sheet piling members (at the bottom elevation of the lagoon) can be used to reduce unbalanced hydrostatic pressures that are likely otherwise to develop behind these bulkheads. The size and spacing of the drilled holes should be determined as the work progresses on an as needed basis. However, given the deteriorated condition of the existing materials, workmen should be careful from a safety standpoint, to watch for indications of wall movements and signs of an imminent wall failure so that no one gets hurt trying to accomplish the dewatering process. It is further suggested that Takota obtain the owner's written approval prior to drilling any holes in the existing sheet metal bulkhead. Alternatively, pumping from sump pits or well points located behind the bulkheads may be required (in lieu of drilling holes) to reduce unbalanced hydrostatic pressures behind the bulkheads.

It is also recommended that temporary slotted pipes or other devises be installed behind the bulkheads to; 1) measure the groundwater levels behind the bulkheads and 2) monitor the effectiveness of measures taken to reduce the hydrostatic pressures behind the bulkheads. The liquid level measuring devices would be installed directly behind the bulkheads and spaced about 30 feet apart. Each device can be constructed of 2-inch diameter slotted PVC casing extending to a depth of at least 10 feet below the ground surface and backfilled with SP type sand.

Water levels immediately behind the bulkheads should be maintained at or near the same water levels inside the work areas. If sufficient drainage of the lagoon can not be achieved because of excessive seepage or migration of fine-grained soils through the bulkheads, it may be necessary to place and pump from well points located behind the bulkheads to depress the groundwater table and reduce the loss of soils immediately behind the bulkheads while pumping out the lagoon.

CONSTRUCTION DEWATERING

Assuming that sufficient drainage is achieved behind the bulkheads, and the bulkheads are observed to be stable, dewatering of the work sites should continue using either sump pumps placed at lowest points within the lagoon, as needed and/or using a well point system. Well points, if used would be located within the inside perimeter of the work areas and additional points can be added toward the center of the work sites as needed to sufficiently lower the water table.

Either method should be capable of lowering the groundwater level at least 3 feet below the working grades to allow construction to progress. The effectiveness of either dewatering method should be verified by observation of water levels in shallow hand auger borings located within the work areas. Dewatering should be maintained until boat ramp construction and compaction of the subgrade is complete.

The embedment depths of the bulkhead members were not determined. If the embedment depths are sufficient, then the below grade portions of the bulkhead will serve as partial cut-off walls and aid in the dewatering process. If the embedment depths are relatively shallow, the bottoms of the bulkheads will lack sufficient lateral support and fail, particularly if the embedment soils are partially excavated and removed from the lagoon bottom. Backhoe pits or additional probings should be

completed adjacent to the bulkheads at locations within the lagoon to identify the apparent depth of the members concurrent to dewatering the sites.

SUBGRADE STABILIZATION

The bottom of the lagoon consists of very soft organic sediments that will be disturbed. It is our opinion that these materials will be impractical to dry and stabilize (compact) within the time frame of this project, even if the groundwater table is depressed below the bottom. Furthermore, the soft sediments will not be capable of supporting grading and compaction equipment. The development of recommendations to stabilize these soft conditions is beyond our scope of work at this time.

## LIMITATIONS OF REPORT

This report has been prepared for the exclusive use of Takota Corporation for specific application to the subject project. Our conclusions and recommendations have been prepared using generally accepted standards of geotechnical engineering practice in the State of North Carolina. No other warranty is expressed or implied. QORE is not responsible for the conclusions, opinions, or recommendations of others based on these data.

Our conclusions and recommendations are based on the data obtained from the previously described subsurface exploration and our experience. They do not reflect variations in the subsurface conditions, which are likely to exist between our borings and in unexplored areas of the site. These variations result from the inherent variability of the subsurface conditions in this geologic region as well as any previous site grading activities. If such variations become apparent during construction, it will be necessary for us to re-evaluate our conclusions and recommendations based upon on-site observation of the conditions.

Please read the ASFE document on the following page for more information on the use and limitations of this geotechnical engineering report.

