IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-553
(Senior Judge Bruggink)

TAKOTA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRYANT G. SNEE
Deputy Director

JANE C. DEMPSEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0897
Facsimile: (202) 307-0972

July 23, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

I. Nature Of The Case ........ 2

II. Statement Of Facts ........ 2

A. The Contract ........ 2

B. Takota's Performance ........ 4

C. Navy's Directives ........ 5

D. Notices To Resume Work, Show Cause Letter, And Termination For Default ........ 9

E. Reprocurement Contract ........ 11

SUMMARY OF THE ARGUMENT ........ 11

ARGUMENT ........ 13

I. Standard Of Review ........ 13

II. The Navy Properly Exercised Reasonable Discretion In Terminating Takota For Default ........ 13

A. Takota's Violations Of Contract Specifications ........ 14

B. Takota's Fraudulent Conduct ........ 18

C. Takota's Failure To Make Progress ........ 21

III. The Navy Did Not Waive The Original Contract Completion Date Or Its Right To Terminate Takota ........ 25

A. The Navy Terminated Takota Within A Reasonable Time After Default ........ 26

B. Takota Had Not Continued Performance Under The Contract ........ 30

CONCLUSION ........ 31

## TABLE OF AUTHORITIES

## CASES

PAGE(S)

Abcon Assocs., Inc. v. United States,
44 Fed. Cl. 625 (1999) .......... 28

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 13

Aptus Co. v. United States,
61 Fed. Cl. 638 (2004) .......... 14, 15, 18, 19, 25

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,
145 F.3d 1303 (Fed. Cir. 1998) .......... 13

Consol. Indus., Inc. v. United States,
195 F.3d 1341 (Fed. Cir. 1999) .......... 14

DeVito v. United States,
188 Ct. Cl. 979 (1969) .......... 26, 27, 30

Empire Energy Mgmt. Sys., Inc. v. Roche,
362 F.3d 1343 (Fed. Cir. 2004) .......... 26, 30

Florida Dep't of Ins. v. United States,
81 F.3d 1093 (Fed. Cir. 1996) .......... 26

Indemnity Ins. Co. v. United States,
12 Cl. Ct. 219 (1988) .......... 26, 27

Indemnity Ins. Co. of North America v. United States,
14 Ct. Cl. 219 (1988) .......... 26

Joseph Morton Co. Inc. v. United States,
757 F.2d 1273 (Fed. Cir. 1985) .......... 14, 18

Kelso v. Kirk Bros. Mech. Contractors, Inc.,
16 F.3d 1173 (Fed. Cir. 1994) .......... 15

Lamb Eng'g & Constr. Co. v. United States,
58 Fed. Cl. 106 (2003) .......... 19

McDonnell Douglas Corp. v. United States,
182 F.3d 1319 (Fed. Cir. 1999) .......... 14, 15, 30

McDonnell Douglas Corp. v. United States,
323 F.3d 1006 (Fed. Cir. 2003) .......... 21, 22, 25

Morganti Nat'l, Inc. v. United States,
49 Fed. Cl. 110 (2001) .......... 22

**STATUTES AND REGULATIONS**

FAR § 52.233-1 .......... 12, 17, 23

FAR § 52.236-2 .......... 23

FAR § 52.236-2(a) .......... 17

FAR § 52.243-4 .......... 12, 17, 23

FAR § 52.243-5 .......... 12, 17, 23

DFARS § 252.236-7000 .......... 23

DFARS § 252.243.7001 .......... 23

DFARS § 252.243.7002 .......... 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TAKOTA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-553 |
| | ) | (Senior Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND RESPONSE TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court enter judgment in favor of the United States, deny plaintiff's motion for partial summary judgment, and dismiss plaintiff's complaint.[1]

Plaintiff, Takota Corporation ("Takota"), seeks to have the default termination issued by the United States Department of Navy ("Navy") converted into a termination for convenience. However, as set forth more fully below, the contracting officer properly exercised reasonable discretion in terminating Takota for default based upon Takota's failure to follow the contract specifications, Takota's fraudulent conduct, and Takota's

[1] On July 18, 2008, the parties and Judge Bruggink held an emergency status conference, during which Judge Bruggink denied the Government's request for an enlargement of time to file a response and cross-motion for partial summary judgment. The Government requested an enlargement of time so that defendant's counsel could seek approval from within the United States Department of Justice to file a fraud counterclaim. Judge Bruggink stated that the time necessary for further briefing on the parties' motions for summary judgment and for the Court to hold oral argument would be sufficient time for defendant's counsel to seek such approval and file with the Court a motion for leave to file an amended answer before the Court issued an order regarding the parties' motions for summary judgment.

failure to make progress. Moreover, the Navy never waived the original contract completion date or its right to terminate Takota for default.

## STATEMENT OF THE ISSUES

1. Whether the Navy exercised reasonable discretion in terminating Takota for default based upon Takota's violations of contract specifications, fraudulent conduct, and failure to make progress under the contract.

2. Whether the Navy waived the original contract completion date and its right to terminate Takota for default.

## STATEMENT OF THE CASE

### I. Nature of the Case

Takota challenges and seeks to overturn the Navy's default termination of Takota's right to proceed under Contract No. N62470-05-C-7156. Specifically, Takota contends that any delay in its performance was attributable to a differing site condition and lack of government direction. See Compl. Takota requests that this Court declare that the Navy's default termination of the contract was wrongful and convert it to a termination for convenience. See id.

### II. Statement of Facts

#### A. The Contract

On April 13, 2005, the Navy issued a sealed bid solicitation to offerors to perform work at Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina. Specifically, the work entailed demolishing and replacing two boat ramps and docks in the marina. Boat Ramp 1 was located in the lagoon and Boat Ramp 2 was located in the

creek of the marina. DPFUF 6.[2] All offerors were encouraged to conduct a site visit, which could have been arranged at any time during normal duty hours. Without conducting this recommended site visit, Takota submitted a bid in the amount of $463,000.00. DPFUF 2.

