IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TAKOTA CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-553C<br>(Senior Judge Bruggink) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following responses to plaintiff's proposed findings of uncontroverted fact.

1. Contract No. N62470-05-C-7156 ("the Contract") was awarded to Takota Corporation ("Takota") on July 22, 2005. The Contract called for the extension of two boat ramps and dredging at the Hancock Marina, Marine Corps Air Station Cherry Point, North Carolina. The contract price was $463,000.00. The contract performance period was anticipated by the Contract to be 150 days and the Contract completion date was set as January 3, 2006.

**RESPONSE**: Agree.

2. In order to perform the required work on the boat ramps, Takota was required to seal off certain areas of the Marina and pump out the water. Takota planned to affect this sealing by the use of temporary cofferdams. (See Tab 1, ¶ 4, Declaration of Chad Riley). The contract documents specifically acknowledged that the existing seawalls/bulkheads

(the "Seawalls") in these areas were in a deteriorated state and that the contractor would have to monitor movement and/or erosion of the Seawalls during construction:

> GENERAL NOTES (DWG C-03 – DEMOLITION PLAN):
>
> 3. Dewatering the lagoon will cause a significant unbalanced load condition of the already deteriorating steel sheet pile bulkhead (seawalls). Contractor shall monitor all existing bulkhead (seawalls) during the dewatering and construction process. Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction.
>
> CONSTRUCTION SEQUENCE (DWG C-04 – SITE PLAN):
>
> 3. The area enclosed by the coffer dam shall be dewatered prior to construction/demolition by means that prevent/minimize erosion. Bulkheads (seawalls) shall be carefully monitored during dewatering process. Contractor shall provide adequate shoring/bracing for bulkheads (seawalls). Should signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction.

See Tab 2; Contract Plans & Drawing, Sheets C-03 & C-04.

**RESPONSE**: Agree.

3. To dewater, Takota installed its temporary cofferdams with the edges abutting the bulkheads and the bottom securely anchored. (See Tab 1, ¶ 5 Declaration of Chad Riley). Once Takota started pumping water out of the containment area, it noticed that ground water was flowing into the dewatered area from behind the existing Seawall. *Id*. In essence, water was being forced through fissures and voids that existed between the back side of the Seawalls and the earth, causing erosion to that area plus destabilization of the Seawalls themselves. *Id*. It also prevented the area from becoming fully dewatered. *Id.*

**RESPONSE**: Disagree. When Navy engineers and Dewberry & Davis ("Dewberry"), the Navy's architectural and engineering firm, visited the site to investigate Takota's differing site condition, they observed that the temporary cofferdams

used by Takota were not properly sealed at the point they were supposed to abut the seawalls. In addition, they did not see evidence of a differing site condition, and concluded that Takota's cofferdams were not suitable to dewater the areas given the water pressure, river flow, and tidal wave actions. DPFUF 39; DA Tab 26.[1] The Navy had requested Takota to dewater the boat ramp areas to observe the alleged differing site condition, but Takota refused, responding that the seawalls would fail. DPFUF 35; DA Tab 23, pages 18-20. Under the contract, Takota was required to shore the seawalls, and provide additional shoring should there be signs of movement or additional deterioration. Takota failed to do so even after it feared that the seawalls would fail. DPFUF 10; DA Tab 1, drawings C-03 and C-04; DA Tab 23, page 28. Regardless, Takota had dewatered enough of the lagoon to begin demolition of Boat Ramp 1 without any seawall failure. DPFUF 29; DA Tab 17, report numbers 16 and 17. Moreover, Takota's project superintendent, John Jones, Sr., informed the project manager, Chad Riley, in an email dated October 22, 2005, that the water flow was not beyond the capacity of the pumps to keep the lagoon dry. DPFUF 30; DA Tab 20.

4. Worried that the continued water flow would further erode and destabilize the area behind the Seawalls, possibly leading to their collapse, Takota applied the guidance from the Drawing Notes and ceased dewatering and allowed the condition to stabilize. (See Table 1, ¶ 6, Declaration of Chad Riley). In accordance with the Contract requirements, on October 28, 2005, Takota notified the Navy that it was suspending operations due to the unsafe condition and asked for direction from the government. (See *Id.*; Tabs 3, 4, and 5).

