IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TAKOTA CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-553C<br>(Senior Judge Bruggink) |

DEFENDANT'S AMENDED
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, defendant, the United States respectfully submits the following proposed findings of uncontroverted fact.

1. On July 22, 2005, the United States Department of Navy ("Navy") awarded Contract No. N62470-05-C-7156 ("the contract") to Takota Corporation ("Takota") at a firm fixed price of $463,000.00. DA Tab 1.[1] Prior to awarding Takota the contract, the Navy requested Takota to verify its bid. DA Tab 62.

2. Although the solicitation stated that "offerors or quoters are urged and expected to inspect the site" prior to submitting a bid, Takota never conducted this pre-bid site visit. DA Tab 1, page 13.

3. The Contract called for the extension of two boat ramps and dredging at the Hancock Marina, Marine Corps Air Station Cherry Point, North Carolina. The contract

[1] "DA __" refers to the defendant's appendix.

performance period was anticipated to be 150 days, and the Contract completion date was set as January 3, 2006. DA Tab 1.

4. The contract contained the following pertinent clauses incorporated by reference:

> Time Extensions, FAR § 52.211-13 (SEP 2000)
> Limitations on Subcontracting, FAR § 52.219-14 (DEC 1996)
> Disputes, FAR § 52.233-1 (JUL 2002)
> Differing Site Conditions, FAR § 52.236-2 (APR 1984)
> Site Investigations and Conditions Affecting the Work, FAR § 52.236-3 (APR 1984)
> Schedules for Construction Contracts, FAR § 52.236-15 (APR 1984)
> Changes, FAR § 52.243-4 (AUG 1987)
> Changes and Changed Conditions, FAR § 52.243-5 (APR 1984)
> Default (Fixed-Price Construction), FAR § 52.249-10 (APR 1984)
> Modification Proposals-Price Breakdown, DFARS § 252.236-7000 (DEC 1991)
> Requests for Equitable Adjustment, DFARS § 252.243.7002 (MAR 1998)

The full text of the clauses can be found at DA Tab 2.

5. The contract contained the following pertinent clauses incorporated by full text:

> Commencement, Prosecution, and Completion of Work, FAR § 52.211-10 (APR 1984)
> Site Visit (Construction), FAR § 52.236-27 (FEB 1995)
> Payments Under Fixed-Price Construction Contracts, FAR § 52.232-5 (SEPT 2002)
> Contract Drawings, Maps, and Specifications, DFARS § 252.236-7001 (AUG 2000)
> Pricing of Contract Modifications, DFARS § 252.243-7001 (DEC 1991)
> Government Representative, NAVFAC § 5252.242.9000 (OCT 1996)

6. Section 0111N of the contract, entitled “Summary of Work,” included the following Project Description at paragraph 1.1.1:

> a. The work includes sheet piling, dewatering, earthwork, concrete demolition, and construction to remove and replace the concrete boat ramps and docks at the Hancock Marina, Marine Corps Air Station Cherry Point.
>
> b. . . . Project intent assumes lagoon dredging will be accomplished in the dry. Entrance to the lagoon will be dammed off with sheet piles or other temporary measures. Lagoon will be drained by sump pumps. … It is assumed the lagoon retaining walls will not be repaired. It is assumed the lagoon boat ramp (Boat Ramp 1) and the creek boat ramp (Boat Ramp 2) will be removed and replaced at the same time or consecutively but will share erosion control and dewatering. …

DA Tab 1, section 0111N.

7. Section 01310N of the contract, entitled "Administrative Requirements" included a "partnering" clause, under which:

> To most effectively accomplish the contract, the Government requires the formation of a cohesive partnership with the contractor and its subcontractors. The partnering relationship is based upon trust, dedication to common goals, an understanding of each other's expectations and values, and a commitment to success. The goals of the partnering process are improved communication, efficiency and cost effectiveness, increased opportunity for innovations, and the continuous improvement of product quality. The partnership will strive to draw in the strength of each organization in an effort to achieve a quality project done right the first time, within budget, on schedule, and without any safety mishaps, thereby providing the opportunity for the contractor to make a reasonable profit.

DA Tab 1, Section 01310N.

8. Section 02300 of the contract, entitled "Earth Work," required Takota to submit a shoring plan and dewatering work plan prior to beginning construction:

> [The Contractor shall] submit procedures for accomplishing dewatering work.