## CLOSURE

This completes our supplemental geotechnical exploration report prepared for the subject project. QORE appreciates the opportunity to be of continued service to you. Please contact us if you have any questions concerning this report or if we may be of further service.

Sincerely,
**QORE, Inc.**

Thomas B. Baird

Thomas B. Baird, P.E.
Geotechnical Engineer

NORTH CAROLINA PROFESSIONAL ENGINEER SEAL 023411 DAVID T. CUNNINGHAM 5-2-06

David T. Cunningham

David T. Cunningham, P.E.
Senior Geotechnical Engineer

Attachments: ASFE document
Boring Location Plan
Test Boring Records
Grain Size Distribution Test Report

# Important Information About Your Geotechnical Engineering Report

*Subsurface problems are a principal cause of construction delays, cost overruns, claims, and disputes.*

*The following information is provided to help you manage your risks.*

## Geotechnical Services Are Performed for Specific Purposes, Persons, and Projects

Geotechnical engineers structure their services to meet the specific needs of their clients. A geotechnical engineering study conducted for a civil engineer may not fulfill the needs of a construction contractor or even another civil engineer. Because each geotechnical engineering study is unique, each geotechnical engineering report is unique, prepared *solely* for the client. No one except you should rely on your geotechnical engineering report without first conferring with the geotechnical engineer who prepared it. *And no one — not even you* — should apply the report for any purpose or project except the one originally contemplated.

## Read the Full Report

Serious problems have occurred because those relying on a geotechnical engineering report did not read it all. Do not rely on an executive summary. Do not read selected elements only.

## A Geotechnical Engineering Report Is Based on A Unique Set of Project-Specific Factors

Geotechnical engineers consider a number of unique, project-specific factors when establishing the scope of a study. Typical factors include: the client's goals, objectives, and risk management preferences; the general nature of the structure involved, its size, and configuration; the location of the structure on the site; and other planned or existing site improvements, such as access roads, parking lots, and underground utilities. Unless the geotechnical engineer who conducted the study specifically indicates otherwise, do not rely on a geotechnical engineering report that was:

- not prepared for you,
- not prepared for your project,
- not prepared for the specific site explored, or
- completed before important project changes were made.

Typical changes that can erode the reliability of an existing geotechnical engineering report include those that affect:

- the function of the proposed structure, as when it's changed from a parking garage to an office building, or from a light industrial plant to a refrigerated warehouse,
- elevation, configuration, location, orientation, or weight of the proposed structure,
- composition of the design team, or
- project ownership.

As a general rule, *always* inform your geotechnical engineer of project changes—even minor ones—and request an assessment of their impact. *Geotechnical engineers cannot accept responsibility or liability for problems that occur because their reports do not consider developments of which they were not informed.*

## Subsurface Conditions Can Change

A geotechnical engineering report is based on conditions that existed at the time the study was performed. *Do not rely on a geotechnical engineering report* whose adequacy may have been affected by: the passage of time; by man-made events, such as construction on or adjacent to the site; or by natural events, such as floods, earthquakes, or groundwater fluctuations. *Always* contact the geotechnical engineer before applying the report to determine if it is still reliable. A minor amount of additional testing or analysis could prevent major problems.

## Most Geotechnical Findings Are Professional Opinions

Site exploration identifies subsurface conditions only at those points where subsurface tests are conducted or samples are taken. Geotechnical engineers review field and laboratory data and then apply their professional judgment to render an opinion about subsurface conditions throughout the site. Actual subsurface conditions may differ—sometimes significantly—from those indicated in your report. Retaining the geotechnical engineer who developed your report to provide construction observation is the most effective method of managing the risks associated with unanticipated conditions.