The Navy requested Takota to verify its bid. Following letters and emails regarding Takota's bid, and discussions between the Navy and Takota, the Navy executed, on July 22, 2005, a firm fix-priced contract in the amount of $463,000.00 with Takota. DPFUF 1. Section 01110N of the contract described the scope of work to include "sheet piling, dewatering, earthwork, concrete demolition, and construction to remove and replace the concrete boat ramps and docks." DPFUF 6. All work was to be completed within 150 calendar days after the contract award, and the original contract completion date was set at January 3, 2006. DPFUF 3.

Under the contract, before demolition and construction of the boat ramps were to commence, Takota was required to dewater the areas surrounding the boat ramps using temporary damming measures, called cofferdams. The project description called for the use of "sheet piles or other temporary measures" as cofferdams. DPFUF 6.

Additionally, the contract, under the section entitled, "General Notes," of drawing C-03 specifically warned that the seawalls (bulkheads) were in an "already deteriorating" state. DPFUF 10. Therefore, the contract required Takota, under the section entitled "Construction Sequence," of drawing C-04, to provide adequate shoring/bracing for the seawalls. If, during the dewatering process, Takota observed signs of weakening or movement of the bulkheads, Takota was required to "provide

---

[2] "DPFUF__" refers to the Defendant's Proposed Findings of Uncontroverted Fact.

additional shoring," stop the dewatering process, and contact the contracting officer for further direction. Id.

Because dewatering and shoring were vital to the performance of the contract, Section 02300 of the contract required Takota to submit a shoring plan and dewatering work plan. The dewatering plan was required to include procedures for accomplishing the dewatering work, and the shoring plan was required to include drawings and calculations describing the methods for the installation of shoring and sheeting to protect the work area. DPFUF 8.

This section also required that Takota hire a professional geotechnical engineer to provide inspection of excavations and soil/groundwater conditions throughout the period of construction. This engineer would be responsible for performing preconstruction and periodic site visits throughout construction to assess site conditions, and would update and submit the excavation, sheeting, and dewatering plans as construction progressed to reflect the changing conditions. DPFUF 9.

B. Takota's Performance

Right from the outset of performance, Takota experienced difficulty in performance. Specifically, it experienced difficulties dewatering the boat ramp areas. Takota had decided to install a port-a-dam as its temporary cofferdam of choice at the site of Boat Ramp 1, and an aqua-barrier at the site of Boat Ramp 2. DPFUF 28. On October 21, 2005, Takota attempted to dewater the site at Boat Ramp 1 for one day, and managed to dewater enough of the lagoon to demolish partially Boat Ramp 1. DPFUF 29. Takota had proceeded with this demolition without prior authorization of the contracting officer

as required under Section 02220 of the contract. On October 28, 2005, Takota stopped all work. Takota never resumed performance at the construction site. DPFUF 34.

Despite the contract requirements and the deteriorated condition of the seawalls warning in the contract, Takota did not provide shoring for any portion of the deteriorated seawalls. DPFUF 29. Moreover, Takota did not submit, before beginning work, the required dewatering and shoring and sheeting plan. Takota also did not hire a professional geotechnical engineer, as required under the contract, to perform the preconstruction and periodic site visits while it worked at the construction site. DPFUF 25.

C. Navy's Directives

On October 28, 2005, Chad Riley, Takota's project manager, sent an email to the Navy's Assistant Resident Officer in Charge of Construction ("AROICC"), ENS Antoine Crite, and the Navy's engineering technician, Conrad Gillen, that it was stopping work due to a differing site condition. DPFUF 33. Takota claimed in this email that:

> When dewatering we are experiencing water flow behind the bulkhead/sheet piles from the top of our temporary cofferdams into the work area. As the pressure increases on the top side of the temporary cofferdams the water flow behind the sheet piles increases thus creating several problems, erosion behind the sheet piles which will put the bulkhead in jeopardy and increases the flow of water into the work area and dewatering becomes unmanageable.

Id.

In response, the Navy visited the construction site, only to find the sites at the boat ramps filled with water. The Navy directed Takota to dewater the lagoon so that the alleged condition could be observed, but Takota refused, stating that the seawalls would fail. DPFUF 35.

On November 1, 2005, AROICC Crite advised Takota in an email that it was required to submit a sheeting and shoring plan as part of the dewatering effort and that Takota was required to employ a geotechnical engineer throughout construction to assess the site conditions, recommend and update Takota's dewatering plan, and provide monthly reports. DPFUF 36. In response, Takota stated that it would have its geotechnical engineer visit the site. However, at that time, it had not yet hired a geotechnical engineer. DPFUF 37. Subsequently, Takota requested proposals from two geotechnical engineering firms. Takota hired QORE Property Sciences ("QORE"). However, it did not submit a sheeting and shoring plan. DPFUF 38.

On November 2, 2005, a team of Navy representatives and a representative from the Navy's architectural and engineering firm, Dewberry & Davis, Inc. ("Dewberry") visited the site to investigate Takota's claim. They took photographs of the site and reviewed the daily reports. They observed that the temporary cofferdams used by Takota were not properly sealed at the point they were supposed to abut the seawalls. They did not see evidence of a differing site condition, and concluded that the two cofferdam systems selected and installed by Takota were not suitable to dewater the areas given the water pressure, river flow, and tidal wave actions in Hancock Creek. DPFUF 39.

On November 13, 2005, AROICC Crite sent an email to Takota directing it to use sheet piling in place of the temporary cofferdams chosen by the company. AROICC Crite warned Takota that "the completion date is 03 January 2006. Liquidated damages will accumulate at the specified rate of $200.00 per calendar day for delays in completion beyond the stated date of award." DPFUF 40.