[1] "DPFUF__" refers to the Defendant's Proposed Findings of Uncontroverted Fact. "DA__" refers to the defendant's appendix.

**<u>RESPONSE</u>**: Disagree. Takota did not properly apply the guidance from the Drawing Notes. Takota failed to provide shoring (and, for the matter, any additional shoring) for the seawalls, as required under the contract, before contacting the Navy for direction. DPFUF 10, 29; DA Tab 1, drawings C-03 and C-04; DA Tab 17, report numbers 16 and 17; DA Tab 23, page 28.

5. In response to Takota's notice of the condition of the Seawalls, the Navy Project Chief Engineer informed Takota that the problem stemmed from Takota's failure to follow the contract specification by not using sheet piling. (See Tab 6). The Navy immediately retracted this position when the Navy discovered that the referenced specification had mistakenly not been included in the contract documents furnished to Takota. *Id*.

**<u>RESPONSE</u>**: Disagree. In response to Takota's notice regarding the condition of the seawalls, the Navy notified Takota that it failed to follow the contract specifications. The Navy told Takota that it was required to submit a sheeting and shoring plan as part of the dewatering effort and that it did not have a geotechnical engineer, as required under the contract. DPFUF 36; DA Tab 24. Although the Navy directed Takota to dewater the lagoon, Takota refused to do so. DPFUF 35; DA Tab 23, pages 18-20. The Navy investigated the site with Dewberry, and determined that Takota's cofferdams were not suitable to dewater the areas. It therefore directed Takota to use sheet piling as cofferdams, which Takota refused to do. DPFUF 39, 40; DA Tab 26; DA Tab 27.

6. When the Navy failed to investigate the condition of the Seawalls, Takota engaged two professional geotechnical engineers from QORE Property Sciences to visit

the project site to observe and assess the situation. (See Tab 7). QORE determined, via excavated test pits behind the Seawalls, that the water coming into the construction site from behind the Seawalls was caused by a combination of three elements: (1) the Seawall's deteriorated state; (2) the previously unknown condition of unsuitable materials used to backfill the Seawalls (e.g., bricks, asphalt, hardened concrete mix) as well as voids; and (3) the increased hydrostatic pressure caused by the damming operation (*Id.* At p.2). QORE engineers concluded that the effectiveness of the temporary cofferdams was seriously impacted by the condition of the existing Seawalls, especially given the complexity of the materials and voids found behind the walls. *Id*. One of the solutions suggested by QORE in response to the problem was to trench back perpendicularly from the Seawalls and to fill the trench with concrete to establish permanent groundwater cutoff walls. *Id*.

**RESPONSE**: Disagree. First, as already discussed, the Navy did investigate the site and the site conditions. DPFUF 35, 39; DA Tab 23, pages 18-20; DA Tab 26. Second, Takota did not hire QORE, the geotechnical engineer, as a result of the Navy's inaction, but instead hired the geotechnical engineer after the Navy advised Takota that the contract required it to hire a geotechnical engineer throughout construction. DPFUF 37, 38; DA Tab 24; DA Tab 25; DA Tab 61. Finally, nothing in QORE's report discusses that the effectiveness of the cofferdams was seriously impacted by the condition of the seawalls. In fact, the solution proposed for the lagoon area was to relocate the port-a-dam to reduce the size of the dewatering area. There was no mention of repairing or doing anything to the seawall in the lagoon area. PA Tab 7.[2]

---

[2] "PA__" refers to the plaintiff's appendix.

7. On November 22, 2005, Takota sent a letter to the Contracting Officer advising that, as a result of the Navy's inaction addressing the differing site condition notice, Takota would proceed with the work by ordering additional cofferdam to enclose just the boat ramp areas so that Takota could proceed with the work and avoid a substantial claim for extended overhead costs. (See Tab 8; ¶ 9). Takota also informed the government that it would be treating this work as a constructive change. *Id*.

**RESPONSE**: As already discussed, disagree with Takota's characterization that the Navy did not take any action to address the alleged differing site condition. Agree that Takota sent a letter dated November 22, 2005. The document speaks for itself.