> The Contractor shall submit a Shoring and Sheeting plan for approval *15 days prior to starting work*. Submit drawings and calculations, certified by a registered professional engineer, describing the methods for shoring and sheeting of excavations. Shoring, including sheet piling, shall be furnished and installed as necessary to protect workmen, banks, adjacent paving, structures, and utilities.

DA Tab 1, section 02300 (emphasis added).

9. Section 02300 also required that Takota hire a professional geotechnical engineer:

> Section 3.6, paragraph 3.6.2, Geotechnical Engineer, stated: The Contractor is required to hire a Professional Geotechnical Engineer to provide inspection of excavations and soil/groundwater conditions throughout construction. The Geotechnical Engineer shall be responsible *for performing pre-construction* and periodic site visits throughout construction to assess site conditions. The Geotechnical Engineer shall update the excavation, sheeting and dewatering plans as construction progresses to reflect changing conditions and shall submit an updated plan if necessary.

DA Tab 1, section 02300 (emphasis added).

10. The contract drawings contained the following notes regarding construction and the condition of the bulkheads:

> <u>DRAWING C-03 – DEMOLITION PLAN, GENERAL NOTES</u>:
>
> 2. Construction areas shall be dewatered prior to construction. No construction shall take place in the wet.
>
> 3. Dewatering the lagoon will cause a significant unbalanced load condition of the already deteriorating steel sheet pile bulkhead (seawalls). Contractor shall monitor all existing bulkhead (seawalls) during the dewatering and construction process. Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction.

DA Tab 1, drawing C-03.

> DRAWING C-04 - SITE PLAN, CONSTRUCTION SEQUENCE:
>
> 2. Install turbidity curtain then coffer dams in the water, as shown on the plans.
>
> 3. The area enclosed by the coffer dam shall be dewatered prior to construction/demolition by means that prevent/minimize erosion. Bulkheads (seawalls) shall be carefully monitored during dewatering process. Contractor shall provide adequate shoring/bracing for bulkheads (seawalls). Should signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction.

DA Tab 1, drawing C-04.

11. On August 4, 2005, Takota sent a subcontract to Montemayor, Inc. of East Point, Georgia ("Montemayor"), to perform the work under the contract. Despite the requirements of Limitations on Subcontracting, FAR § 52.219-14, the subcontract stated:

> 1. PERFORMANCE OF WORK:
>
> A. The SUBCONTRACTOR shall furnish all supervision, labor, materials, supplies, tools, plant, equipment and associated miscellaneous apparatus for the completion of the work, as outlined in the "Scope of Work" provision of this AGREEMENT (or as may be amended), in accordance with the terms and conditions herein described and all those of the ORIGINAL CONTRACT; It being understood that any reference to the 'ORIGINAL CONTRACT' in this document means all of the ORIGINAL CONTRACT documents including but not necessarily limited to: plans, specifications, details and drawings, all associated general conditions and paragraphs, amendments, wage scale decisions, the Buy American Act, Federal Acquisition Regulations, all applicable Government regulations etc., all of which shall include the terms and conditions which are a part thereof. It is further understood that the ORIGINAL CONTRACT and all related documents are hereby incorporated and made part

> of this AGREEMENT whereby the SUBCONTRACTOR is bound by all of the same terms and conditions noted therein.
>
> * * *
>
> 29. SCOPE OF WORK TO BE PERFORMED BY SUBCONTRACTOR: SUBCONTRACTOR agrees to provide all supervision, labor, materials, tools, plant, testing, equipment and associated miscellaneous apparatus to provide for all work and all responsibilities related to extend boat ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, NV (sic) including all required submittals. All work to be in accordance with the plans, specifications, amendments and all other related documents (wherever shown, detailed or specified) as necessary to have a complete project acceptable to the government.

DA Tab 3.

12. Contemporaneous correspondence indicates that a subcontract agreement was executed.[2] Moreover, in response to Defendant's First Set of Interrogatories, Takota identified Montemayor as a subcontractor who performed work upon the contract. DA Tab 68, interrogatory answer 3. In an email dated August 6, 2005, Takota contacted Montemayor regarding the subcontract agreement and an intended schedule. DA Tab 4.

13. In an email dated August 22, 2005, Doug Reitmeyer of Takota informed Takota's project manager, Chad Riley, that "[Montemayor] are partners of Takota for this project and will be treated the same as if they were part owners." DA Tab 5.

14. Montemayor had at least four employees working on the project: Lee Weaver, Brian Frankie, John Jones, Sr., and John Jones, Jr. Lee Weaver prepared the administrative submittals required under the contract including the Health &

[2] The Government requested copies of all subcontracts in its Request for Production of Documents. Takota failed to produce a signed copy of the subcontract with Montemayor.