## A Report's Recommendations Are *Not* Final

Do not overrely on the construction recommendations included in your report. *Those recommendations are not final,* because geotechnical engineers develop them principally from judgment and opinion. Geotechnical engineers can finalize their recommendations only by observing actual

subsurface conditions revealed during construction. *The geotechnical engineer who developed your report cannot assume responsibility or liability for the report's recommendations if that engineer does not perform construction observation.*

## A Geotechnical Engineering Report Is Subject to Misinterpretation

Other design team members' misinterpretation of geotechnical engineering reports has resulted in costly problems. Lower that risk by having your geotechnical engineer confer with appropriate members of the design team after submitting the report. Also retain your geotechnical engineer to review pertinent elements of the design team's plans and specifications. Contractors can also misinterpret a geotechnical engineering report. Reduce that risk by having your geotechnical engineer participate in prebid and preconstruction conferences, and by providing construction observation.

## Do Not Redraw the Engineer's Logs

Geotechnical engineers prepare final boring and testing logs based upon their interpretation of field logs and laboratory data. To prevent errors or omissions, the logs included in a geotechnical engineering report should *never* be redrawn for inclusion in architectural or other design drawings. Only photographic or electronic reproduction is acceptable, *but recognize that separating logs from the report can elevate risk.*

## Give Contractors a Complete Report and Guidance

Some owners and design professionals mistakenly believe they can make contractors liable for unanticipated subsurface conditions by limiting what they provide for bid preparation. To help prevent costly problems, give contractors the complete geotechnical engineering report, *but* preface it with a clearly written letter of transmittal. In that letter, advise contractors that the report was not prepared for purposes of bid development and that the report's accuracy is limited; encourage them to confer with the geotechnical engineer who prepared the report (a modest fee may be required) and/or to conduct additional study to obtain the specific types of information they need or prefer. A prebid conference can also be valuable. *Be sure contractors have sufficient time* to perform additional study. Only then might you be in a position to give contractors the best information available to you, while requiring them to at least share some of the financial responsibilities stemming from unanticipated conditions.

## Read Responsibility Provisions Closely

Some clients, design professionals, and contractors do not recognize that geotechnical engineering is far less exact than other engineering disciplines. This lack of understanding has created unrealistic expectations that have led to disappointments, claims, and disputes. To help reduce the risk of such outcomes, geotechnical engineers commonly include a variety of explanatory provisions in their reports. Sometimes labeled "limitations" many of these provisions indicate where geotechnical engineers' responsibilities begin and end, to help others recognize their own responsibilities and risks. *Read these provisions closely.* Ask questions. Your geotechnical engineer should respond fully and frankly.

## Geoenvironmental Concerns Are Not Covered

The equipment, techniques, and personnel used to perform a *geoenvironmental* study differ significantly from those used to perform a *geotechnical* study. For that reason, a geotechnical engineering report does not usually relate any geoenvironmental findings, conclusions, or recommendations; e.g., about the likelihood of encountering underground storage tanks or regulated contaminants. *Unanticipated environmental problems have led to numerous project failures.* If you have not yet obtained your own geoenvironmental information, ask your geotechnical consultant for risk management guidance. *Do not rely on an environmental report prepared for someone else.*

## Obtain Professional Assistance To Deal with Mold

Diverse strategies can be applied during building design, construction, operation, and maintenance to prevent significant amounts of mold from growing on indoor surfaces. To be effective, all such strategies should be devised for the *express purpose* of mold prevention, integrated into a comprehensive plan, and executed with diligent oversight by a professional mold prevention consultant. Because just a small amount of water or moisture can lead to the development of severe mold infestations, a number of mold prevention strategies focus on keeping building surfaces dry. While groundwater, water infiltration, and similar issues may have been addressed as part of the geotechnical engineering study whose findings are conveyed in this report, the geotechnical engineer in charge of this project is not a mold prevention consultant; ***none of the services performed in connection with the geotechnical engineer's study were designed or conducted for the purpose of mold prevention. Proper implementation of the recommendations conveyed in this report will not of itself be sufficient to prevent mold from growing in or on the structure involved.***

## Rely, on Your ASFE-Member Geotechncial Engineer for Additional Assistance

Membership in ASFE/The Best People on Earth exposes geotechnical engineers to a wide array of risk management techniques that can be of genuine benefit for everyone involved with a construction project. Confer with you ASFE-member geotechnical engineer for more information.