Takota refused to comply with this directive, and instead maintained that a differing site condition existed based upon voids located behind the seawalls. DPFUF 41. Takota submitted a preliminary geotechnical report prepared by QORE to support its differing site condition claim. This report found that "the exposed portions of the driven sheets are significantly rusted and delaminating. We understand that divers found similar conditions underwater." The report recommended relocating the port-a-dam to reduce the size of dewatering area. At Boat Ramp 2, the report recommended that Takota trench back perpendicular from the bulkhead and place concrete to form permanent groundwater "cut-off" walls. Id.

On November 22, 2005, Takota sent a letter to the Navy maintaining that the differing site condition was a constructive change and that it would proceed with the work by ordering an additional cofferdam to enclose the boat ramp areas. DPFUF 46.

The Navy responded to Takota's letter by directing Takota to submit an equitable adjustment before proceeding with the work. However, Takota refused to comply with the Navy's directive to provide an equitable adjustment. DPFUF 49.

At Takota's request, and in accordance with the partnering requirements of the contract, the Navy met with representatives from Takota on December 7, 2005 to discuss possible solutions so that Takota would proceed with work. DPFUF 7, 53. The Navy reminded Takota that the contract completion date was January 3, 2006, and that liquidated damages would accumulate at the rate of $200.00 per calendar day for delays in completion beyond the stated date of award. At the meeting, the parties discussed that a possible solution to the dewatering problem would be to pump concrete with seal mix

to fill voids behind the bulkheads in the lagoon area, and to excavate an "H-shaped" trench into which concrete would be poured at the site of Boat Ramp 2. DPFUF 53.

The Navy directed Takota to provide a cost estimate for this proposed work. DPFUF 54. However, Takota again refused to comply with the Navy's directive, and, instead, submitted a letter on December 21, 2005, stating that a precise estimate could not be furnished, and that the Navy should issue a "not to exceed" change order for the design efforts. Takota stated that it was entitled to a time extension until "this matter" was resolved and for any additional time required for performance of any remedial work. DPFUF 56.

On January 6, 2006, AROICC Crite responded to Takota acknowledging that a "suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work." DPFUF 58. Takota again, refused to submit the information required for negotiating a change to the contract. Takota maintained that a differing site condition existed, and that the deteriorated condition of the seawalls was causing water to flow through them and that a dry working environment could not be accomplished. Takota also expressed concern that the seawall was in an "extremely fragile and deteriorated condition," and that the pressure exerted while dewatering would create "enough force to cause the wall to fail." DPFUF 59.

In an effort to resolve the impasse, and in accordance with the contract's partnering provision, the Navy, again, on February 28, 2006, met with representatives of Takota. DPFUF 7, 62. The meeting was chaired by the Resident Officer in Charge of Construction ("ROICC"), CDR Newton. CDR Newton advised Takota that, in order to

move the project forward, the Navy would reset the schedule and accept Takota's temporary cofferdams and provide payment although the Navy had concerns with regards to their suitability given the conditions at Hancock Creek. CDR Newton explained the Navy's position that there was no differing site condition, and that the project could be built as specified in the contract. The Navy explained that it was reasonable to expect ground water, surface run-off, seepage from the seawalls, and leakage from the cofferdams. It therefore recommended that Takota pump around the clock, instead of the one day effort Takota had exerted previously. The Navy also reminded Takota that it had not adhered to the contract requirements for dewatering and shoring, that Takota had not submitted dewatering and shoring plans, and that it had not hired a geo-technical engineer before beginning the dewatering effort. DPFUF 62.

Takota, in response, did not acknowledge the Navy's offer or request to move the project forward. Instead, it maintained that a differing site condition existed. Takota insisted that dewatering could not be accomplished even though Takota's own project manager had specifically stated in an email that "[t]he flow was not beyond the capacity of the pumps to keep [the site at Boat Ramp 1] dry." Takota further claimed that the Navy had not provided any direction, and that it was just a "dumb" contractor that was not aware of the contract requirements. DPFUF 63.

## D. Notices To Resume Work, Show Cause Letter, And Termination For Default

On March 7, 2006, the Navy issued a notice to resume work and to submit a geotechnical report, dewatering plan, shoring and sheeting plan, and other required submittals. This letter noted that the completion date of the project had passed, that the

Navy "has neither waived the completion date, nor its right to assess liquidated damages," and that "Takota's further refusal or failure to prosecute the work required under the contract may result in the Government exercising its right to terminate the right to proceed with the work." DPFUF 64.

Takota failed to provide any submittals as requested, and instead, sent a letter to the Navy on March 22, 2006 regarding the status of the submittals. DPFUF 66. Consequently, on March 24, 2006, the Navy sent a second notice to resume work directing Takota to provide the submittals required under the contract. The Navy provided Takota until April 4, 2006 to submit the critical submittals, specifically, the geotechnical report, dewatering plan, shoring and sheeting plan, progress schedule, quality control plan, and a revised schedule of prices. The Navy provided Takota until April 18, 2006 to provide the remaining submittals. The letter warned that "Takota's failure to comply with either deadline will further indicate a refusal or failure to prosecute the work required under the contract" and that "the Government has neither waived the completion date, nor its right to assess liquidated damages." DPFUF 67.

On April 20, 2006, the Navy issued a show cause letter to Takota because Takota had failed to provide a shoring and sheeting plan, progress schedule, dewatering plan, quality control plan, and schedule of prices, which were due on April 4, 2006. Further, Takota had not provided any of the submittals that were due on April 18, 2006. DPFUF 71.

Takota responded on May 2, 2006 stating that "circumstances dictate and warrant the delays." It then provided a status update with regards to the outstanding submittals. DPFUF 73. On May 4, 2006, the Navy received Takota's dewatering plan, which the

Navy rejected on May 16, 2006, because it failed to address how to seal the space between the selected cofferdam where it abutted the existing seawall, it lacked details such as how, where, and when the work would be done, and it failed to specify what methods would be used. DPFUF 74, 75. The Navy concluded that the submittal was a geotechnical report, and not a dewatering plan. DPFUF 75.