8. On November 28, 2005, Takota was advised by the Navy in writing that Takota was precluded from proceeding with the work until after any equitable adjustment request associated with remedying the condition of the Seawalls was presented to and approved by the ROICC Office. (See Tab 9). Takota immediately confirmed in writing to the Contracting officer that the government was directing Takota to stop work pending submission and review of an equitable adjustment request. See Tab 10; Tab 1 ¶ 10.

**RESPONSE**: Disagree. The Navy had advised Takota to submit an equitable adjustment because Takota had informed the Navy that it was going to proceed with the work by ordering an additional cofferdam to enclose the boat ramp areas. Ordering an additional cofferdam has nothing to do with "remedying the condition of the seawalls." DPFUF 46, 49; DA Tab 31; DA Tab 33.

9. By e-mail dated December 6, 2005, the Navy's Project Architect communicated to the Navy its comments to Takota's earlier-proposed solutions to the problem. (See Tab 11). The Project Architect stated that Takota's suggestion to add deadman anchors

or pump grout behind the seawalls "may have some merit … and [that the project Architect] would not object to a reasonable modification to accomplish the work." *Id*. The Navy's Project Architect also agreed that another solution proposed by Takota – damming up directly around the boat ramps long enough to install the new ramps, followed by dredging – had merit, although concern was expressed that the contractor might "damage work he just placed with the dredging operation." *Id*.

**<u>RESPONSE</u>**: Agree. The email further stated that "The dewatering is a means and methods issue and totally the responsibility of the contractor. Differential loading – and support – on the sea wall clearly should have been assumed based on a review of the contract documents during bidding." PA Tab 11.

10. On December 7, 2005, the Navy convened a "Mutual Understanding Meeting" with Takota to discuss measures to control the amount of water flow from behind the Seawalls to sustain a dry working environment. See Tab 12; Tab 13. During those discussions, the Navy and Takota agreed that excavating behind the bulkhead and filling the trench with concrete was the approach that would be used to correct the problem. See Tab 13. At that time, there was no dispute that the bulkhead needed to be repaired if the project was to be completed. See Tab 12. The only issue that remained at the conclusion of the meeting was for the Navy to find additional funds to pay for the additional work that would be required. *Id*.

**<u>RESPONSE</u>**: Agree that on December 7, 2005, Navy representatives met with Takota to discuss possible approaches. Excavating behind the bulkhead and filling the trench with concrete was discussed as a possible approach. The Assistant Resident Officer in Charge of Construction ("AROICC"), ENS Crite, requested Takota to submit a

cost proposal for the work, but Takota failed to do so. DPFUF 53, 54, 56; DA Tab 36; DA Tab 38; DA Tab 23, pages 107-108.

11. By letter dated December 21, 2005, in response to a request by the Navy for an estimate to perform the corrective work, Takota notified the Contracting Officer that it could not provide a "precise" estimate to perform the repairs necessary to the bulkhead so that dewatering could occur. See Tab 14; Tab 1, ¶ 12. Takota did inform the Navy that the concrete trench solution would cost at least $300 per cubic year plus $2,300 per day for a dive team, plus the cost of any materials for the bulkhead repair. *Id*.

**RESPONSE**: Agree.

12. On January 6, 2006, the Navy confirmed in writing that excavating the bulkhead and filling the trench with concrete was the agreed upon approach to solve the differing site condition problem. See Tab 13. The Navy further stated, with regard to Takota's Contract, that "a suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work." *Id*.

**RESPONSE**: Agree. However, Takota never requested anything in writing regarding an equitable adjustment outlining the money or the time extension that was needed. DPFUF 57, 58; DA Tab 51, page 32.

13. Subsequent to the Navy's January 6, 2006 correspondence (Tab 13), the Navy decided not to proceed with the necessary corrective work to the Seawalls when the Navy learned that it did not have the funding to pay for it. See Tab 15; Deposition Testimony of Antoine Crite, page 107, line 6 – page 109, line 13.