Safety/Accident Prevention Plan, Environmental Plan, Fire Protection Plan, and Quality Control Plan. DA Tab 6.

15. Brian Frankie prepared the project schedule and worked with equipment and material suppliers to obtain items for the project. John Jones, Sr. and John Jones, Jr., who arrived on-site in mid-August, prepared submittals, rented equipment for the project, and worked to line up subcontractors for various portions of the work. DA Tab 7.

16. On August 18, 2005, a pre-construction conference was held. At Takota's request, representatives from Montemayor attended the pre-construction conference along with Chad Riley, Takota's project manager.[3] DA Tab 8.

17. At the preconstruction conference, Takota was directed to forward technical submittals to the Navy's architectural and engineering firm, Dewberry & Davis ("Dewberry"). It was advised of the following requirements to begin on-site work:

> Approval of Bonds and Insurance
>
> Approval of Schedule of Prices; it must be detailed by specification section, with cost equitably distributed. Lump sum items will only be paid when 100% complete
>
> All plans submitted must be approved; i.e., Safety, Environmental, Quality Control, etc.
>
> There must be an approved Superintendent, and CQC Staff (if applicable)
>
> Approved Progress Schedule, must include start/finish dates, delineate major aspects of the work and show percent complete at any given time.
>
> List of Subcontractors and work they are to perform.

[3] The List of Attendees at the Pre-Construction Conference contains an error. It lists John L. Lewis, Sr. of Montemayor, Inc. as the superintendent. The correct name of the superintendent is John L. Jones, Sr.

Key personnel list with home address/phone # (Prime & Subs).

DA Tab 8, pages 2-3.

18. On September 17, 2005, the Navy informed Takota that its performance and payment bonds and insurance for the project were received and acceptable. Takota was advised that the letter constituted a notice to proceed with work at the job site, pending approval of other preconstruction submittals required by the contract. DA Tab 9.

19. On September 21, 2005, the Navy informed Takota that it had not received any administrative submittals, and that construction could not start until the pre-construction submittals were received and approved. DA Tab 10.

20. On September 21, 2005, Takota responded advising the Navy it sent a package of submittals via priority mail on September 19, 2005. DA Tab 11.

21. On September 26, 2005, Montemayor submitted Invoice #1, in the amount of $28,222.22 to Takota. The invoice included costs for mobilization, superintendence, and the cost of the job site trailer. DA Tab 12.

22. The Government's First Set of Requests for Production of Documents requested Takota to produce all correspondence with its subcontractors. DA Tab 13. There was no evidence in the documents produced that Takota ever paid the invoice received from Montemayor. Moreover, the Defense Contract Audit Agency's ("DCAA") audit of Takota's certified claim did not find evidence that Montemayor's Invoice #1 was paid. DA Tab 64.

22a. On October 4, 2005, Takota submitted an Application and Certificate for Payment #1, in the amount of $59,945.00, to the Navy. The amount of this invoice included $27,000 for mobilization costs. It also certified that payments had been made or would

be made to subcontractors and suppliers. The invoice was rejected by the Navy because the Schedule of Values had not yet been approved by the Navy. DA Tab 69.

23. On or about October 4-5, 2005, Takota severed its relationship with Montemayor. Takota hired John Jones, Sr. to continue work on the project as a superintendant. DA Tab 18.

24. On October 5, 2005, the Navy advised Takota that work could commence. DA Tab 16.

25. Two days prior, on October 3, 2005, Takota began work at the site. DA Tab 17, report number 1. Takota began work without submitting a dewatering plan or shoring and sheeting plan as required under the contract. Takota also had not hired a professional geotechnical engineer to conduct a pre-construction site visit or perform periodic site visits throughout construction to assess site conditions as required under the contract.

26. On October 17, 2005, after a disagreement with the Navy about the format of the schedule of values, Takota sent a letter to the Navy stating that it would not ask for payment for any line item unless it was 100 percent completed. DA Tab 14. The Navy required, under Section 01200N, a schedule of values that broke out labor and materials. DA Tab 1. However, Takota refused to use the required format. Tab 51, pages 17-20. Upon the basis that Takota agreed not to receive payment until the Navy considered a line item to be 100 percent completed, the Navy approved Takota's schedule of values. DA Tab 15.