ASFE
The Best People on Earth

8811 Colesville Road/Suite G106, Silver Spring, MD 20910
Telephone: 301/565-2733 Facsimile: 301/589-2017
e-mail: info@asfe.org www.asfe.org

*Copyright 2004 by ASFE, Inc. Duplication, reproduction, or copying of this document, in whole or in part, by any means whatsoever, is strictly prohibited, except with ASFE's specific written permission. Excerpting, quoting, or otherwise extracting wording from this document is permitted only with the express written permission of ASFE, and only for purposes of scholarly research or book review. Only members of ASFE may use this document as a complement to or as an element of a geotechnical engineering report. Any other firm, individual, or other entity that so uses this document without being an ASFE member could be committing negligent or intentional (fraudulent) misrepresentation.*

IIGER08041.0M




**LEGEND**

- ● Boring Location
- o Hand Auger Location

QORE PROPERTY SCIENCES

## BORING LOCATION PLAN

Supplemental Geotechnical Exploration
Hancock Marina Boat Ramps
Marine Corps Air Station
Cherry Point, North Carolina

| | |
|---|---|
| File No. R-2133 | FIGURE NO. 1 OF 1 |
| DRAWN BY NA | CHECKED BY DTC |
| SCALE NTS | DATE 4/22/2006 |

SOURCE: Existing Site Plan Sheet C-01 prepared by Dewberry & Davis, Inc.

11

BORING NO: **B-1**

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: 4.0 | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hollow Stem Auger | RIG TYPE: CME 550 | HAMMER: Rope and Cat Head |
| GROUNDWATER: ∇ 3.5 ATD | BORING DIAMETER (IN): 6 | SHEET 1 OF 1 |

Remarks: ** Higher penetration resistance due to asphalt pieces.

| ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | BLOWS /6" |
|---|---|---|---|
| 4.0 | 0 | Fill: Loose, moist, tan, silty SAND with clay | 2 - 3 - 3 |
| 1.0 | | Fill: Firm, moist to wet, brown, silty SAND with asphalt pieces** | 17 - 8 - 4 |
| -2.0 | | Fill: Very loose, wet, dark brown, silty SAND with organics | 1 - 2 - 2 |
| -4.0 | | Coastal Plain Sediment: Soft, wet, gray-tan, sandy CLAY (CL) | 1 - 1 - 2 |
| -8.0 | | Very loose, wet, gray and tan, clayey SAND (SC) | 1 - 1 - 1 |
| -14.0 | | Very loose, wet, tan, SAND (SP) | 2 - 2 - 2 |
| -16.0 | 20 | End of Boring at 20.0' | |

STANDARD PENETRATION RESISTANCE (N)



BORING_RECORD R-2133.GPJ QOP_CORP.GDT 4/24/06

12

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

BORING NO: **B-2**

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: 4.0 | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hollow Stem Auger | RIG TYPE: CME 550 | HAMMER: Rope and Cat Head |
| GROUNDWATER: ∇ 3.0 ATD | BORING DIAMETER (IN): 6 | SHEET 1 OF 1 |

Remarks:

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | BLOWS /6" |
|---|---|---|---|---|
| | 4.0 | 0 | Fill: Loose, moist, tan, silty SAND with clay | 2 - 3 - 2 |
| ∇ | 1.0 | | Fill: Loose, wet, gray and brown, silty SAND | 2 - 3 - 3 |
| | | 5 | | 2 - 3 - 3 |
| | -5.0 | | Black and dark brown, organic, PEAT (PT) | 3 - 3 - 2 |
| | | 10 | | 2 - 4 - 3 |
| | -11.0 | 15 | Coastal Plain Sediments: Firm, wet, tan and gray, clayey SAND (SC) | 3 - 5 - 7 |
| | -16.0 | 20 | End of Boring at 20.0' | |
| | | 25 | | |

STANDARD PENETRATION RESISTANCE (N)