On May 24, 2006, the Navy issued modification P00001 terminating Takota for default. DPFUF 76.

D. Reprocurement Contract

On September 28, 2006, the Navy issued contract number N40085-06-C-1728 to Cieszko Construction Company ("Cieszko") to demolish and replace the boat ramps at Hancock Marina. The contract specifications and drawings were identical.[3] DPFUF 77.

Cieszko began performance under the contract by shoring the entire length of the seawalls in the boat ramp areas. It used sheet piles for the temporary cofferdams at the entrance to the lagoon and around Boat Ramp 2. Cieszko dewatered both boat ramp areas without seawall failure or seawall repair, and successfully demolished and replaced both boat ramps. Cieszko did not submit a claim for a differing site condition or any equitable adjustments. DPFUF 78.

## SUMMARY OF THE ARGUMENT

Takota seeks to have this Court convert the termination for default issued by the Navy into termination for convenience. Takota bases its motion for summary judgment upon two arguments. First, Takota alleges that the Navy's termination for default was wrongful because it failed to extend the contract completion date to account for the

---

[3] An amendment to the contract clarified that some of the electrical work had been completed or partially completed by Takota.

Navy's delay in furnishing direction. Second, Takota alleges that the Navy waived the original completion date. Pl.'s Br. at 5-15.

However, Takota has not offered any persuasive evidence to support these allegations. Rather, the evidence demonstrates that the Navy reasonably and properly exercised its broad discretion to default terminate Takota because it failed to follow the contract specifications, committed fraud, and failed to make progress. First, Takota failed to make progress when it refused to comply with the Navy's numerous directives regarding how Takota should proceed under the contract after Takota had alleged a differing site condition. Although the Navy attempted to come to a resolution with Takota in order to allow Takota to proceed with performance, Takota remained staunch in its differing site condition claim and refused to do any further work on the construction site after October 27, 2005.

Second, the Navy was justified in terminating Takota for default because it failed to follow the contract specifications by failing to provide vital submittals prior to beginning construction, failing to hire a mandatory geotechnical engineer during construction at the site, failing to shore the seawalls, and failing to follow the procedures set forth in the Disputes Clause, FAR § 52.233-1, Changes Clause, FAR § 52.243-4, and Changed Conditions Clause, FAR § 52.243-5.

Third, the Navy was justified in terminating Takota for default because of its fraudulent conduct. Takota had certified, in its progress invoices to the Navy, that its subcontractors had been paid or would be paid for work performed. Although its subcontractors, Montemayor, Inc. ("Montemayor") and United Rentals, Inc. ("United Rentals"), had performed work under the contract, Takota never paid them for the

services rendered. Takota's failure to follow the contract specifications and its fraudulent conduct were unaffected by Takota's delay allegations, and each alone is a sufficient basis upon which this Court to find that the Navy was reasonable in terminating Takota.

Finally, the Navy never waived its right to terminate Takota for default. The Navy had expressly preserved its right to terminate Takota, and did so within a reasonable time after default.

## ARGUMENT

### I. Standard Of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact, and the Court must resolve doubts about any factual issues in favor of the non-moving party. Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307 (Fed. Cir. 1998).

### II. The Navy Properly Exercised Reasonable Discretion In Terminating Takota For Default

The Navy reasonably and properly exercised its broad discretion to default terminate Takota because it violated the contract specifications, failed to make progress, failed to pay subcontractors, and falsely certified that its subcontractors were or would be

paid. Each of these bases, viewed separately, provide an adequate justification for this Court to uphold the default termination.

It is well settled that a contracting officer has broad discretion to terminate a contract for default. Consol. Indus., Inc. v. United States, 195 F.3d 1341, 1343 (Fed. Cir. 1999). The default provision of a government contract does not require termination after a finding of default, but instead, provides the agency with discretion to do so. McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999). Four factors serve as guideposts in determining whether a contracting officer's decision was reasonable:

> (1) evidence of subjective bad faith on the part of the government official; (2) whether there is a reasonable, contract-related basis for the official's decision; (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation.

McDonnell, 182 F.3d at 1326. Failure to meet contract specifications and an inability to meet the contract delivery schedule are relevant considerations to whether a contract is in default. See id. at 1329. Furthermore, fraud will support a default termination, even when the fraud is not discovered until after the termination, and is offered as a *post-hoc* justification for the termination. See Aptus Co. v. United States, 61 Fed. Cl. 638, 648 (2004) (citing Joseph Morton Co. Inc. v. United States, 757 F.2d 1273, 1277 (Fed. Cir. 1985).

A. Takota's Violations Of Contract Specifications

Takota failed to follow the contract specifications, which directly resulted in its difficulties in performing the contract. A clear violation of contract terms by the contractor supports a finding that a reasonable, contract-related basis for the termination exists. See McDonnell, 182 F.3d at 1328; see also Aptus, 61 Fed. Cl. 638. The court will

sustain "a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason." Kelso v. Kirk Bros. Mech. Contractors, Inc., 16 F.3d 1173, 1175 (Fed. Cir. 1994). The failure to follow contract specifications is enough to justify the termination for default, notwithstanding Takota's allegations of a differing site condition and the Navy's delay in providing direction. See Aptus, 61 Fed. Cl. at 647 (holding that if the court determined that default termination was justified on any ground that was unaffected by delay, evidence of government delay, no matter how convincing, becomes entirely irrelevant).

Aptus is instructive. This Court, in Aptus, held that the plaintiff's violations of contract requirements, specifically, significant violations of submittal requirements, and failure to follow technical requirements, in their totality, justified the contracting officer's decision to terminate plaintiff. The contract had required submittals to be made, which was "an important tool by which the government monitor[ed] progress." Id. at 662-663.