**RESPONSE**: Disagree. This is a complete misrepresentation of AROICC Crite's deposition testimony. AROICC Crite testified that he had directed Takota to submit a cost proposal, and that had Takota submitted one, which it did not, he would have gone to the funding agency to determine whether funding was available. DA Tab 23, pages 107-109.

14. During the pendency of discussing the Seawall issue with the Navy, Takota submitted a pay application on November 23, 2005, which included $78,500 for the installation of the cofferdams. See Tab 16. Without evidence or explanation, the Navy rejected this portion of Takota's payment application on the basis that the cofferdams failed to function properly. See Tab 17.

**RESPONSE**: Agree that Takota had submitted a pay application on November 23, 2005, which included $78,500 for the cofferdams. Disagree that the Navy rejected this portion of Takota's payment application without evidence or explanation. Prior to the Navy approving Takota's schedule of values, it had spent considerable time discussing the format with Takota, and had requested Takota to submit it with a breakdown of labor and materials. However, Takota was unwilling to pursue a more detailed breakdown of the schedule of values, and instead, forwarded a letter dated October 17, 2005, agreeing that it would not bill for a line item until "it is 100% completed and inspected by the Government." DPFUF 26; DA Tab 14; DA Tab 51, pages 17-20; DA Tab 15. After Takota had notified the Navy of a differing site condition due to leakage of water, the Navy investigated the site and observed that the cofferdams used by Takota were not properly sealed at the point they were supposed to abut the walls. In addition, they did not see evidence of a differing site condition, and concluded

that the cofferdams were not suitable to dewater the areas. DPFUF 39; DA Tab 26. Therefore, when Takota submitted its invoice for the cofferdams, the Navy responded that money for the cofferdams was being withheld because "they were not functioning properly." DPFUF 48; DA Tab 32.

15. By letter dated February 1, 2006, Takota submitted a request for a final decision to the Contracting Officer seeking payment of the $78,500 being withheld by the Navy for the cofferdams. See Tab 18.

**RESPONSE**: Agree.

16. Immediately following receipt of Takota's February 1, 2006 request for a Contracting Officer's final decision, the Navy convened an internal strategy meeting on February 6, 2006. Notes from that meeting indicate that Ken [Wilson], a Navy attorney stated that Takota had filed a claim and that it would go through the claims process, and that, in the meantime, the Navy should issue Takota a termination for default. See Tab 19.

**RESPONSE**: Disagree. Takota's assertion regarding the Navy deciding to issue a termination for default on February 6, 2006, based upon handwritten notes of the meeting is pure speculation. Not only are the notes unclear, both AROICC Crite and Marjorie Sadler, the contracting officer, testified during deposition that a termination for default decision was not made in February. Ms. Sadler testified, ". . . I would know that. We had not made a decision to T for D, not at the beginning of February." She explained that was an option, but that was not the road that the Navy chose to take. DA Tab 51, pages 39-40. AROICC Crite also testified that it was not true that at the February 6, 2006 meeting, the Navy had decided to terminate Takota's contract. DA Tab 23, pages 128-

129. He further testified that "[t]he only discussion that I was in on [in January and February] was to get the contractor back on-site so we could move forward, so we can – so they can complete this project." DA Tab 23, page 110.

17. The Assistant Resident Officer in Charge of Construction ("AROICC") for the Navy confirmed, during his deposition, that the Navy's decision to terminate for default reached during the February 6, 2002 meeting was based on Takota issuing a claim "because normally when a contractor – issues a claim, they're not going to do any more work for anybody." (See Tab 15, Crite Deposition Transcript, p. 137, lines 8-14).

**RESPONSE**: Disagree. AROICC Crite's testimony that "because normally when a contractor – issues a claim, they're not going to do any more work for anybody," was clearly in reference to the Navy's March 7, 2006 notice to resume work, not the February 6, 2006 meeting:

> Q: This is March 7, 2006.
> A: Uh-huh.
> Q: Isn't it true that by this date the Navy had already decided to terminate Takota's contract for default?
> A.: That decision was based off Takota issuing a claim. . . .