27. On October 18, 2005, Takota submitted another Application and Certificate for Payment, in the amount of $32,945.00, to the Navy. In this invoice, Takota deleted the $27,000 for the mobilization line item and $18,000 for the demobilization line item,

reflecting $0.00 as the scheduled value, and redistributed these amounts to line items four through ten, fourteen, and twenty-six. Again, Takota certified that its subcontractors and suppliers had been paid or would be paid. DA Tab 19. The Navy paid Takota the full amount of the invoice. DA Tab 32.

28. On October 19-20, 2005, Takota installed a port-a-dam cofferdam system at Boat Ramp Ramp 1 (in the lagoon area). It installed an aqua-barrier cofferdam system at Boat Ramp 2 (in the creek) on October 20, 2005. DA Tab 17, report numbers 15 and 16. Pictures of the port-a-dam, a steel frame covered with a fabric membrane, that Takota installed at the lagoon entrance can be found at DA Tab 57. Pictures of the aqua-barrier, an inflatable barrier device, that Takota installed in the creek can be found at DA Tab 58.

29. Without shoring any portion of the seawalls, it started dewatering the lagoon around Boat Ramp 1 on October 21, 2005. Although there was a leak at the point the port-a-dam abutted the seawalls, Takota was able to dewater enough of the lagoon to begin demolition of the Boat Ramp 1. DA Tab 17, report number 17. Takota did not dewater after October 21, 2005. DA Tab 17.

30. On October 22, 2005, the job site superintendent, John Jones, Sr., informed Takota's project manager, Chad Riley, that:

> Last night when we left the site we turned off the pumps in the lagoon. There was about 1 to 1-1/2 ft. of water left. There was a small leak by the dam on one side. We determined that this was water flowing behind the bulkhead piling and was no way to get it stopped without sealing the whole sea wall. ***The flow was not beyond the capacity of the pumps to keep it dry***. When I returned to the site this morning, the opposite side of the dam had blown out and the lagoon was full again. . . . Upon further inspection of the site I found that the Hydro solution bladders were under water. There was a high tide with the storm last night and they were over topped. . . . Monday I entend to contact

> Chuck Bisset and get a price for sheet pile replacement as a last resort.

DA Tab 20 (emphasis added).

31. On October 24, 2005, Takota fired John Jones, Sr., the job site superintendent, and John Jones, Jr., the project quality control manager. DA Tab 17, report number 18. Under the contract, work could not continue without a superintendent and quality control manager on site at all times. DA Tab 1.

32. As shown on the daily reports, from October 25-27, 2005, Takota continued with electrical work despite the lack of a job-site superintendent and a quality control manager. DA Tab 17, report numbers 19, 20, 21. Without prior authorization as required under the contract, Takota's electrical subcontractor turned off power at the marina. On October 24, 2005, the Navy notified Takota that it must adhere to the contract specifications when working at the project site. DA Tab 21.

33. On October 28, Takota notified the Navy in writing that it was stopping work due to differing site conditions:

> When dewatering we are experiencing water flow behind the bulkhead/sheet piles from the top of our temporary cofferdams into the work area. As the pressure increases on the top side of the temporary cofferdams the water flow behind the sheet piles increases thus creating several problems, erosion behind the sheet piles which will put the bulkhead in jeopardy and increases the flow of water into the work area and dewatering becomes unmanageable.

DA Tab 22.

34. Beginning October 28, 2005 and continuing through February 3, 2006, Takota's daily reports noted "no work, waiting on instruction from Government on how to proceed." DA Tab 17, report numbers 22-36.

35. After observing the sites filled with water, the Navy requested Takota to dewater so that it could observe the alleged differing site condition, but Takota refused, responding that the seawalls would fail. DA Tab 23, pages 18-20.

36. On November 1, 2005, the Lieutenant Antoine Crite, the Assistant Resident Officer in Charge of Construction ("AROICC"), advised Takota that it was required to submit a sheeting and shoring plan as part of the dewatering effort and that Takota was required to employ a geotechnical engineer throughout construction to assess the site conditions, recommend and update Takota's dewatering plan, and provide monthly reports. DA Tab 24.

37. On November 1, 2005, Takota responded, stating Section 3.6, Shoring, does not apply to the cofferdams and that the method chosen is not a deviation from the contract. Takota also advised that it would have its geotechnical engineer conduct a site visit. At that time, however, Takota did not have a geotechnical engineer, despite the clear contract requirements that a geotechnical engineer was required before work commenced. DA Tab 24.