BORING_RECORD P-2133.GPJ QORE_CORP.GDT 4/24/06

/13

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

BORING NO: **B-3**

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: 5.0 | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hollow Stem Auger | RIG TYPE: CME 550 | HAMMER: Rope and Cat Head |
| GROUNDWATER: ∇ 5.0 ATD | BORING DIAMETER (IN): 6 | SHEET 1 OF 1 |

Remarks:

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | BLOWS /6" |
|---|---|---|---|---|
| | 5.0 | 0 | Topsoil (9") | |
| | 4.2 | | Fill: Loose to firm, moist, tan and gray, silty SAND with clay | 3 - 3 - 3<br>3 - 5 - 6 |
| ∇ | 0.0 | 5 | Black and dark brown, organic, PEAT (PT) | 1 - 1 - 2 |
| | -3.5 | | Coastal Plain Sediments: Very loose, wet, gray and tan, clayey SAND (SC) | 1 - 2 - 2<br>1 - 2 - 1 |
| | -11.0 | | Loose, wet, tan and gray, SAND (SP-SC) with some clay | 2 - 3 - 5 |
| | -15.0 | 20 | End of Boring at 20.0' | |

STANDARD PENETRATION RESISTANCE (N)

BORING NO: B-4

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: 4.0 | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hollow Stem Auger | RIG TYPE: CME 550 | HAMMER: Rope and Cat Head |
| GROUNDWATER: ∇ 5.0 ATD | BORING DIAMETER (IN): 6 | SHEET 1 OF 1 |

Remarks:

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | BLOWS /6" |
|---|---|---|---|---|
| | 4.0 | 0 | Fill: Very loose, moist, brown, silty SAND | 2 - 2 - 2 |
| | 1.0 | | Fill: Firm, moist, brown and gray, sandy CLAY | 2 - 3 - 3 |
| ∇ | -1.0 | 5 | Black and dark brown, organic, PEAT (PT) | 2 - 2 - 1 |
| | -5.0 | | Coastal Plain Sediments: Very loose, wet, brown and gray, silty SAND (SM) | 3 - 2 - 1 |
| | -9.0 | | Very loose to loose, wet, tan and gray, SAND (SP-SC) with some clay, shell fragments between 19.5 and 20.0 | 3 - 2 - 2<br>3 - 4 - 4 |
| | -16.0 | 20 | End of Boring at 20.0' | |

BORING_RECORD R-2133.GPJ QORE_CORP.GDT 4/24/06

15

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

BORING NO: **B-5**

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: 4.0 | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hollow Stem Auger | RIG TYPE: CME 550 | HAMMER: Rope and Cat Head |
| GROUNDWATER: ▽ 6.0 ATD | BORING DIAMETER (IN): 6 | SHEET 1 OF 1 |
| Remarks: | | |

| ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | BLOWS /6" |
|---|---|---|---|
| 4.0 | 0 | Fill: Loose, moist, brown and gray, SAND with some silt and gravel | 6 - 5 - 5 |
| 1.0 | | Fill: Very loose, moist, brown and gray, clayey SAND | 2 - 3 - 2 |
| | 5 | | 1 - 2 - 2 |
| -4.0 | | Black and dark brown, organic, PEAT (PT) | 1 - 1 - 1 |
| | 10 | | |
| -9.0 | | Coastal Plain Sediments: Very loose, wet, gray, clayey SAND (SC) | 2 - 2 - 2 |
| | 15 | | |
| -14.0 | | Very firm, wet, gray, SAND (SP-SC) with shell fragments and some clay | 9 - 10 - 12 |
| -16.0 | 20 | End of Boring at 20.0' | |
| | 25 | | |

Groundwater symbol ▽ shown at depth of approximately 6 ft.