Similarly, Takota, in this case, failed to follow the contract requirements, which, in their totality, justified the default termination. First, Takota failed to provide vital submittals, including a dewatering plan and a sheeting and shoring plan, before it began the dewatering process at Hancock Marina. DPFUF 25. Section 02300 of the contract specifically required Takota to submit a dewatering plan to include procedures for accomplishing the dewatering work. It also required Takota to submit a sheeting and shoring plan to include drawings and calculations describing the methods for the installation of shoring and sheeting to protect the work areas. DPFUF 8. The Navy repeatedly reminded Takota of the contract's requirement to provide such submittals and

requested Takota to provide such submittals, to no avail. DPFUF 36, 40, 62, 64, 67, 71. Takota failed to ever provide a shoring and sheeting plan, and submitted a dewatering plan in May 2006, which the Navy rejected, well after the January 3, 2006 contract completion date and after the April 4, 2006 deadline provided in the Navy's second notice to resume work. DPFUF 71, 74, 75.

Second, Takota failed to hire a professional geotechnical engineer throughout its period of construction. DPFUF 25. Section 02300 of the contract required Takota to hire a geotechnical engineer to perform preconstruction and periodic site visits to assess site conditions, and update and submit excavation, sheeting, and dewatering plans as construction progressed to reflect the changing conditions. DPFUF 9. Had such an engineer been hired from the outset as required, Takota's dewatering and performance under the contract would have been monitored. The difficulties that Takota experienced during its dewatering in October 2005 could have been resolved in an efficient and unproblematic manner, or avoided altogether, had Takota hired a geotechnical engineer to conduct pre-construction and periodic site visits. Instead, Takota did not hire a geotechnical engineer until November 2005, after it had stopped work at the construction site, and after the Navy had reminded Takota of the contract's requirement that one be hired. DPFUF 36, 37, 38.

Third, Takota violated the technical requirement in the contract to provide shoring/bracing for the seawalls. The contract specifically warned that the seawalls were in a "deteriorating" state, and mandated that Takota provide adequate shoring of the seawalls. DPFUF 10. Additionally, the contract required that Takota "provide additional shoring" if, during the dewatering process, Takota observed signs of weakening or

movement of the seawalls. Id. Despite this contract requirement, Takota failed to provide shoring for any part of the seawalls, even after it concluded that the seawalls were in jeopardy of "caving in" if the lagoon were dewatered. Takota never shored, nor provided "additional shoring," as required under the contract, before contacting the Navy about a differing site condition. DPFUF 29, 33. Moreover, because of its failure to shore the seawalls, when the Navy directed Takota to dewater the lagoon so it could observe and investigate the alleged differing site condition of "water flow behind the bulkhead/sheet piles from the top of our temporary cofferdams into the work area," Takota refused to do so because it claimed that the seawalls would collapse.[4] DPFUF 35.

Finally, after the Navy disagreed with Takota's alleged differing site condition claim, and instead concluded that Takota's cofferdams were not suitable measures to dewater the areas given the water pressure, river flow, and tidal wave actions, Takota failed to follow properly the procedures set forth in the Disputes Clause, FAR § 52.233-1, Changes Clause, FAR § 52.243-4, and Changed Conditions Clause, FAR § 52.243-5, all of which the contract incorporated by reference. DPFUF 39. The Disputes Clause required that Takota "proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract." DPFUF 42. The Changes and Changed Conditions Clause required that Takota submit "a proposal for adjustment" if a differing site condition increased the cost and/or time for performing the work. DPFUF 47. Takota did neither. Instead, Takota stopped all work

[4] Takota failed to comply with the formal notice requirements of FAR § 52.236-2(a) for a differing site condition claim, which requires that the contractor promptly, and ***before the conditions are disturbed***, give written notice to the contracting officer of the differing site condition. In this case, Takota allowed the boat ramp sites to fill with water before notifying the contracting officer of the differing site condition.

at the construction site after October 27, 2005, and refused to submit a proposal for adjustment regarding the differing site condition. DPFUF 42, 47.

Moreover, after the Navy and Takota agreed upon a possible solution to the alleged dewatering problem, at a December 7, 2005 meeting, of pumping concrete with seal mix to fill voids behind the bulkheads in the lagoon area, and excavating an "H-shaped" trench into which concrete would be poured, the Navy directed Takota to submit a cost proposal pursuant to the Changes Clause, the Modification Proposal Price Breakdown clause and other clauses related to change work. DPFUF 53, 54. This would have allowed the parties to negotiate an equitable adjustment to the contract for time and cost for proposed work. Instead of filing written notice describing the "general nature and amount of the proposal," as required, and a detailed price breakdown covering all work involved, including any amounts for subcontractors and a justification for any time extension required, Takota requested the Navy to issue a "not to exceed change order." DPFUF 56. Takota never requested anything in writing regarding an equitable adjustment outlining the money or the time it needed, nor did it continue work at the site. DPFUF 57.

B. Takota's Fraudulent Conduct

Takota committed fraud when it failed to pay its subcontractor, Montemayor and United Rentals, even after it had certified in two progress invoices to the Navy, that its subcontractors had been paid or would be paid. Proof of fraud is a ground for default termination. Joseph Morton Co. v. United States, 757 F.2d 1273, 1277 (Fed. Cir. 1985); Aptus, 61 Fed. Cl. at 648. Fraud will support a default termination, even when the fraud is not discovered until after the termination, and is offered as a *post-hoc* justification for

the termination. Id. Default termination based upon fraud, or any ground that was unaffected by delay, allows this Court to determine whether default termination was justified without considering evidence of government delay. Aptus, 61 Fed. Cl. at 647 (holding that if default termination is justified on any ground that is unaffected by delay, evidence of government delay, no matter how convincing, becomes entirely irrelevant). Further, even if the fraud at issue only affected a small portion of the work performed under the contract, the fraud may taint the whole contract, justifying default termination of the contract in its entirety. Id. Certifying that payments to subcontractors had been made or would be made, and failing to do so, acting either knowingly or with reckless disregard of the truth or falsity of the claims submitted is fraudulent conduct. See Lamb Eng'g & Constr. Co. v. United States, 58 Fed. Cl. 106 (2003).