DA Tab 23, pages 136-137. In addition, AROICC Crite was mistaken. Marjorie Sadler, the contracting officer, testified during deposition that when the Navy issued its March 7, 2006 notice to resume work, the purpose was to attempt to get Takota back to work. The Navy had not wanted to take the road of default with Takota, so it had issued the March 7, 2006 and March 24, 2006 notices to resume work. Had Takota made an effort to resume work, a request for additional time would have been entertained. Tab 51, pages 51-53.

18. Notwithstanding the Navy's plan to terminate Takota's contract for default, by letter dated March 7, 2006, the Contracting Officer directed Takota to resume work on the project without direction regarding corrective measures to account for the condition of the Seawalls or establishing a new completion date to account for the suspension of work while the parties had addressed the issue. (See Tab 20). The Contracting Officer informed Takota that the already-passed project completion date (January 3, 2006) remained in effect and that the Navy neither waived that date nor its right to assess liquidated damages. Finally, the letter directed Takota to re-submit many of its earlier submittals, even through previously approved, and refused to permit construction activities pending their approval. *Id*.

**RESPONSE**: Disagree. As already discussed, the Navy was not planning to terminate Takota for default when it sent the March 7, 2006 notice to resume work. The Navy sent the notice to attempt to get Takota to begin work. Had Takota done so, the Navy would have entertained a request for an extension of time. The letter directed Takota to provide the required submittals, many of which the Navy never received. DA Tab 51, pages 51-61. With regards to the ones the Navy had received in 2005, such as the personnel submittal, they would have changed due to the passage of time because Takota had stopped work at the site in October 2005. DA Tab 51, page 61.

19. Takota recommenced performance in compliance with the Contracting Officer's directive. In addition, Takota requested its geotechnical engineer, QORE, to address a solution to the Seawall condition problem so that dewatering could be accomplished that would permit construction activities. (See Tab 1, ¶ 15).

**RESPONSE**: Disagree. The Navy saw "little to nothing" happen between March 7, 2006, when the Navy sent out its first notice to resume work, and March 24, 2006, when the Navy sent out its second notice to resume work. During that time, Takota had not provided any submittals as requested in the notice to resume work. DA Tab 51, pages 52-53.

20. On March 24, 2006, less than three weeks following the notice to resume work and provide new submittals, the Contracting Officer wrote to Takota advising that the required submittals had not yet been provided and that the Navy required six of the submittals, including an updated progress schedule, by April 4, 2006 and the remainder by April 18, 2006. See Tab 21. The Contracting Officer threatened Takota with a default termination if it failed to meet either deadline. *Id*. In this letter, the Contracting Officer ignored the fact that the Navy had received on March 24, 2006 Takota's submittal for the Geotechnical Engineer's Report. See Tab 24.

**RESPONSE**: Agree that on March 24, 2006, the Navy sent Takota a second notice to resume work. The document speaks for itself.

21. On March 29, 2006, following QORE's further on-site inspection for Takota for the purpose of developing its submittal for a dewatering, Takota was chastised by the Contracting Officer for allowing QORE on site to "work" before all re-submittals had been approved, stating that "no actual work onsite can be performed until the required submittals have been submitted and approved and then work will proceed only after their [sic] is a Superintendent and a Quality Control person on site to oversee the work." See Tab 22.

**RESPONSE**: Agree that on March 29, 2006, the Navy sent Takota a letter and an email regarding contract requirements. The letter clearly indicates that Takota had not notified the Navy of Takota's geotechnical team's arrival on site for the purpose of issuing badges. The Navy therefore reminded Takota that the security requirements under the contract required each contractor employee to submit the following information: "1) documentation of a criminal records check from the state or county covering the previous two years, 2) picture identification, 3) proof of employment." The Navy further stated that "The Government is eager to complete this project but Base and ROICC policies and procedures will be followed." PA Tab 22.

22. On March 30, 2006, Takota faxed and emailed a reply letter to the Contracting Officer, listing each of the requested submittal requirements referenced by the Contracting Officer and indicating whether or not a new submittal would be necessary and would be provided. See Tab 23.