38. On November 2, 2005, Takota contacted two geotechnical engineering firms and requested proposals for the work specified in contract section 3.6. In these emails, Takota stated that: "time is an issue because construction of the job has stopped due to us not have (sic) an engineer." DA Tab 25. On November 3, 2005, QORE Property Sciences ("QORE"), one of the geotechnical engineering firms that Takota had contacted, visited the site to observe and assess the existing site conditions and prepare a geotechnical report of its finding and recommendations. DA Tab 61. Takota did not submit a sheeting and shoring plan.

39. On November 2, 2005, Navy engineers and Dewberry visited the site to investigate the alleged differing site condition. They took photographs of the site and reviewed the daily reports. They observed that the temporary cofferdams used by Takota were not properly sealed at the point they were supposed to abut the seawalls. They did not see evidence of a differing site condition, and concluded that the two cofferdam systems selected and installed by Takota were not suitable to dewater the areas given the water pressure, river flow, and tidal wave actions in Hancock Creek. DA Tab 26.

40. On November 13, 2005, the Navy advised Takota that:

> While your argument is true that the contract states, "the entrance of the lagoon will be dammed off with sheet piles or other temporary measures" and Takota is not in fault for using "temporary measures". Nonetheless, it is also true that the work must be completed, exhausting every applicable method. The "temporary measure" used to dewater the boat basin clearly is inadequate. **Thus, the Government directs the Contractor to use sheet piling in its place, the other method specified in the contract**.

The Navy further reminded Takota regarding the contract requirements of providing shoring for the seawalls and submitting a shoring and sheeting plan. The Navy warned that "the completion date is 03 January 2006. Liquidated damages will accumulate at the specified rate of $200.00 per calendar day for delays in completion beyond the stated date of award." DA Tab 27.

41. On November 16, 2005, Takota responded by maintaining that a differing site condition existed based upon voids located behind the seawalls and that the Navy was required to provide a solution. Takota also submitted a preliminary geotechnical report from QORE to support its differing site condition claim. This report found that "the exposed portions of the driven sheets are significantly rusted and delaminating. We

understand that divers found similar conditions underwater." The report recommended relocating the port-a-dam to reduce the size of the dewatering area reduced. At Boat Ramp 2, the report recommended that Takota trench back perpendicular from the bulkhead and place concrete to form permanent groundwater "cut-off" walls. In this letter, Takota also asked the Government to terminate the contract for convenience. DA Tab 28.

42. At this point, there was a clear dispute between the parties over the alleged differing site condition. Under the Disputes Clause of the contract, Takota was required to continue performing the work under the contract and file a claim later. Instead, Takota did not continue work at the construction site. DA Tab 2, FAR § 52.233-1.

43. The Navy sent Takota's letter and geotechnical report to Dewberry, and asked for its comments on the solutions proposed. DA Tab 29.

44. In October and November 2005, United Rentals, Inc., an equipment supply company, which supplied equipment for the project, submitted invoices to Takota for costs associated with the project at Hancock Marina. DA Tab 65; DA Tab 68, interrogatory answer 3. Takota did not pay United Rentals for the materials supplied and/or work performed.

45. On November 18, 2005, Montemayor resubmitted Invoice #1 and provided supporting documents for work performed under its subcontract. The costs included labor, equipment rental, and cash expenditures. Takota did not pay the invoice. Montemayor subsequently filed a claim with Takota's surety, Guarantee of North America. DA Tab 30.

46. On November 22, 2005, Takota informed the Navy that it was going to treat the alleged differing site condition as a constructive change, and that it was going to proceed with work by ordering an additional cofferdam to enclose the boat ramp areas. DA Tab 31.

47. Takota's assertion of a constructive change triggered the Changes and Changed Condition clause, which requires the contractor to submit a "proposal for adjustment" if a differing site condition increased or decreased the cost and/or time for performing the work. DA Tab 2, FAR § 52.243-5. However, Takota did not submit a proposal for adjustment.

48. On November 23, 2005, Takota submitted another Application and Certificate for Payment in the amount of $130,000 and a certification that its subcontractors and suppliers had been or would be paid. This invoice included a request for payment of line items four, six, and nine, all three of which Takota had increased in value by its redistribution of its mobilization and demobilization line item values. The Navy authorized payment of the invoice in the amount of $51,500. The Navy informed Takota that it deducted the lump sum amount of $78,500 for the cofferdams on the basis that, although on site, they were not functioning properly. DA Tab 32.