STANDARD PENETRATION RESISTANCE (N)



BORING_RECORD R-2133.GPJ QOP_CORP.GDT 4/24/06

16

BORING NO: **HA-1**

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hand Auger | RIG TYPE: | HAMMER: |
| GROUNDWATER: Not Encountered | BORING DIAMETER (IN): 3 | SHEET 1 OF 1 |
| Remarks: | | |

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | L | S | R | STANDARD PENETRATION RESISTANCE (N) | BLOWS /6" |
|---|---|---|---|---|---|---|---|---|
| | | 0 | Pond Sediments: Wet, black and dark gray, organic, clayey SILT (OH) | | | | | |
| | | | Gray, wet, sandy CLAY (CL) | | | | | |
| | | 5 | End of Boring at 5.0' | | | | | |
| | | 10 | | | | | | |
| | | 15 | | | | | | |
| | | 20 | | | | | | |
| | | 25 | | | | | | |

BORING_RECORD R-2133.GPJ QOP_CORP.GDT 4/24/06

17

BORING NO: **HA-2**

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hand Auger | RIG TYPE: | HAMMER: |
| GROUNDWATER: Not Encountered | BORING DIAMETER (IN): 3 | SHEET 1 OF 1 |
| Remarks: | | |

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | L | S | R | STANDARD PENETRATION RESISTANCE (N) | BLOWS /6" |
|---|---|---|---|---|---|---|---|---|
| | | 0 | Pond Sediments: Wet, black and dark gray, organic, clayey SILT (OH) | | | | | |
| | | | Gray, wet, clayey SAND (SC) | | | | | |
| | | 5 | End of Boring at 5.0' | | | | | |
| | | 10 | | | | | | |
| | | 15 | | | | | | |
| | | 20 | | | | | | |
| | | 25 | | | | | | |

BORING_RECORD R-2133.GPJ QORP_CORP.GDT 4/24/06

18

BORING NO: **HA-3**

QORE™ PROPERTY SCIENCES

# TEST BORING RECORD

| | | |
|---|---|---|
| PROJECT: HANCOCK MARINA BOAT RAMPS | JOB NO: R-2133 | REPORT NO: 123468 |
| PROJECT LOCATION: MARINE CORPS AIR STATION - CHERRY POINT, NORTH CAROLINA | | |
| ELEVATION: | BORING STARTED: 3/29/2006 | BORING COMPLETED: 3/29/2006 |
| DRILLING METHOD: Hand Auger | RIG TYPE: | HAMMER: |
| GROUNDWATER: Not Encountered | BORING DIAMETER (IN): 3 | SHEET 1 OF 1 |
| Remarks: | | |

| G | ELEV. (FT.) | DEPTH (FT.) | MATERIAL DESCRIPTION | L | S | R | STANDARD PENETRATION RESISTANCE (N) | BLOWS /6" |
|---|---|---|---|---|---|---|---|---|
| | | 0 | Pond Sediments: Wet, black and dark gray, organic, clayey SILT (OH) | | | | | |
| | | | Dark gray, wet, SAND (SP) | | | | | |
| | | | Gray and tan, wet, clayey SAND (SC) | | | | | |
| | | 5 | End of Boring at 5.0' | | | | | |
| | | 10 | | | | | | |
| | | 15 | | | | | | |
| | | 20 | | | | | | |
| | | 25 | | | | | | |

BORING_RECORD P-2133.GPJ QORE_CORP.GDT 4/24/06

19

QORE™ PROPERTY SCIENCES

# GRAIN SIZE DISTRIBUTION TEST REPORT

( ASTM D422 )

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **JOB NAME :** | *Hancock Marina Boat Ramps - Marine Corps Air Station, Cherry Point, NC* | | | | | | |
| **JOB NO. :** | *R-2133* | **REPORT NO. :** | *123468* | **DATE :** | *4/22/2006* | **REVIEWED BY :** | DTC |
| **BORING :** | *B-3* | **DEPTH :** | *13.5'-15'* | **SAMPLE NO. :** | *S-5* | **SAMPLE TYPE :** | *SS* |
| **SAMPLE LOCATION :** | Soil Test Boring B-3 | | | | | **SP. GRAVITY, Gs :** | *2.65* |
| **SOIL DESCRIPTION :** | *Tan clayey SAND* | | | | | **FINES , % :** | *17* |
| **LIQUID LIMIT, % :** | *ND* | **PLASTICITY INDEX , % :** | *ND* | **MOISTURE , % :** | ND | **COEFF. OF CURVATURE , $C_C$ :** | - |
| **D10 , MM :** | ~0.03 | **D30 , MM :** | 0.15 | **D60 , MM :** | 0.2 | **COEFF. OF UNIFORMITY , $C_U$ :** | 7 |
| **CLASSIFICATION** | | **UNIFIED :** | *SC* | **AASHTO :** | - | | |