Takota subcontracted with Montemayor to furnish all supervision, labor, materials, tools, plant, equipment and associated miscellaneous apparatus for completion of the work under the contract. DPFUF 11. Montemayor signed a subcontract agreement with Takota sometime in August 2005, and had at least four employees working on the project, including Lee Weaver, Brian Frankie, John Jones Sr., and John Jones Jr. DPFUF 12, 14. Lee Weaver prepared the administrative submittals required under the contract, Brian Frankie prepared the project schedule and worked with equipment and material suppliers to obtain items for the project, and John Jones Sr. and John Jones Jr., who arrived on-site in mid-August, prepared submittals, rented equipment for the project and worked on hiring subcontractors for various portions of the project. DPFUF 14, 15.

On September 26, 2005, Montemayor submitted an invoice in the amount of $28,222.22 to Takota for costs of mobilization, superintendence, and the cost of the job

site trailer. DPFUF 21. Takota never paid Montemayor for the services rendered, even though it had certified that its subcontractors had been paid or would be paid for work performed in its first progress invoice submitted to the Navy on October 18, 2005. DPFUF 22, 27. The Navy paid the full amount of the progress invoice, which was for $32,945.00. DPFUF 27.

On November 18, 2005, Montemayor resubmitted its invoice and provided supporting documentation for work performed and costs incurred under the subcontract, including costs for equipment leased from United Rentals. However, Takota still refused to pay the invoice, and Montemayor subsequently filed a claim with Takota's surety. DPFUF 45. Five days later, on November 23, 2005, Takota submitted its second progress invoice to the Navy in the amount of $130,000, again, certifying that its subcontractors had been or would be paid. The Navy paid Takota $51,500.00, and withheld $78,500 for Takota's cofferdams on the basis that, although they were on site, they were not functioning properly. DPFUF 48.

United Rentals submitted invoices to Takota in October and November 2005. DPFUF 44. In December 2005, United Rentals contacted Takota regarding payment status. On December 28, 2005, Takota's project manager, Chad Riley, reviewed the invoices for accuracy. When the invoices remained unpaid, United Rentals submitted a claim to Takota's surety. DPFUF 51.

On May 18, 2006, United Rentals sent another email to Takota asking when it intended to pay the overdue invoices. United Rentals subsequently turned the matter over to a collection agency, and eventually to an attorney. United Rentals filed a lawsuit in the district court in Clark County, Nevada on July 6, 2007. DPFUF 51.

C. Takota's Failure To Make Progress

The Navy's termination for default, aside from Takota's failure to follow the contract specifications and fraudulent conduct, was reasonable because Takota failed to make any progress in performance of the contract after October 27, 2005, when it alleged that a differing site condition existed. Takota refused to comply with any of the Navy's numerous directives and attempts to resolve Takota's difficulties in dewatering the boat ramp areas.

To uphold a default termination for failure to make progress, the government must establish that it had a reasonable belief that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance. McDonnell Douglas Corp. v. United States, 323 F.3d 1006, 1016 (Fed. Cir. 2003). In applying that standard, the court has required that the termination decision be based upon tangible, direct evidence reflecting the impairment of timely completion. Id. Although the contracting officer's testimony and contemporaneous documents are relevant to that determination, the trial court may consider other factors such as a comparison of the percentage of work completed and the amount of time remaining under the contract, and other pertinent circumstances surrounding the termination decision. Id. at 1016, 1017. Precedent does not require that the contracting officer be correct in his assessment, but only needs to be "justifiably insecure about the contract's timely completion." Id. at 1017. A termination for failure to make progress usually occurs where the contractor has fallen so far behind schedule that timely completion has become unlikely. See Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. 110, 129 (2001). In this connection, the government is not required to prove that it was

impossible for the contractor to complete performance on time. Rather, a termination for default will be upheld where "a demonstrated lack of diligence indicates that [the government] could not be assured of timely completion." Id.

Takota demonstrated a lack of diligence when it refused to comply with any of the Navy's directives, refused to proceed with work at the construction site, and failed to provide required submittals by the deadlines provided in the Navy's second notice to resume work. Contrary to Takota's bald faced allegation that the Navy failed to provide Takota with direction on how to proceed in light of its alleged differing site condition claim, Pl.'s Br. at 8-10, the Navy did, in fact, provide numerous directives, all of which Takota refused to follow.

First, Takota refused to comply with the Navy's directive to dewater, stating that the seawalls, which it did not shore, would fail. As already discussed, had Takota complied with the technical requirement under the contract to shore the deteriorated seawalls, Takota would have been able to comply this directive. DPFUF 35.

Second, after being advised on November 1, 2005 by AROICC Crite that it was required to submit a sheeting and shoring plan and a dewatering plan, Takota failed to submit the required technical submittals. DPFUF 36.

Third, on November 13, 2005, AROICC Crite directed Takota to use sheet piling in place of the temporary cofferdams chosen by the company. However, Takota refused to comply with this directive to use sheet piling as temporary cofferdams, and maintained that a differing site condition existed based upon voids located behind the seawalls. DPFUF 40, 41.

Fourth, when notified by Takota on November 22, 2005 that it planned to treat the alleged differing site condition as a constructive change and order an additional cofferdam to enclose the boat ramp areas, the Navy advised Takota to submit an equitable adjustment for review and approval before proceeding with additional work.[5] However, Takota refused to submit an equitable adjustment for the additional cofferdam that it wanted to order. DPFUF 46, 49.

Fifth, following a meeting on December 7, 2005, during which the parties discussed a possible solution to the alleged dewatering problem, the Navy directed Takota to submit an equitable adjustment for cost and time for the proposed work. Again, Takota refused to submit an equitable adjustment for this proposed work, and instead asked the government to issue a "not to exceed" change order. DPFUF 53, 54, 56.