**RESPONSE**: Agree that on March 30, 2006, Takota provided a letter regarding the status of the submittal requirements.

23. On April 20, 2006, the Contracting Officer issued Takota a Show Cause Notice, claiming that Takota had "repudiated performance" of the Contract by virtue of its "limited response to [the Navy's] previous request for critical submittals outlined in subject contract and the language of [Takota's] letters of 29 March and 30 March 2006. . . coupled with . . . [Takota's] refusal to resume work in a timely manner." See Tab 24. Within the Show Cause Notice, the Contracting Officer told Takota that its progress schedule "needs to be revised to reflect the delay in work between November 2005 and May 2006, and projecting a new completion date."

**RESPONSE**: Agree the Navy issued a show cause letter on 20 April 2006. The letter indicated that Navy had not received any of the submittals that were due on April 18, 2006. With regards to the submittals due on April 4, 2006, the Navy had not received a progress schedule and schedule of prices, nor had it received the key submittals, the dewatering plan and shoring and sheeting plan. PA Tab 24.

24. Takota responded to the Contracting Officer's Show Cause Notice on May 2, 2006. See Tab 25. Takota's response included the information that a revised schedule had been submitted showing the submittals and initial work preparation period beginning on March 26, 2006, with substantive project work scheduled to begin in mid May 2006. The new projected completion date was projected by Takota to be July 30, 2006, a period of 145 calendar days from the Contracting Officer's March 7, 2006 direction to proceed. *Id*. P. 4.

**RESPONSE**: Agree that on May 2, 2006, Takota sent a letter to the Navy. The document speaks for itself.

25. Takota's response to the Show Cause Notice also included the information that the following submittals had been addressed by Takota within the Contracting Officer's April 4, 2006 deadline: Submittal No. 10 (list of contract personnel, construction schedule, and list of subcontractors); Submittal No. 11 (QC manager and qualifications and QC plan); Submittal No. 12 (accident prevention plan, activity hazard analysis, site safety manager, and environmental plan); Submittal No. 13 (pre-construction survey report); Submittal No. 14 (demolition plan); and Submittal No. 15 (concrete mix design). See Tab 25, 0. 2

**RESPONSE**: Agree that on May 2, 2006, Takota sent a letter to the Navy, responding to the Navy's show cause letter. The document speaks for itself. At this point, the Navy still had not received all of the required submittals, including the dewatering plan.

26. Takota also submitted its dewatering plan to the Navy on May 2, 2006. See Tab 26. On May 23, 2006, Takota sent an email to the AROICC asking him to "Please check the approval status of submittal number 16 (dewatering plan) which was submitted on 5/2/06". See Tab 27.

**RESPONSE**: Agree that on May 23, 2006, Takota sent an email to the Navy stating that a dewatering plan had been submitted on May 2, 2006. However, the Navy did not receive Takota's proposed dewatering plan until May 4, 2006. According to the submitted report from QORE, its purpose was "to assist Takota Corporation in the preparation of a temporary dewatering plan to execute work." DPFUF 74, DA Tab 53. The submittal was disapproved on May 16, 2006. The Navy reviewer advised Takota that QORE's report failed to address how to seal the space between the selected cofferdam where it abutted the existing seawall, that it lacked details such as how, where, and when the work would be done, and that it failed to specify what methods would be used. The Navy concluded that the submittal was a geotechnical report, and not a dewatering plan. DPFUF 75, DA Tab 53.

27. On May 24, 2006, the Contracting Officer issued a Final Decision terminating Takota's contract for default. See Tab 28. The Contracting Officer stated only the following reason for the termination decision: "This action is taken as a result of your

failure to make progress to ensure completion of the contract and failure to perform the contract within the specified time." *Id*.

**RESPONSE**: Agree that on May 24, 2006, the Navy issued a Contracting Officer Final Decision terminating Takota's contract. The document speaks for itself.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

/s/Jane C. Dempsey
JANE C. DEMPSEY
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.,
ATTN: Classification Unit-
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-0972
E-mail: Jane.Dempsey@usdoj.gov

July 23, 2008

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of July, 2008, a copy of the foregoing Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact was served by electronic delivery to:

Robert J. Symon
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, D.C. 20036
rsymon@bradleyarant.com

/s/ Jane C. Dempsey