49. On November 28, 2005, the Navy responded to Takota's letter regarding its intention of ordering an additional cofferdam to enclose the boat ramp areas. The Navy advised Takota that, any additional work, or change work, must be presented to the Navy through an equitable adjustment and approved before work could proceed. DA Tab 33.[4]

---

[4] The changes clause, FAR § 52-243.4 (AUG 1987), changes and changed conditions clause, FAR § 52.243.5, modification proposals-price breakdown, DFARS § 252.236-

50. On November 28, 2005, Takota sent the Navy a letter requesting a meeting with the Navy. The Navy agreed, and arranged a meeting with Takota for December 7, 2005. DA Tab 34.

51. In December 2005, United Rentals contacted Takota regarding payment status of the invoices sent in October and November 2005. Chad Riley, Takota's project manager stated that "[w]e called the excavator in at 2 weeks but were billed for a month. Everything else looks good." DA Tab 66. When the invoices remained unpaid, United Rentals submitted a claim to Takota's surety. United Rentals subsequently turned the matter over to a collection agency, and eventually to an attorney. United Rentals filed a lawsuit in the district court in Clark County, Nevada on July 6, 2007. DA Tab 67.

52. On December 6, 2005, Dewberry provided its comments regarding QORE's preliminary geotechnical report, which Takota submitted to the Navy. Dewberry informed the Navy that "[t]he dewatering is a means and methods issue and totally the responsibility of the contractor. Differential loading – and support – on the seawall clearly should have been assumed based on a review of the contract documents during bidding." DA Tab 35.

53. On December 7, 2005, the Navy met with representatives from Takota to discuss possible solutions so that Takota would proceed with the work. The meeting minutes indicate that the Navy reminded Takota that the contract completion date was January 3, 2006, and that liquidated damages would accumulate at the rate of $200.00 per calendar day for delays in completion beyond the stated date of award. At the meeting, the parties discussed that a proposed solution to the dewatering problem would be to pump concrete

---

7000 (DEC 1991), and requests for equitable adjustment, DFARS § 252.243-7002 (MAR 1998) apply. DA Tab 2.

with seal mix to fill voids behind the bulkheads in the lagoon area, and to excavate an "H-shaped" trench into which concrete would be poured at the site of Boat Ramp 2. DA Tab 36.

54. In accordance with the contract, Pricing of Contract Modifications, DFARS § 252.243-7001 and Changes, FAR § 52.243-4, the Navy requested Takota to submit a cost proposal. DA Tab 23, page 107. Under the Changes clause, the contractor is required to furnish a written notice describing the general nature and *amount of the proposed change work*. DA Tab 2, FAR § 52.243-4.

55. On December 21, 2005, Takota advised the Navy that it was working on a proposal and would be providing it within the next few days. The email forwarded the "full" geotechnical report from QORE. DA Tab 37.

56. On December 21, 2005, Takota sent a letter to the Navy stating that a precise estimate could not be furnished, and that the Navy should issue a "not to exceed" change order. DA Tab 38.

57. On January 3, 2006, Takota sent a follow-up letter on its request for the Navy to issue a "not to exceed" change order. Takota also requested a time extension. DA Tab 39. Takota never requested anything in writing regarding an equitable adjustment outlining the money or the time it needed for the proposed change work. DA Tab 51, page 32.

58. On January 6, 2006, the Navy responded to Takota advising that repair of the bulkheads was not what was discussed at the December 7, 2005 meeting, but that the discussion involved the control of the amount of water flow to sustain a dry working

environment. The Navy advised Takota that a time extension would be granted after the parties had negotiated an equitable adjustment for the proposed work. DA Tab 40.

59. On January 11, 2005, Takota advised the Navy that because the existing seawall/bulkhead was in an "extremely fragile and deteriorated condition" it did not make sense to continue to try to dewater, and that the pressure exerted while dewatering would create "enough force to cause the wall to fail." DA Tab 41.

60. On January 12, 2006, the Navy forwarded correspondence from Takota to Dewberry. The email requested Dewberry's position regarding the design adequacy and whether the project could be built as designed and specified. DA Tab 42.

61. On February 1, 2006, Dewberry sent a letter to Navy stating their opinion that project could be built as designed. Dewberry further stated that "the seawalls are specifically noted on Sheet C-03 (Note 3) and Sheet C-04 (Construction Sequence)." DA Tab 42.