20

# Tab 27

**Crite, Antoine LTJG NAVFAC Lant**

**From:** Chad Riley [chad@takota.com]
**Sent:** Tuesday, May 23, 2006 7:47 AM
**To:** Crite, Antoine LTJG NAVFAC Lant
**Cc:** rick sydes; Chad Riley
**Subject:** Dewatering Plan approval status

Mr. Crite,

Please check the approval status of submittal number 16 (dewatering plan) which was submitted on 5 2-06. If you have any questions please let me know.

Thank you,

Chad Riley
Takota Corporation

# Tab 28

**Crite, Antoine LTJG NAVFAC Lant**

| | |
|---|---|
| **m:** | Newton, Chris CDR NAVFAC Lant |
| **it:** | Wednesday, May 24, 2006 4:03 PM |
| **o:** | Skip Conklin (E-mail); George Radford (E-mail); Pisano (E-mail) |
| **Cc:** | Crite, Antoine LTJG NAVFAC Lant; Fornes, Danny E CIV NAVFAC Lant; Aseo, Arturo A LCDR NAVFAC Lant; Cindy Willis (E-mail); Davenport, Ronnie E CIV LANT ROICC Cherry Point; Donnie Parrott (E-mail); Newton, Chris CDR NAVFAC Lant; Reilly, Lillie CIV LANT ROICC Cherry Point; Robert Lawrence (E-mail); Sadler, Marjorie B. CIV LANT ROICC Cherry Point |
| **Subject:** | Hancock Boat Ramp Project: Notice of Termination - Takota Corporation |
| **Importance:** | High |

Takota_T.pdf

Skip / George / Paul:

FYI and as previously briefed, the Hancock Boat Ramp Contract with Takota Corporation of Las Vegas has been terminated for default (effective today). By this unilateral contract action, he is required to remove his "stuff" from the site by 9 June. Please see attached for more specifics.

V/R
Chris Newton, P.E.
Commander, CEC, USN
Facilities Engineer
esident Officer in Charge of Construction
rine Corps Air Station Cherry Point
one: 252-466-2746 FAX: 252-466-5749
Email: chris.newton@navy.mil
Semper Gumby!

-----Original Message-----
From: Chandler, Chrissie J CIV
Sent: Wednesday, May 24, 2006 13:48
To: 'art@takota.com'
Cc: Sadler, Marjorie B. CIV LANT ROICC Cherry Point
Subject: FW: Notice of Termination - Takota Corporation
Importance: High

ATTN: Mr. Arthur Caprario

Mr. Caprario: Attached below is Unilateral Modification P00001 under Contract N62470-05-C-7156, Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina.

The orginial is being sent via certified mail.

Respectfully,
Chrissie Chandler

HRISSIE CHANDLER
ntract Specialist
VFAC Mid-Atlantic Acquisition Dept
laims, Protests & Terminations
(757) 322-4086 (DSN 262)
FAX (757) 322-4611

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES | |
|---|---|---|
| J | 1 | 3 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO.(If applicable) |
|---|---|---|---|
| ~00001 | 24-May-2006 | PR057156 | |

| 6. ISSUED BY CODE N40085 | 7. ADMINISTERED BY (If other than item 6) CODE N40085 |
|---|---|
| NAVFAC MID ATLANTIC<br>9742 MARYLAND AVENUE<br>NORFOLK VA 23511-3095 | CG MCAS CHERRY POINT<br>FACILITIES SUPPORT CONTRACTS B-87<br>PSC BOX 8006<br>CHERRY POINT NC 28533-0006 |