Sixth, after the January 3, 2006 completion date had passed, AROICC Crite on January 6, 2006 again asked Takota to submit an equitable adjustment for the proposed work discussed at the December 7, 2005 meeting. In the letter, AROICC Crite acknowledged that a time extension would be granted once the parties negotiated the additional cost and a revised schedule. DPFUF 58.

Seventh, the Navy convened a meeting between the parties on February 28, 2006, in an effort to move forward with the project and find a resolution so Takota would proceed with the work required by the contract. The Navy offered to reset the schedule

[5] The contract clauses relating to change work and cost and pricing of change work are: Changes, FAR § 52.243-4 (August 1987); Changes and Changed Conditions, FAR §52.243-5 (April 1984); Modification Proposals – Price Breakdown, DFARS §252.236-7000 (December 1991); Pricing of Contract Modifications, DFARS §252.243.7001; Requests for Equitable Adjustment, DFARS §252.243.7002 (March 1998); Differing Site Conditions, FAR §52.236-2 (April 1984); Disputes, FAR §52.233-1 (July 2002).

and accept Takota's temporary cofferdams and provide payment although it had concerns with regards to their suitability for dewatering, given the conditions in Hancock Creek. The Navy explained that it was reasonable to expect ground water, surface run-off, seepage from the seawalls, and leakage from the cofferdams, and therefore Takota needed to pump around the clock in order to successfully dewater the areas. Takota, in response, did not acknowledge the Navy's offer or request to move the project forward. Instead, it maintained that a differing site condition existed and that dewatering could therefore not be accomplished. DPFUF 62, 63.

Eighth, on March 7, 2006, the Navy issued a notice to resume work and directed Takota to submit a geotechnical report, dewatering plan, shoring and sheeting plan, and other required submittals. DPFUF 64. Takota failed to submit any of the requested submittals, causing the Navy to issue, on March 24, 2006, a second notice to resume work again directing Takota to provide the submittals required under the contract. DPFUF 66, 67. The Navy directed Takota to provide critical submittal including a geotechnical report, dewatering plan, shoring and sheeting plan, progress schedule, quality control plan, and a revised schedule of prices by April 4, 2006. The Navy directed Takota to provide the remaining submittals by April 18, 2006. DPFUF 67.

On April 20, 2006, the Navy issued a show cause letter to Takota because the company had failed to provide most of the critical submittals due on April 4, 2006, including the shoring and sheeting plan, progress schedule, dewatering plan, quality control plan, and schedule of prices. Takota failed to provide any of the submittals that were due on April 18, 2006. Takota's response to the show cause letter was that "circumstances dictate and warrant the delays." DPFUF 71, 73.

It became increasingly evident to the Navy that Takota was not going to "prosecute diligently its work under the contract," and the Navy therefore concluded that default termination was in the best interests of the government. McDonnell, 323 F.3d at 1017; see also Aptus, 61 Fed. Cl. at 656 (requiring that we look at the results of the contractor's efforts, not simply the sweat he expended). As a result of Takota's refusal to work at the site after it alleged a differing site condition, there was no progress whatsoever in the demolition and construction of the boat ramps. Therefore, on May 24, 2006, the Navy reasonably and properly exercised its broad discretion in issuing modification P00001 terminating Takota for default. DPFUF 76.

## III. The Navy Did Not Waive The Original Contract Completion Date Or Its Right To Terminate Takota

The Navy did not waive the original contract completion date of January 3, 2006 nor did it waive its right to terminate Takota. Takota claims that it never breached or defaulted on the contract, that it appropriately stopped work under the contract to notify the Navy of a differing site condition, that the Navy did not provide direction, and that consequently the Navy's default decision on the basis that Takota failed to meet the original completion date was unreasonable. Pl.'s Br. at 9-10. Takota's claims are baseless and should be rejected.

Takota relies upon the DeVito doctrine to argue that the Navy waived its right to terminate the contract. Under DeVito, the necessary elements that must be present for the Court to find that the government waived its right to terminate Takota are: "(1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied

or express consent." Empire Energy Mgmt. Sys., Inc. v. Roche, 362 F.3d 1343, 1354 (Fed. Cir. 2004); DeVito v. United States, 188 Ct. Cl. 979 (1969).

The purpose of the waiver doctrine is to protect contractors who are led to believe that time is no longer of the essence and undertake substantial efforts after the performance date specified in the contract has passed. Florida Dep't of Ins. v. United States, 81 F.3d 1093, 1096 (Fed. Cir. 1996). Therefore, waiver has only been applied when "exceptional or rare circumstances are presented in a construction contract case." Indemnity Ins. Co. of North America v. United States, 14 Ct. Cl. 219 (1988).

A. The Navy Terminated Takota Within A Reasonable Time After Default

The Navy terminated Takota within a reasonable time after Takota's default. What is considered to be a reasonable time for the government to terminate a contract after default depends on the circumstances of each case. DeVito, 188 Ct. Cl. at 991. A contracting officer should not have to immediately terminate a contract, after a contractor's failure to meet a delivery date, on pain of waiving the right to do so as fairness to the contractor requires that the contracting officer allow a reasonable time within which the contractor may endeavor to demonstrate that its failure to deliver was excusable. Indemnity Ins. Co. v. United States, 12 Cl. Ct. 219, 226 (1988). Even when the delay is found not to be excusable, the contracting officer should have reasonable time within which to determine whether a default termination would be in the best interest of the government as the nondefaulting party. See id.

Therefore, the fact that a contracting officer does not immediately, after a contractor's failure to meet a contract completion date, act to terminate the contract for default does not mean the government waived its right to do so. See id. Moreover, the

period of termination after default is greater where the contractor's situation is such "as to render performance impossible or unlikely, than where he continues performance in reliance on the lack of termination and proceeds to incur obligations in efforts to perform." DeVito, 188 Ct. Cl. at 991.