62. On February 28, 2006, representatives of Takota and the Navy met again to resolve the impasse so that Takota could proceed with the work under the contract. The meeting was chaired by the Resident Officer in Charge of Construction ("ROICC"), CDR Newton. CDR Newton advised that, in order to move the project forward, the Navy would reset the schedule and accept Takota's temporary cofferdams and provide payment although it had concerns with regards to their suitability. CDR Newton explained the Navy's position that there was no differing site condition, and that the project could be built as specified in the contract. The Navy explained that it was reasonable to expect ground water, surface run-off, seepage from the seawalls, and leakage from the cofferdams. It therefore advised Takota to pump around the clock, instead of the one day

effort Takota had exerted previously. The Navy also reminded Takota that it had not adhered to the contract requirements for dewatering and shoring, that Takota had not submitted dewatering and shoring plans, and that it had not hired a geo-technical engineer. DA Tab 43.

63. Takota, in response, did not acknowledge the Navy's offer or request to move the project forward. Instead, it maintained that a differing site condition existed. Takota insisted that dewatering could not be accomplished. Takota admitted that it may have missed the contract requirement for a geotechnical engineer, but that it could be fixed. Takota further claimed that the Navy had not provided any direction, and that it was just a "dumb" contractor that was not aware of the contract requirements. The Navy concluded that Takota was not interested in moving forward with the project and advised Takota that it would be responding to Takota's president on the issue in writing. DA Tab 43.

64. One week later, on March 7, 2006, the Navy issued a notice to resume work, directing Takota to immediately resume work. The letter stated the work stoppage appeared to be related to the dewatering and shoring requirements in the contract. Takota was reminded that all contract requirements remained in effect including the requirement for a geotechnical engineering report, dewatering plan, a shoring and sheeting plan, and other required submittals. The Navy attached a list of submittals that Takota had yet to submit or that had to be resubmitted because of personnel and subcontractor changes made by Takota. This letter noted that the completion date of the project had passed, that the Navy "has neither waived the completion date, nor its right to assess liquidated damages," and that "Takota's further refusal or failure to prosecute the work required

under the contract may result in the Government exercising its right to terminate the right to proceed with the work." DA Tab 44.

65. At this time, although the January 3, 2006 completion date had passed, had Takota begun work, which was the intent of the Navy's March 7, 2006 notice to resume work, the Navy would have entertained a request for an extension of time. DA Tab 51, pages 51-52. Termination for default was not the road that the Navy wanted to undertake at that time. DA Tab 51, page 53.

66. On March 22, 2006, Takota's counsel advised the Navy that Takota was in the final stages of completing its plan to finish the project. However, Takota did not provide any of the submittals requested by the Navy in its March 7, 2006 notice to resume work. DA Tab 45.

67. On March 24, 2006, the Navy issued a second notice to resume work directing Takota to provide the submittals required under the contract. The Navy provided Takota until April 4, 2006 to submit a geotechnical report, dewatering plan, shoring and sheeting plan, progress schedule, quality control plan, and a revised schedule of prices. The Navy provided Takota until April 18, 2006 to provide the remaining submittals. The letter warned that "Takota's failure to comply with either deadline will further indicate a refusal or failure to prosecute the work required under the contract" and that "the Government has neither waived the completion date, nor its right to assess liquidated damages." DA Tab 46.

68. On March 29, 2006, Takota sent a letter to the Navy advising that performance would be delayed and impacted by efforts to resolve the alleged differing site condition. Takota further advised that it would not submit a revised schedule of values, noting that

the schedule of values previously submitted and approved was in the format commonly used for all of Takota's projects with the Government. Takota again requested that the Navy terminate for convenience. DA Tab 47.

69. On March 29, 2006, the Marjorie Sadler, the contracting officer for the Navy, sent an email to Takota advising them that the Navy was unaware of the fact that Takota's project manager and geotechnical engineer had been at the job site. She reminded Takota that no actual work could be performed until the required submittals were submitted and approved, and only if a superintendent and quality control person were on site to oversee the work as required under the contract. DA Tab 48.

70. In a letter dated March 30, 2006, Takota advised the Navy of the status of the outstanding submittals identified in the Navy's March 7, 2006 notice to resume work. DA Tab 49.

71. On April 20, 2006, the Navy issued a show cause letter to Takota. The letter advised Takota that it had failed to provide to the Navy any submittals that were due on April 18, 2006. With regards to the submittals due on April 4, 2006, Takota had failed to provide a shoring and sheeting plan, progress schedule, dewatering plan, quality control plan, and schedule of prices. The letter also advised Takota that there were serious safety issues at the project site, and reminded Takota of its contractual responsibility to maintain a safe and secure worksite. The Navy advised Takota that its limited response to the notices to proceed, its requests for termination for convenience, and its failure to provide the required submittals and refusal to resume work in a timely manner indicated that Takota had repudiated performance. It provided Takota ten days to present in writing

any facts that would support a claim that the failure to perform arose from causes beyond Takota's control or without fault or negligence on its part. DA Tab 50.