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
TAKOTA CORPORATION
3017 PALM SPRINGS WAY
LAS VEGAS NV 89102-5967

CODE 1VG18 FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MOD. OF CONTRACT/ORDER NO.
N62470-05-C-7156

X 10B. DATED (SEE ITEM 13)
13-Apr-2005

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

## 12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

X D. OTHER (Specify type of modification and authority)
FAR 52.249-10 DEFAULT(FIXED PRICE CONSTRUCTION) APR 1984

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

## 14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Modification Control Number: cchand062724

EXTEND BOAT RAMPS AT HANCOCK MARINA, MARINE CORPS AIR STATION, CHERRY POINT, NORTH CAROLINA

NOTICE OF TERMINATION - FINAL DECISION M06-006

You are notified that your right to proceed with the work under Contract N62470-05-C-7156 is terminated completely for default under Contract Clause 52.249-10 Default (Fixed-Price Construction)(APR 1984). The termination is effective immediately upon receipt of this modification.

A. This action is taken as a result of your failure to make progress to ensure completion of the contract and to perform the contract within the specified time.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| | | CINDY S. READAL / SUPV CONTRACT SPECIALIST<br>TEL: (757) 322-4420 EMAIL: cindy.readal@navy.mil | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | | BY Cindy S Readal<br>(Signature of Contracting Officer) | 24-May-2006 |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE **UNILATERAL MODIFICATION P00001**

**The following items are applicable to this modification:**

You are hereby directed to remove the following equipment/materials from the work site immediately:

Turbidity Curtains (2 each) (1 at Boat Ramp #1 and 1 at Boat Ramp #2)
Porta Dam (Cofferdam) and associated hardware
Aqua Barriers (4 each) (3 in the water and 1 on the bank)
Office Trailer
Concrete Deadmen (4 each)
Waste Industries Dumpster
Floating Work Platform
Epoxy Coated Reinforcing Steel

These items are to be removed no later than June 9, 2006 or the Navy will remove them from the site and offset the cost against any money due Takota Corporation.

B. Notice of Termination: FINAL DECISION #M06-006

1. Your right to proceed under subject contract is terminated completely.

2. The Government reserves all rights and remedies provided by law or under the contract, in addition to charging excess costs occasioned by completion of the defaulted contract.

3. The Contracting Officer has determined that the failure to perform is not excusable, and this Notice of Termination constitutes a Final Decision of the Contracting Officer and that the Contractor has the right to appeal such decision under the Disputes clause.

4. This modification constitutes a decision that the Contractor, Takota Corporation, is in default and that the Contractor has the right to appeal pursuant to the Disputes Clause.

5. This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary for hearing and determining contract disputes. If you decide to appeal this decision, written notice thereof must be mailed or otherwise furnished to the Armed Services Board of Contact Appeals. Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041, within ninety days from the date you receive this decision. A copy therefore shall also be furnished to the Contracting Officer from whose decision the appeal is take, at the address set forth in Block 6 of the Modification, Attention: Head, Contracts Office. The notice should indicate that an appeal is intended, should reference this decision, identify the contract by number, and state the amount in dispute. The rules of procedure of the Armed Services Board of Contract Appeals are in the DoD Federal Acquisition Regulation Supplement, Appendix A, Part Two. Optional Accelerated Procedures are available in appeals involving $100,000 or less and Small Claims (Expedited) Procedures are available in appeals involving $50,000 or less..

In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the U. S. Court of Federal Claims* within 12 months of the date you received this decision (*except as provided in Section 4 of the Act (Maritime Contracts)).

Copy to: FEAD Cherry PT
NAVFACENGCOM MIDLANT Codes AQ1, 09C; NCIPT
COMNAVFACENGCOM Code ACQ-MSS

DFAS Columbus
PO Box 369022
Columbus, OH 43236-9022

The Guarantee Co. of North America USA
1000 Town Center, Suite 1800
Southfield, MI 48075