In Indemnity Ins., this Court held that the government did not waive its right to terminate the plaintiff for default by its failure to do so between July and October 1984 because: (1) the government advised plaintiff that it was preserving all of its rights and was considering termination if certain conditions were not met; (2) the plaintiff was given a chance by the contracting officer to explain its failure to make substantial progress; and (3) the contracting officer needed time to consider whether default termination was in the best interest of the government. Id. at 226.

In this case, because of Takota's lack of performance and total absence from the construction site, the Navy was allowed more time to assess whether termination based upon Takota's lack of progress, failure to follow the contract specifications, and failure to perform the contract within the specified time, was in its best interests. DPFUF 34. From January to May 2006, the Navy attempted to work with Takota on resolving the issues so that Takota would proceed with work under the contract. DPFUF 57, 56. However, as discussed already, Takota refused to comply with any of the Navy's directions. Moreover, Takota failed to provide all required submittals by the dates stated in the second notice to proceed, and it became apparent to the Navy that default terminating Takota would be in its best interests. The Navy then issued a show cause letter to Takota, and subsequently terminated Takota for default. DPFUF 71, 76.

Additionally, the Navy acted to preserve its right to terminate Takota for failure to perform the contract within the January 3, 2006 completion date. "The Government can retain its rights by expressly indicating as much to the other party or by assessing liquidated damages." Abcon Assocs., Inc. v. United States, 44 Fed. Cl. 625, 629 (1999). After Takota stopped work at the construction site in late October 2005, the Navy had warned Takota several times that the completion date of the project was January 3, 2006, and that liquidated damages would be assessed for delays in completion beyond the completion date. Specifically, the Navy warned Takota about the completion date in a November 13, 2005 email to Takota. DPFUF 40. Next, on December 7, 2005, at a meeting between the Navy and Takota representatives to discuss Takota's differing site condition claim, the Navy again warned Takota of the contract completion date and the imposition of liquidated damages. DPFUF 53. Further, on March 7, 2006 and March 24, 2006, after waiting for Takota to submit an equitable adjustment so that a time extension could be established, and after attempting to resolve Takota's dewatering difficulties and its alleged differing site condition claim, the Navy issued notices to resume work in which it expressed that it had "neither waived the completion date, nor its right to assess liquidated damages." DPFUF 64, 67.

Takota argues that it never breached or defaulted on the contract, and that the Navy therefore did not have a right to terminate the contract for default based upon the January 3, 2006 completion date. Pl.'s Br. at 10, 12. As already discussed, the Navy disagrees that Takota never breached or defaulted on the contract. Takota fails to acknowledge to this Court that it not only failed to perform the contract within the original completion date, but it also failed to make progress under the contract, failed to

follow the contract specifications, failed to pay its subcontractors, and committed fraud. The Navy properly and reasonably exercised its broad discretion when it terminated Takota for default upon these bases.

Takota also argues that the Navy waived the January 3, 2006 contract completion date because it had recognized Takota's entitlement to a time extension to account for delays by the Navy in furnishing Takota direction regarding the seawall condition. Pl.'s Br. at 14. This assertion is inaccurate and misleading. The Navy was willing to grant Takota a reasonable time extension only if Takota made efforts to proceed with the work as directed by the Navy. On January 6, 2006, the Navy had sent a letter to Takota stating that ***only after*** an appropriate equitable adjustment for the proposed solution discussed in the December 2005 meeting could be negotiated, a suitable time extension would be granted. DPFUF 58. The Navy never stated that this time extension would be automatically granted nor did it state the extension was due to its own delays in providing direction. Needless to say, Takota refused to submit an equitable adjustment nor did it request for a time extension as directed by the Navy, and therefore no time extension was provided.

Takota further cites to the contracting officer's April 20, 2006 show cause letter to Takota in which the contracting officer directed Takota to update its progress schedule "to reflect the delay in work between November 2005 and May 2006 and projecting to a new completion date," in support of its argument that the Navy recognized Takota's entitlement to a time extension. Pl.'s Br. at 14. Again, Takota attempts to mislead the Court by taking this sentence out of context. In reading this letter in the entirety, no rational basis exists to conclude that Takota could have failed to recognize that this time

extension would not be automatically granted. This show cause letter notified Takota that it had failed to provide any submittals that were due on April 18, 2006, and that it had only provided two out of the six submittals that were due on April 4, 2006. Had Takota complied with the notices to resume work, and diligently provided the submittals by the time requested, a reasonable time extension would have been granted. However, Takota, failed to provide the submittals on time.

Moreover, even if the Court finds that the Navy had waived its original January 3, 2006 completion date, this does not mean that the Navy waived its right to terminate Takota for default. A party that chooses to proceed with the contract, overlooking a contractor's default for several months, does not thereby waive its right to terminate for default. See McDonnell, 182 F.3d at 1327. Takota focuses on its failure to meet the January 3, 2006 completion date as the sole reason for the default termination, and fails to recognize that other reasons, namely failure to make progress, failure to follow the contract specifications, and committing fraud, existed that provided the Navy with reasonable bases to terminate Takota for default.

B. Takota Had Not Continued Performance Under The Contract

Takota had not continued performance under the contract, a necessary element in order for Takota to prove waiver. Empire Energy, 362 F.3d at 1354; DeVito, 188 Ct. Cl. 979. After October 27, 2005, only two weeks into its performance, Takota stopped all work, and never resumed work at the construction site. DPFUF 34.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court enter judgment in favor of the United States, deny plaintiff's motion for partial summary judgment, and dismiss plaintiff's complaint.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

/s/Jane C. Dempsey
JANE C. DEMPSEY
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.,
ATTN: Classification Unit-
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-0972
E-mail: Jane.Dempsey@usdoj.gov

July 23, 2008

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of July, 2008, a copy of the foregoing Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Partial Summary Judgment was served by electronic delivery to:

Robert J. Symon
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, D.C. 20036
rsymon@bradleyarant.com

/s/ Jane C. Dempsey