72. In the March 24, 2006 notice to resume work and the April 20, 2006 show cause letter, the Navy had requested Takota to submit a new progress schedule reflecting a new completion date because it was willing to entertain that option and was attempting to get Takota to proceed with the work. The new progress schedule, had Takota ever submitted one, would have been considered by the Navy, in conjunction with the other submittals. DA Tab 51, pages 73-74.

73. On May 2, 2006, Takota responded to the Navy's show cause letter, stating that "circumstances dictate and warrant the delays." It then provided a status update with regards to the outstanding submittals. DA Tab 52.

74. On May 4, 2006, the Navy received Takota's dewatering plan submittal. The submittal form forwarded a letter from QORE dated May 2, 2006, that was entitled "Report of Supplemental Subsurface Exploration." According to QORE's report, the purpose of the supplemental exploration was to "explore the soil and groundwater conditions at the site and provide subsurface data and geotechnical recommendations **to assist Takota Corporation in the preparation of a temporary dewatering plan to execute the work**." DA Tab 53 (emphasis added).

75. On May 16, 2006, the Navy rejected Takota's dewatering submittal. The Navy reviewer advised Takota that QORE's report failed to address how to seal the space between the selected cofferdam where it abutted the existing seawall, that it lacked details such as how, where, and when the work would be done, and that it failed to specify what

methods would be used. The Navy concluded that the submittal was a geotechnical report, and not a dewatering plan. DA Tab 53.

76. On May 24, 2006, the Navy executed Modification P00001 to the contract, terminating Takota's right to proceed with the work under the contract for default for failure to make progress to ensure timely completion of the contract and to perform the contract within the specified time. DA Tab 54.

77. On September 28, 2006, the Navy issued contract number N40085-06-C-1728 to Cieszko Construction Company ("Cieszko") to demolish and replace the boat ramps at Hancock Marina. DA Tab 55. The contract specifications and drawings were identical. DA Tab 23, page 58.

78. Cieszko began performance under the contract by shoring the entire length of the seawalls in both boat ramp areas. It used sheet piles for the temporary cofferdams at the entrance to the lagoon and around Boat Ramp 2. Pictures of Cieszko's shoring of the seawalls can be found at DA Tab 59. Pictures of Cieszko's sheet piling cofferdams can be found at DA Tab 60. Cieszko dewatered both boat ramp areas without seawall failure or repair, and successfully demolished and replaced the boat ramps. Cieszko did not submit a claim for a differing site condition or any requests for an equitable adjustment. DA Tab 56; DA Tab 60.

79. On April 3, 2006, Takota submitted a certified claim to the termination contracting officer in the amount of $502,245.48, which Takota alleged was associated with the Navy's wrongful default termination of the contract. DA Tab 63.[5]

---

[5] Due to the size of Takota's certified claim, we did not include its supporting documents, which were attached as exhibits A – E.

80. In accordance with FAR § 49.107, which requires the contracting officer to refer settlement proposals over $100,000 to an audit agency, the Navy submitted Takota's certified claim to the DCAA for audit. On June 27, 2008, the DCAA issued Audit Report No. 3311-2008K17100002, which "disclosed $291,190 of questioned costs." It identified the following significant issues:

> 1. The proposal is not acceptable for negotiation of a fair and reasonable price due to inadequate support for labor costs.
>
> 2. The proposal includes costs that are considered unallowable, unallocable, and unreasonable in accordance with FAR Part 31.
>
> 3. The contractor did not provide adequate cost or pricing data to support its proposed G&A rate of 10 percent.
>
> 4. The contractor proposed extended overhead, or unabsorbed overhead, to which it is not entitled based on established criteria for determining entitlement.

DA Tab 64.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

/s/Jane C. Dempsey
JANE C. DEMPSEY
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.,
ATTN: Classification Unit-
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-0972
E-mail: Jane.Dempsey@usdoj.gov

August 5, 2008

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2008, a copy of the foregoing Defendant's Amended Proposed Findings of Uncontroverted Fact was served by electronic delivery to:

Robert J. Symon
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, D.C. 20036
rsymon@bradleyarant.com

/s/ Jane C. Dempsey