**Symon, Robert J.**

**From:** Dempsey, Jane (CIV) [Jane.Dempsey@usdoj.gov]
**Sent:** Wednesday, August 06, 2008 6:34 PM
**To:** Symon, Robert J.
**Cc:** Becker-Welts, Jeremy; Panepinto, Catherine M.
**Subject:** RE: Takota

You will be violating the Rule 11 safe harbor provision providing us 21 days after you serve us a copy of your motion for sanctions before filing the motion with the court. We would like to meet with Jeremy first before making any decisions regarding our argument.

-----Original Message-----
From: Symon, Robert J. [mailto:rsymon@bradleyarant.com]
Sent: Wednesday, August 06, 2008 6:18 PM
To: Dempsey, Jane (CIV)
Cc: Becker-Welts, Jeremy; Symon, Robert J.; Panepinto, Catherine M.
Subject: RE: Takota

Jane:

Before I as an attorney would accuse anyone of fraud in a pleading, I would make reasonably inquiry of the alleged basis as required by the rules. I do not believe govt counsel has done so in this case, and therefore, am moving for sanctions on that basis tomorrow.

First, Takota never entered into a subcontract with Montemayor as you contend. Takota presented them a subcontract which required payment and performance bonds. Montemayor never furnished the required bonds and neither party signed the contract. Moreover, Takota never billed for any work performed by Montemayor in the pay applications you reference in the pleadings. The record may look like a subcontract was formed, but very little follow up on your part(ie a deposition or interrogatory) would have resulted in the discovery that no formally executed contract existed and no pay application included amounts for Montemayor. Given these facts, there is no fraud or false certification.

Second, Montemayor originally ordered equipment from United Rentals.
Some of that equipment never hit the project site. I know this because I represented Takota in UR's bond claim. After the Montemayor contract failed to form, Takota did order equipment from UR, but neither Pay App
1 or 2 included those amounts. Limited discovery beyond a simple review of the documents would have revealed this fact. Again, no fraud or false certification.

If you are contending that because these subs claimed they were due money, and Takota certified that subs were paid, as the basis of fraud, you have a fundamental misunderstanding of the payment certification required by the FAR. It is clear that the govt is trying to mold the facts of this case to the facts in Judge Bruggink's decision in Lamb Engineering. Judge Bruggink will see right through this and recognize the distinction. The Judge has already warned you of the seriousness of fraud allegations. It does not appear the govt listened.

Finally, a schedule of values is a payment tool. The parties establish pay items and estimate values for those pay items that total the fixed price of the contract. As the work progresses, the parties estimate the percentage of completion for each line item and then payment based upon a calculation of applying the percentage to the scheduled item is made which results in the payment. Some agencies will pay for mobilization and demob costs as pay items and some will not. The navy is apparently an agency that will not, and therefore, Takota upon rejection by the navy of those items redistributed those estimated costs across other line items when it submitted pay app # 2( compare with pay app #1). There is nothing fraudulent about this and no there is no false certification.

If the government has a change of position, please advise immediately. I plan on filing our opposition and sanctions request by noon tomorrow.

Sincerely, Bob



EXHIBIT

1

Robert J. Symon, Esq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, D.C. 20036
(202) 719-8294 - Phone
(202) 719-8394 - Direct Fax

-----Original Message-----
From: Dempsey, Jane (CIV) [mailto:Jane.Dempsey@usdoj.gov]
Sent: Wednesday, August 06, 2008 5:13 PM
To: Symon, Robert J.
Subject: RE:

I got caught up on other matters; I'll call you tomorrow, or if you want to email me your concerns regarding our motion, feel free to do so.

-----Original Message-----
From: Symon, Robert J. [mailto:rsymon@bradleyarant.com]
Sent: Wednesday, August 06, 2008 11:19 AM
To: Dempsey, Jane (CIV)
Subject: RE:

I left you a message. I would like to speak now.

Robert J. Symon, Esq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, D.C. 20036
(202) 719-8294 - Phone
(202) 719-8394 - Direct Fax

-----Original Message-----
From: Dempsey, Jane (CIV) [mailto:Jane.Dempsey@usdoj.gov]
Sent: Wednesday, August 06, 2008 10:13 AM
To: Symon, Robert J.
Subject:

I received your message. Jeremy requested a meeting with me and my supervisor on this case, Bryant Snee, when he returns from vacation. We have agreed to this meeting. I feel that it will be most productive to hold off until then, however, if you feel otherwise, let me know, and I will give you a call.

Jane C. Dempsey
Trial Attorney
Department of Justice
Commercial Litigation - National Courts
1100 L Street, N.W.
Room 7004
Washington, D.C. 20530
(202) 353-0897 phone
(202) 305-7644 fax

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TAKOTA CORPORATION<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | Civil Action No.: 06-553 C<br>(Judge Bruggink) |

**SWORN STATEMENT OF ARTHUR CAPRARIO**

1. I, Arthur Caprario, President of Takota Corporation, am over the age of 18 and fully competent and authorized to make this Sworn Statement on behalf of Takota Corporation (hereinafter "Takota").

2. On or about August 7, 2005, Takota forwarded to Montemayor, Inc. ("Montemayor") a proposed subcontract for the Cherry Point project under Navy Contract No. N62470-05-C-7156. (See Exhibit 1). Pursuant to Article 17 of the subcontract, Montemayor was required to furnish payment and performance bonds in the amount of $375,000. Montemayor never furnished the bonds and the subcontract was never executed by either party. Thus, Takota and Montemayor never consummated a contractual relationship for the project.

3. Takota's Payment Applications No. 1 and 2, submitted to the Navy under the Contract, for the project do not include any amounts for equipment supplied by United Rentals. (See Exhibits 2 and 3). Nor do these payment applications include any amounts for work performed by Montemayor.

4. Payment Application No. 1 submitted by Takota for the project including a line item for mobilization in the amount of $27,000. Takota's schedule also included a pay item for demobilization in the amount of $18,000. Some government agencies will approve mobilization and demobilization costs as a pay item and some do not. In this case, the Navy rejected Takota's



EXHIBIT

2

schedule of values which included these pay items and instructed Takota to redistribute the associated costs across the other pay items. Takota did so in Payment Application No. 2.

I solemnly affirm under penalties of perjury that the contents of this Sworn Statement are true and correct to the best of my knowledge, information and belief.

Arthur Caprario, President
Takota Corporation

**Takota Corporation**
3017 Palm Springs Way
Las Vegas, NV 89102
Phone (877) 871-0145, Fax (760) 437-3341

August 4, 2005

Montemayor, Inc.
Lee Weaver
1168 Entral Avenue
East Point, GA 30344
Phone: 404-305-8585

Re: Project #N62470-05-C-7156, Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, NC and Subcontract #194C01

Dear Lee,

Please send all correspondence to our **Austin office, 13706 Research Blvd., Suite 308, Austin, Texas 78750**. We will need 2 (two) original certificate of insurance. I have included the government minimum coverage required and the certificate must show your General Liability, Automobile and Worker's Comp coverage.

Enclosed are the following documents: Please read instructions carefully if you are unfamiliar with completing these documents please call me.

2 copies of your Subcontract Agreement for your signature
2 copies of Government Form 1413 (Statement and Acknowledgement) for your completion and signature - these are required by the govt. prior to on site work.
IRS form W9 with instructions for your signature
Blank Government Certified Payroll Form (if you prefer we can email this Excel form to you)
Sample Government Certified Payroll Form - Please follow exactly - the govt. may reject pay requests if these are not completed properly and promptly
Davis Bacon Wages pertaining to this project
Blank Production Report Form (Daily Log)
Sample Production Report Form

EXHIBIT
1

**Government Form 1413**
Please complete part II - Acknowledgment of Subcontractor on both copies. Number 13 - list any subcontractors you will be hiring for this project. Please note that if you have a subcontractor(s) we will need them to complete a 1413 for you that shows who their sub(s) is (are) - we will need an original and one copy of their 1413 also. Any sub they list would do the same and so on. Certified payrolls will be required of all subcontractors. Number 14 - print or type the name and title of the person signing. Number 15 - is for your signature. Number 16 - please put in the date. Return both originals to us.

**IRS Form W9**
Please print or type your name, business name, address and Social Security Number or Taxpayer Identification number. **Make sure you check the appropriate box** (Individual/Sole Proprietor, Corporation, Partnership or Other - if other you must state what type) sign, date and return the original to us.

**Certified Payroll**
The certified payroll and Davis Bacon wage forms are for your use. Certified payroll reports must be completed each week once you are on site and must match your daily reports. **Once you are on site you must complete a payroll report every week, even if you did not work on the site. If you did not work on site you will complete all information as usual and instead of wages put "No work performed".** The Davis Bacon wages sent to you show the minimum that must be paid to each employee by work classification. You must meet these minimum wage standards. A "sample" report is enclosed, however if you have any questions please call. The original and two copies must be sent to us in your "weekly package". Please fax a copy of your first report along with your Daily Reports so that they may be checked for accuracy.

**Daily Report Form**
This form is for you to complete once you are on site. Just as with the Certified Payroll this must be completed every day and at a minimum you should list the classification of each person on the job and what they were doing. This must match your certified payroll. **Once you are on site you must complete a report every day, even if you did not work on the site. If you did not work on site you will complete all information as usual and instead of hours put "No Work Performed".** This can be emailed to you if you prefer. You can fax or email this to Jan Harris at jan@takota.com.

We would like you to provide us with photos of the job site on a regular basis. Depending on the size of the job this may be sent to us weekly or at other intervals. We would like the photos to show the progress of the job and also show any problems that may be encountered. If you do not have a camera you may buy a disposable camera. We will do all developing, just send us the film or the disposable camera or you can email the photos to doug@Takota.com

**Billing**
Each month the Government inspects the job site and informs us of the line item percentage that they have accepted. We will then bill the Government for those amounts - you will be paid accordingly for the percentage of the work accepted. For details contact Lori Schwartz at lori@takota.com or call (877) 871-0145. Retainage is held from subs only if held by the Government. When we are paid we will send you a partial release to be signed and your check will be mailed to you upon our receipt of the signed release providing you have sent Jan Harris all daily reports and certified payrolls. If you are unsure of the status of your daily reports and certified payrolls please contact Jan at jan@takota.com or call (877) 871-0145. When final payment is due you will be sent a final release, you will need to sign and notarize that release and return it to our office and we will then send you a check for the final amount owed you.

**MSDS**
You must have material safety data sheets on all hazardous materials and supplies that you have on site. The sheets must be on site and accessible at all times (preferably in a binder), along with a copy of your safety plan.

**Submittals**
Any submittals that were requested from you should be sent immediately to the Project Superintendent so that we may forward them to the government for approval. We will need 8 copies of all submittal data and operations & maintenance manuals (O&M's).

Please complete the enclosed documents immediately and send via overnight delivery to our Austin office. Your Certificates of Insurance and any required Bonds or Letters of credit should be sent immediately via fax with the original sent along with your subcontract package. The certified payroll reports, daily reports, film to be developed and other necessary documents should be sent to this office on a weekly basis via overnight or 2 day delivery.

Once again, if you have any questions regarding the completion of these documents please give me a call. We look forward to working with you on this project.

Regards,

Jan Harris

Jan Harris
Contract Administrator
jan@takota.com

# Takota Corporation

3017 Palm Springs Way
Las Vegas, NV 89102
Phone (877) 871-0145, Fax (760) 437-3341

**<u>SUBCONTRACT AGREEMENT</u>** (hereinafter referred to as AGREEMENT) Subcontract No 194C01
This AGREEMENT made on August 8, 2005, by and between Takota Corporation as the Prime Contractor, herein after called the "CONTRACTOR", and Montemayor, Inc. hereinafter called the "SUBCONTRACTOR."

SUBCONTRACTOR Information:

Address: 1168 Central Avenue, East Point, GA 30344

Phone: 404-305-8585 Fax: Cell (if any):

Contact Person, Lee Weaver

Subcontractor's Employers Federal ID No.: ______________________________

This company is doing business as a ___________________________________

Organized and existing under the laws of the State of ______________________

Number of full-time employees ______________________

WITNESSED: Whereas the CONTRACTOR has heretofore entered into a contract, hereinafter referred to as the "ORIGINAL CONTRACT" described as Federal Government Contract No. N62470-05-C-7156 with the United States Government, hereinafter referred to as the "PRINCIPAL", the work described under the "Scope of Work" Provision of this AGREEMENT, and as may be amended, is to be completed by the SUBCONTRACTOR under and in accordance with all of the terms and conditions of this AGREEMENT and those of the ORIGINAL CONTRACT.

NOW therefore, in consideration of the covenants and agreements hereinafter contained and payments to be made as hereinafter provided, the CONTRACTOR and the SUBCONTRACTOR do hereby mutually agree as follows:

**1. PERFORMANCE OF WORK:**

A. The SUBCONTRACTOR shall furnish all supervision, labor, materials, supplies, tools, plant, equipment and associated miscellaneous apparatus for the completion of the work, as outlined in the "Scope of Work" provision of this AGREEMENT (or as may be amended), in accordance with the terms and conditions herein described and all those of the ORIGINAL CONTRACT; It being understood that any reference to the "ORIGINAL CONTRACT" in this document means all of the ORIGINAL CONTRACT documents including but not necessarily limited to: plans, specifications, details and drawings, all associated general conditions and paragraphs, amendments, wage scale decisions, the Buy American Act, Federal Acquisition Regulations, all applicable Government regulations etc., all of which shall include the terms and conditions which are a part thereof. It is further understood that the ORIGINAL CONTRACT and all related documents are hereby incorporated and made a part of this AGREEMENT whereby the SUBCONTRACTOR is bound by all of the same terms and conditions noted therein.

B. It is distinctly understood and agreed by the SUBCONTRACTOR that this AGREEMENT is made for the consideration herein specified, and that the SUBCONTRACTOR has, by examination of its choice, satisfied itself as to the nature and location of the work; the character, quantity and kind of labor, plant and materials which will be required; the character, quantity and kind of tools and equipment needed during the prosecution of the work and all conditions and other matters which can in any manner affect the work under this agreement.

C. The SUBCONTRACTOR is responsible for obtaining all amendments to the ORIGINAL CONTRACT and for ensuring inclusion of any materials, equipment, and labor required by said amendments in the SUBCONTRACTOR's performance of work. Accordingly, by its execution of this AGREEMENT, the SUBCONTRACTOR acknowledges that all such amendments have been reviewed in their entirety and that all costs associated with the work therewith have been included herein. Furthermore, it is understood that it is the SUBCONTRACTOR's responsibility to ensure that any plans, specifications or other related documents in its possession, despite the source of procurement, are correct and properly amended. In this regard, it is agreed that the SUBCONTRACTOR shall hold the CONTRACTOR harmless from any costs or other damages, bid mistakes or performance problems which it may incur as a result of its use of incorrect and/or partially or improperly amended contract documents.

D. Within ten (10) days of the date of this AGREEMENT, the SUBCONTRACTOR is responsible for the complete preparation and submission of all submittals which are required by this AGREEMENT and the ORIGINAL CONTRACT and which may be necessary for the orderly, timely and proper completion and/or coordination of the work required herein Submittals not received within time frame could be acquired by the contractor at SUBCONTRACTOR'S EXPENSE.

E. The SUBCONTRACTOR is responsible for the performance and costs of all engineering, layout, marking, locating, staking, set-up, inspections, testing, etc., associated with the work required herein.

F. The SUBCONTRACTOR is responsible for the daily upkeep of as-built drawings for the "work-in-place" associated with the IBCONTRACTOR's performance of this AGREEMENT and agrees to make these drawings available to the CONTRACTOR and/or PRINCIPAL : monthly review. Final as-built drawings shall be submitted to the CONTRACTOR within ten (10) days of the SUBCONTRACTOR's completion of the work required herein.

G. The SUBCONTRACTOR is responsible for providing, posting and/or installing all required operating instructions, sequence of operation charts, marking charts, labeling, tagging and etc., as required by the ORIGINAL CONTRACT for any of the work performed hereunder.

2. **COMMENCEMENT, PROSECUTION AND COMPLETION OF WORK:**

A. The SUBCONTRACTOR agrees to commence the work herein required at the job site at such locations and at such times as the CONTRACTOR may direct, with sufficient supervision, labor, materials, tools, plant and equipment necessary to complete the work under this AGREEMENT according to the "Project Schedule" created by the CONTRACTOR and/or within other dates which may be established by the CONTRACTOR by separate direction. It is specifically understood that the completion dates and times established within the "Project Schedule" and/or other dates and times provided by the CONTRACTOR for the SUBCONTRACTOR's completion of the work hereunder may differ from that specified within the ORIGINAL CONTRACT documents, and the SUBCONTRACTOR's completion of the work herein within such scheduled completion dates and times is a contract requirement.

B. Upon commencement of work, the SUBCONTRACTOR shall continue performance diligently and continuously, without delay or interruption, as the project permits, until all work is completed to the satisfaction of the CONTRACTOR and the PRINCIPAL, in accordance with the "Project Schedule", or ahead of Schedule if conditions permit, or other dates provided by the CONTRACTOR. In that regard, the SUBCONTRACTOR agrees to provide competent workers and supervisors for the project who are properly skilled for the work and who are acceptable to the CONTRACTOR. The SUBCONTRACTOR is required to designate an on-site project supervisor and an alternate supervisor who will be solely dedicated to this project and who will be on site during all activities directly or indirectly associated with the SUBCONTRACTOR's scope of work. It being further understood that the SUBCONTRACTOR will provide a replacement supervisor if, at the sole discretion of the CONTRACTOR, the CONTRACTOR deems it necessary for the successful completion of the project.

C. The CONTRACTOR may, at its sole discretion, alter or change the "Project Schedule" and/or other dates for the SUBCONTRACTOR's completion of the required work and the SUBCONTRACTOR shall comply with any such changes at no extra cost except as may be allowed under the "CLAIMS FOR EXTRA WORK OR DAMAGES" clause of this AGREEMENT.

**PRIVITY OF CONTRACT:**

The SUBCONTRACTOR agrees and understands that there is no privity of contract between the SUBCONTRACTOR and the PRINCIPAL. It is further understood and agreed that the SUBCONTRACTOR is to communicate solely with the CONTRACTOR on any and all issues relevant to this AGREEMENT and/or the ORIGINAL CONTRACT.

4. **SUBLETTING AND ASSIGNMENT:**

A. The work shall be performed by the SUBCONTRACTOR with the assistance of workers under his immediate supervision and shall not be sublet, assigned, or otherwise disposed of, either in whole or in part, except with the prior written consent of the CONTRACTOR. Furthermore, the SUBCONTRACTOR shall not sell, assign, or otherwise dispose of monies earned under this AGREEMENT without the express written consent of the CONTRACTOR until all claims for labor, materials and supplies furnished to the SUBCONTRACTOR have been paid.

B. All terms and conditions of this AGREEMENT which are carried forward from the ORIGINAL CONTRACT are considered to be "flow-down" clauses. Accordingly, the SUBCONTRACTOR understands and agrees to insert all such terms in all of its Subcontract Agreements and purchase orders, as may be appropriate including this "flow-down" provision.

5. **CHANGES TO THIS AGREEMENT:**

A. Where the PRINCIPAL creates or directs changes which affect the work herein required, either directly or indirectly, the SUBCONTRACTOR shall be bound by said changes, including the performance thereof, to the same extent as the CONTRACTOR under the terms of the ORIGINAL CONTRACT.

B. The CONTRACTOR shall have the full right and authority at any time to amend, change, alter, add-on, etc., the terms, conditions, scope of work and/or other requirements of this AGREEMENT, whether for the benefit of the CONTRACTOR or others, by written direction and/or AGREEMENT amendment.

C. The SUBCONTRACTOR shall perform all changes to this AGREEMENT in complete accordance with all of the terms and conditions of AGREEMENT and of the ORIGINAL CONTRACT; it being understood that the SUBCONTRACTOR may collect for extra expenses incurred as

a result of any such direction only to the extent that the SUBCONTRACTOR is allowed under the "CLAIMS FOR EXTRA WORK OR DAMAGES" clause of this AGREEMENT.

**<. CLAIMS FOR EXTRA WORK OR DAMAGES:**

CONTRACTOR agrees to compensate the SUBCONTRACTOR for any "CHANGES TO THIS AGREEMENT", which are not part of the ORIGINAL CONTRACT or this AGREEMENT, only as herein provided:

A. CHANGES BY THE PRINCIPAL: Where the extra expenses incurred by the SUBCONTRACTOR for extra work performed and/or materials provided as the result of authorized change orders or by written direction, or extra work performed and/or materials supplied as a result of defective ORIGINAL CONTRACT documents, such as differing site conditions, latent defects, latent ambiguities, etc., and/or PRINCIPAL directed changes, it is specifically understood and agreed that the SUBCONTRACTOR's only compensation will be the amounts acknowledged, allowed and paid by the PRINCIPAL or as may be awarded and paid by the applicable governing bodies through the claims process as provided for under the terms of the ORIGINAL CONTRACT and the SUBCONTRACTOR is barred from collecting indirect expenses such as unabsorbed or under absorbed overhead, extended overhead, labor inefficiencies, delay damages, impacts, and/or loss of business or any other costs from the CONTRACTOR unless specifically allowed and paid for by the PRINCIPAL.

B. CHANGES BY THE CONTRACTOR: Where the CONTRACTOR directs the SUBCONTRACTOR, in writing, to perform extra work that the CONTRACTOR has determined is not within the scope of this AGREEMENT, and the extra work is not to be paid for by the PRINCIPAL in the form of either a claim or a change order, the SUBCONTRACTOR's sole compensation will be by the CONTRACTOR and shall consist only of a time extension where applicable and direct on-site allowable and allocable change related costs, which are fully supported by documentation from the SUBCONTRACTOR, including no more than 10% for overhead and 10% for profit. It being specifically understood, that the SUBCONTRACTOR is barred from collecting indirect expenses such as unabsorbed or under absorbed overhead, extended overhead, labor inefficiencies, delay damages, impacts, and/or loss of business or any other costs from the CONTRACTOR.

C. Notwithstanding anything to the contrary herein, or written or discussed anywhere by any persons, it is understood that any claim or request for extra costs and/or expenses incurred arising out of the performance of work herein required, or in complying with the terms and conditions of this AGREEMENT, must be filed with the CONTRACTOR, in writing, no later than ten (10) days after the event has taken place or the problem discovered.

D. DISPUTES: In the event of a dispute between the SUBCONTRACTOR, the CONTRACTOR and/or the PRINCIPAL as to whether or not any work directed to be performed is a contractual obligation under the ORIGINAL CONTRACT or extra work, the SUBCONTRACTOR agrees to follow the written direction of the CONTRACTOR and perform any such work, including providing equipment, plant and/or materials, according to of the terms and conditions herein. With regards to any claim arising from said dispute, it is hereby agreed that the PRINCIPAL's, or any bsequent governing court determinations, will be the sole determinant decision as to whether or not the work was a contractual obligation or an extra, and the SUBCONTRACTOR's only compensation will be the amounts allowed and paid thereby.

**7. EXTENSIONS OF TIME:**

Notwithstanding any rights which may be allowed under the terms of the ORIGINAL CONTRACT or elsewhere within this AGREEMENT, the SUBCONTRACTOR's sole compensation for any delays or suspensions to the prosecution of the work hereunder will be in the form of a time extension or as may be allowed under the "CLAIMS FOR EXTRA WORK OR DAMAGES" clause of this AGREEMENT.

**8. PROGRESS PAYMENTS:**

A. At periodic intervals throughout the course of the ORIGINAL CONTRACT, which dates will be decided by the CONTRACTOR, requests for partial and/or progress payments for work performed under the ORIGINAL CONTRACT will be tendered to the PRINCIPAL by the CONTRACTOR, in accordance with the applicable provisions of the ORIGINAL CONTRACT. Within seven (7) days of the date of approval of any such pay request by the PRINCIPAL and receipt of payment thereof by the CONTRACTOR, the CONTRACTOR will make a partial payment to the SUBCONTRACTOR for any satisfactory performance. <u>It is specifically understood that this AGREEMENT is a "pay-as-paid" AGREEMENT whereby any and all payments to the SUBCONTRACTOR are dependent, as a condition precedent, upon receipt by the CONTRACTOR of payments from the PRINCIPAL.</u> The SUBCONTRACTOR agrees to provide the CONTRACTOR with a fully executed Prompt Payment Act Certification and/or Certification of Payments form as a prerequisite condition of the receipt of any and all partial payments.

B. If the CONTRACTOR does not make payment to the SUBCONTRACTOR within the required time, an interest penalty, as prescribed in the "Prompt Payment Act" clause of the ORIGINAL CONTRACT, will be paid on any amount owing, less withholding or deductions otherwise authorized by the clause.

C. For the purpose of calculating progress payments, the SUBCONTRACTOR shall submit an acceptable itemized breakdown of the amount of this AGREEMENT, hereinafter referred to as the "SUBCONTRACTOR's Schedule of Values", to the CONTRACTOR within ten (10) days of the date of this AGREEMENT. Payment will only be made to the SUBCONTRACTOR for work actually performed, completed and accepted by the CONTRACTOR and the PRINCIPAL, at the unit or percentage of completion amounts, as identified on the Schedule of Values, and as paid by the PRINCIPAL.

D. Payments or partial payments otherwise due the SUBCONTRACTOR may be withheld by the CONTRACTOR and/or the PRINCIPAL on account of defective work not remedied and/or reasonable anticipation of damages from any breach of contract. Upon such withholdings, the CONTRACTOR will notify the SUBCONTRACTOR in writing, including reasons thereof, and remedies necessary for the SUBCONTRACTOR to cure such reasons.

E. The SUBCONTRACTOR further agrees that if the SUBCONTRACTOR believes that it has not been properly paid, the SUBCONTRACTOR will provide a written notice of such belief, together with the basis of such belief, to the CONTRACTOR. The CONTRACTOR, by agreement herein, will then have seven (7) days in which to answer this notification.

**9. FINAL PAYMENT:**

Upon completion of the ORIGINAL CONTRACT and within seven (7) days following payment therefore in full to the CONTRACTOR by the PRINCIPAL, the SUBCONTRACTOR will be paid the remaining amounts due him under this AGREEMENT. The SUBCONTRACTOR shall, as a condition precedent to payment, and before payment of said remaining percentage to him, execute and deliver to the CONTRACTOR a full and valid release completely discharging the CONTRACTOR of and from any and all claims and demands whatsoever for all matters growing out of, or in any manner connected with, or founded upon, this AGREEMENT.

**10. PAYMENTS FOR LABOR AND SUPPLIES:**

The SUBCONTRACTOR is required to promptly make payments, in full accordance with the "Prompt Payment Act", to all persons supplying labor, materials, equipment and/or supplies used, or to be used, or in connection with the prosecution of work herein required. The CONTRACTOR reserves the right to make any such payment not so made by the SUBCONTRACTOR when earned or due and to deduct the amount from any monies otherwise due the SUBCONTRACTOR under this AGREEMENT.

**11. PAYROLL TAXES, SALES AND GROSS RECEIPTS TAXES, WORKER'S COMPENSATION INSURANCE, LICENSES AND PERMITS:**

A. The SUBCONTRACTOR shall have the status of an employer as defined by the Unemployment Compensation Act of the locale wherein the project is located and shall comply with any and all local, State and/or Federal rules and regulations therewith, including withholdings, reportings, and payments for Social Security, industrial insurance, workers' compensation insurance, unemployment, income, or any other assessed payments.

B. The SUBCONTRACTOR is responsible for, and specifically agrees to pay any and all Federal, State and Municipal taxes, including but not limited to corporate taxes, sales taxes, gross receipts taxes, etc., as they may be required by regulation if any are assessed, in connection with the labor, equipment and/or materials the SUBCONTRACTOR provides under this AGREEMENT.

C. The SUBCONTRACTOR shall furnish and pay for any and all licenses and permits required by local, state, or federal authorities pertaining to the performance of this AGREEMENT.

**12. COORDINATION RESPONSIBILITIES:**

A. The SUBCONTRACTOR shall cooperate fully with the CONTRACTOR, all other subcontractors, and/or suppliers associated with the project, and shall so plan and conduct the work to be performed hereunder so as not to interfere with their operations or with the normal operations of the associated Government facilities, operations, or personnel. The CONTRACTOR will not be responsible for any delays or interference resulting from the acts or operations of the SUBCONTRACTOR, other subcontractors, the Government, or from any other cause in connection with the prosecution of the work herein required or in the ORIGINAL CONTRACT.

B. The SUBCONTRACTOR is responsible for the coordination of all submittals, shop drawings, materials, and installation of materials, provided under this AGREEMENT, with all other subcontractors and material suppliers. The SUBCONTRACTOR is further responsible for coordinating with all of the other trades working on this project to insure the protection of all of the completed work as it progresses during the SUBCONTRACTOR's installation of materials herein required.

C. C. The SUBCONTRACTOR is required to furnish daily logs at the end of each day for every day worked. The logs shall contain information in sufficient detail and accuracy as may be deemed necessary by the CONTRACTOR. In addition, the SUBCONTRACTOR's designated supervisor shall attend and participate in all coordination and safety meetings scheduled by the CONTRACTOR.

**13. SETTLEMENT OF CONTROVERSIES:**

The SUBCONTRACTOR agrees that if any controversy arises between the SUBCONTRACTOR and the CONTRACTOR and/or the PRINCIPAL as to the performance of the work herein required, or the interpretation of any of the ORIGINAL CONTRACT documents, including labor, materials, mannerisms, quantities, kind, price, value, industry standard, trade practice, etc., the Contractor's decision concerning said controversy will be determinative and the SUBCONTRACTOR will thereby prosecute performance in accordance with the Contractor's decision and any subsequent written direction. However, nothing within this clause shall limit the SUBCONTRACTOR's right to pursue remedies for monetary compensation associated with any such determination and/or direction as allowed under the "CLAIMS FOR EXTRA WORK OR DAMAGES"

provision of this AGREEMENT, nor limit the SUBCONTRACTOR's responsibility for the correct technical performance of whatever work it performs, as noted under the "CONTRACTOR'S DISCLAIMER" clause of this AGREEMENT.

**14. INDEMNIFICATION:**

SUBCONTRACTOR agrees to indemnify, hold harmless and defend the CONTRACTOR, its shareholders, directors, officers, employees, agents, representatives, assigns, and surety, and to unconditionally indemnify the same from any and all claims, demands, damages, liability, injuries, losses, expenses, costs, negligence, wrongful conduct, and all causes of action (including accidents, injuries, death) of any kind or nature, without limit (including attorney's fees and court costs) whether attributed directly or indirectly, solely, jointly or concurrently, active or passive, in any matter relating to, arising out of, or resulting from the performance of the ORIGINAL CONTRACT and changes thereto.

**15. BREACH OF CONTRACT:**

If the SUBCONTRACTOR should either verbally or in writing refuse to follow direction of the CONTRACTOR, fail to commence the work, or to perform any duties required under the terms and conditions of this AGREEMENT, including but not limited to the preparation and submission of submittals and shop drawings, certified payrolls, required reportings, etc., within the time scheduled by the CONTRACTOR, or to prosecute said work continuously and diligently with sufficient workers and equipment to insure its completion within the time specified or as may be scheduled by the CONTRACTOR, or to perform said work according to the provisions of the ORIGINAL CONTRACT and/or the provisions of this AGREEMENT, or for any reason whatsoever, the SUBCONTRACTOR shall fail to carry on said work in an acceptable manner, such action(s) or inaction(s) shall be considered a BREACH OF CONTRACT. Accordingly, the CONTRACTOR may elect to give notice in writing of such breach, specifying the same, and if the SUBCONTRACTOR, within a period of seventy-two (72) hours after such notice, shall not proceed in accordance therewith, it is hereby agreed that the CONTRACTOR shall have full power, authority and right, without process of law and without violating this AGREEMENT, to declare the SUBCONTRACTOR in default and to take any/all actions the CONTRACTOR deems necessary to complete the SUBCONTRACTOR's obligations under this AGREEMENT at the cost and expense of the SUBCONTRACTOR, its surety, and/or sureties. In addition, the CONTRACTOR may deduct from payments otherwise due the SUBCONTRACTOR for the amount of any loss or damage incurred by the CONTRACTOR, including any reasonable attorney's fees, and for any anticipated damages thereto.

**16. TERMINATION FOR CONVENIENCE:**

The CONTRACTOR, by written notice, may terminate this AGREEMENT at any time, in whole or in part, when it is determined, at the CONTRACTOR's sole discretion, to be in the CONTRACTOR's best interest. Such termination will be termed a "TERMINATION FOR CONVENIENCE", and the SUBCONTRACTOR's sole compensation for such action shall be in accordance with the TERMINATION FOR CONVENIENCE clause of the ORIGINAL CONTRACT.

**. BONDS AND INSURANCE:**

A. Unless expressly stated otherwise within this AGREEMENT (see last page), the SUBCONTRACTOR shall furnish and pay for Payment and Performance Bonds in the amount of $375,000.00 this AGREEMENT for each bond. Said bonds shall be received within ten (10) days of the signing of this AGREEMENT and shall be in a form and with a surety or sureties acceptable to the CONTRACTOR.

B. The SUBCONTRACTOR further agrees to obtain and continuously carry adequate worker's compensation insurance, public liability insurance and all other insurance required by any applicable statutes and by the ORIGINAL CONTRACT pertaining to the work herein required, together with such other insurance as the CONTRACTOR may deem necessary for the protection of all parties. The SUBCONTRACTOR agrees to provide full occurrence type liability insurance policies and/or certificates, without limitations, disclaimers, sunset clauses, or restrictive clauses of any type, to the CONTRACTOR and/or to the PRINCIPAL as may be demanded by either.

**18. ACCIDENT PREVENTION:**

The SUBCONTRACTOR agrees to comply with, administer and implement into its work all health and safety orders, rules and/or regulations ıposed pursuant to any Federal, State or Local law and all of those required under the terms of the ORIGINAL CONTRACT. This shall, as a inimum, include all of OSHA's health and safety standards for the construction industry inclusive of those established within part 29 CFR 1926 and ı910 thereof, and the requirements established within the Corps of Engineers Health and Safety Requirements Manual EM 385-1-1. Additionally, the SUBCONTRACTOR agrees to comply with all of the health and safety requirements established within the Accident Prevention, Safety, and Hazard Analysis Programs which may be established by the CONTRACTOR and which may contain more stringent requirements than those noted above.

**19. ENVIRONMENTAL PROTECTION:**

The SUBCONTRACTOR agrees to comply with, administer, and implement into its work activities all environmental orders, rules and/or regulations imposed pursuant to any Federal, State or Local law and all of those required under the terms of the ORIGINAL CONTRACT. The SUBCONTRACTOR shall be responsible for the protection of all environmental resources, including but not limited to air, water, land, and noise, within the area of the SUBCONTRACTOR's work activities.

**20. CONTRACTOR'S DISCLAIMER:**

The SUBCONTRACTOR shall be solely responsible for its technical performance under this AGREEMENT and shall not rely on the directions or instructions of the CONTRACTOR's job superintendent, employees, representatives, or representatives of the PRINCIPAL or others concerning technical aspects of the work required herein or for extra or other work encountered due to changes, claims, differing site conditions, etc. Accordingly, the SUBCONTRACTOR agrees to indemnify and hold the CONTRACTOR and all other subcontractors and/or suppliers harmless from any and all damages, delays or extra expenses whatsoever in connection with improperly provided or installed labor and/or material associated therewith. Any monetary changes in the work required by this AGREEMENT must be in writing and approved by an officer of the CONTRACTOR.

**21. DAVIS-BACON ACT AND PAYROLL RECORDS:**

A. The regulation of the Secretary of Labor applicable to the CONTRACTORS and SUBCONTRACTORS made pursuant to the DAVIS-BACON ACT, are made part of this AGREEMENT by reference.

B. The SUBCONTRACTOR agrees to submit a Certified copy of all payrolls weekly to the CONTRACTOR as required by the ORIGINAL CONTRACT. Certified payroll reports are to be received in the CONTRACTOR's office no later than five (5) days past the last day of the JBCONTRACTOR's weekly pay period.

C. The SUBCONTRACTOR shall submit to the CONTRACTOR a fully executed copy of the Statement of Acknowledgment, for each subcontractor, at any tier, prior to his or her working on the job site. The SUBCONTRACTOR is responsible to ensure that lower tier subcontractors comply with Labor Standards Provisions (SF-19A) of the ORIGINAL CONTRACT.

D. The SUBCONTRACTOR agrees to submit to the CONTRACTOR, on a daily basis, a daily log, in a format acceptable to the CONTRACTOR, listing the names, labor classifications, and hours worked in each classification for all employees who worked on the project for that day. Said record is to be initialed by each employee each day signifying agreement with both the hours actually worked and the labor classifications thereon.

**22. COPELAND (ANTI-KICKBACK) ACT - NONREBATE OF WAGES:**

The regulations of the Secretary of Labor applicable to the CONTRACTORS and the SUBCONTRACTORS made pursuant to the Copeland Act, to aid in the enforcement of the Anti-Kickback Act, are made a part of this AGREEMENT by reference.

**23. NOTICE TO GOVERNMENT OF LABOR DISPUTES:**

Whenever the SUBCONTRACTOR has knowledge of any actual or potential labor disputes, which may delay or threaten to delay the timely performance of the ORIGINAL CONTRACT, the SUBCONTRACTOR shall immediately give notice thereof, including all relevant information with respect thereto, to the CONTRACTOR. Failure to do so may render the SUBCONTRACTOR liable for resultant damages incurred by others.

**24. NONDISCRIMINATION IN EMPLOYMENT - EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION:**

In connection with performance of work under this contract, the SUBCONTRACTOR shall ensure a working environment free of harassment, intimidation, and coercion wherever its employees are assigned to work. The SUBCONTRACTOR shall familiarize himself with the Equal Opportunity and Affirmative Action provisions of the ORIGINAL CONTRACT for compliance herewith.

**. WARRANTY FOR LABOR AND MATERIAL:**

The SUBCONTRACTOR specifically agrees to provide warranty labor and material, as may be required to satisfy the PRINCIPAL and the CONTRACTOR, as set forth in the ORIGINAL CONTRACT or required hereunder, for all items covered by this AGREEMENT.

**26. CLEAN-UP, HAUL-OFF AND DUMPING FEES:**

The SUBCONTRACTOR shall be responsible for all clean up associated with the work hereunder. Said clean-up shall take place daily prior to the end of work of each day and shall include keeping all areas free from debris and unsafe conditions, the picking up, hauling off of all debris; demo'd equipment and/or material, associated dumping fees, the proper stacking, lock-up, protection and/or placement of all tools and materials.

**27. ADDITIONAL REQUIREMENTS AND CLARIFICATIONS:**

*** A. The SUBCONTRACTOR acknowledges that this is a legally binding document constructed to allow the CONTRACTOR's enforcement of the SUBCONTRACTOR's responsibilities herein and to insure the protection of any and all of the CONTRACTOR's rights and interest. Accordingly, the SUBCONTRACTOR, by its signature hereon, agrees that it has protected its own economic interests and legal rights by reviewing all of the terms, conditions and scope of work herein and notifying the CONTRACTOR immediately, before the signing or execution of this document, if the SUBCONTRACTOR has had any difficulty reading and/or understanding any part of this AGREEMENT or if there has been any question pertaining to any of the SUBCONTRACTOR's responsibilities under this AGREEMENT and/or the ORIGINAL CONTRACT and the SUBCONTRACTOR's required compliance in any way therewith.

*** B. If any provision(s) of this AGREEMENT is (are) in conflict with any Government Regulations, Statutes or requirements of the ORIGINAL CONTRACT, said Regulation, Statute or requirement shall supersede the non-conforming provision(s) herein. However, it is understood that this paragraph specifically, but not exclusively, does not apply to Clause 28 of this AGREEMENT, the Changes, Suspension of Work, or Variations in Estimated Quantities clauses, equitable adjustments or delay and damage recovery allowances of the ORIGINAL CONTRACT or as may be allowed within the Federal Acquisition Regulations.

*** C. By signing this AGREEMENT, the SUBCONTRACTOR certifies that it is eligible to receive contracts from the Federal Government and that it and/or any of its principals and/or employees have not been convicted of, or had any proceedings brought against it or them for fraudulent or illegal acts of any kind which could render the SUBCONTRACTOR, or any of its principles or employees, ineligible to conduct business with the Federal Government.

*** D. All claims or disputes which directly or indirectly arise out of or relate to this AGREEMENT, the ORIGINAL CONTRACT, or the project which is the subject of this AGREEMENT shall be submitted to binding arbitration pursuant to the Construction Industry Rules of the American Arbitration Association. The SUBCONTRACTOR expressly agrees that all claims it may have under the Miller Act against the CONTRACTOR and/or the CONTRACTOR's surety shall be submitted to binding arbitration as set forth herein; and that the CONTRACTOR's surety is an intended third party beneficiary of this arbitration clause, with a direct right of enforcement hereof. The SUBCONTRACTOR further hereby expressly waives its right to file suit against either the CONTRACTOR or the CONTRACTOR's surety in United States District Court under the Miller Act.

*** E. This AGREEMENT constitutes the total and final agreement between the parties herein. Accordingly, the terms, conditions and scope of work of this AGREEMENT (including any modifications) supersedes, replaces and voids completely any and all previous price quotes, proposals, understandings and/or agreements offered or discussed, either verbally or in writing, which may have taken place by, between or with any parties prior to the date of this AGREEMENT.

**28. CONTRACTOR'S LABOR REQUISITION OPTION:**

This paragraph is a CONTRACTOR'S option only wherein SUBCONTRACTOR agrees that its workers may be hired by CONTRACTOR to complete work under this AGREEMENT, and that if CONTRACTOR chooses to exercise this option, SUBCONTRACTOR agrees that the amounts paid the workers and associated costs including labor burden, shall be deducted from the total amount of this AGREEMENT. While the SUBCONTRACTOR'S workers are on CONTRACTOR'S payroll the workers shall be CONTRACTOR'S employees and CONTRACTOR shall assume responsibility for all associated labor burden expenses, and the work completed during such time shall be CONTRACTOR completed work.

29. SCOPE OF WORK TO BE PERFORMED BY SUBCONTRACTOR: **SUBCONTRACTOR agrees to provide all supervision, labor, materials, tools, plant, testing, equipment and associated miscellaneous apparatus to provide for all work and all responsibilities related to extend boat ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, NV ıcluding all required submittals. All work to be in accordance with the plans, specifications, amendments and all other related ·cuments (wherever shown, detailed or specified) as necessary to have a complete project acceptable to the government.**

SUBMITTALS DUE: August 15, 2005
**CONTRACTOR FURNISHED ITEMS: None**
**Exclusions: None**

**Total Price: $375,000.00 - Takota will reimburse the bond fee when a paid invoice is sent.**

*****END SCOPE OF WORK*****

In signing this AGREEMENT, the SUBCONTRACTOR agrees that this AGREEMENT is expressly made conditional and offered predicate upon the SUBCONTRACTOR's acceptance of the terms and conditions stated herein which may differ from those previously offered or discussed; the SUBCONTRACTOR additionally agrees that he has received a complete set of plans and specifications including all of the general provisions, labor provisions, rate of pay scales, and all amendments which are a part thereof for the project specified herein.

CONTRACTOR:
Takota Corporation

By: ______________________ Witness ______________________
Doug Reitmeyer, Construction Manager Date

SUBCONTRACTOR:

By: ______________________ Witness ______________________
Montemayor, Inc. Date

# STATEMENT AND ACKNOWLEDGEMENT

OMB No.:9000-0014
Expires: 03/31/92

'ublic reporting burden for this collection of information is estimated to average 1.5 hours per response, including the time for reviewing instructions, searching existing data sources, gather and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS) Office of Federal Acquisition and Regulatory Policy, GSA, Washington, DC 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0014), Washington, DC 20503.

## PART I – STATEMENT OF PRIME CONTRACTOR

| 1. PRIME CONTRACT NO. | 2. DATE SUBCONTRACT AWARDED | 3. SUBCONTRACT NUMBER |
|---|---|---|
| N62470-05-C-7156 | July 26, 2005 | 194C01 |

| 4. PRIME CONTRACTOR (Name, address and ZIP code) | 5. SUBCONTRACTOR (Name, address and ZIP code |
|---|---|
| Takota Corporation<br>3017 Palm Springs Way<br>Las Vegas, NV 89102 | Montemayor, Inc.<br>1168 Central Avenue<br>East Point, GA 30344 |

6. The prime contractor states that under the contract shown in Item 1, a subcontract was awarded on the date shown in Item 2 by (Name of Awarding Firm) Takota Corporation

to the subcontractor identified in Item 5, for the following work:

Ramps

| 7. Project | 8. LOCATION |
|---|---|
| Extend Boat Ramps | Hancock Marina, Marine Corps Air Station, Cherry Point, NC |

| 9. NAME AND TITLE OF PERSON SIGNING | 10. BY (Signature) | 11. DATE SIGNED |
|---|---|---|
| Doug Reitmeyer<br>Construction Manager | | |

## PART II – ACKNOWLEDGEMENT OF SUBCONTRACTOR

12. The subcontractor acknowledges that the following clauses of the contract shown in Item 1 are included in this subcontract:

- Contract Work Hours and Safety Standards Act – Overtime Compensation – Construction
- Payrolls and Basic Records
- Withholding of Funds
- Disputes Concerning Labor Standards
- Davis-Bacon Act
- Apprentices and Trainees
- Compliance with Copeland Regulations
- Subcontracts
- Contract Termination-Debarment
- Certification of Eligibility

13. NAME(S) OF ANY INTERMEDIATE SUBCONTRACTORS, IF ANY

| 14. NAME AND TITLE OF PERSON SIGNING | 15. BY (Signature) | 16. DATE SIGNED |
|---|---|---|
| | | |

NSN 7540-01-151-4297
Previous edition is usable

STANDARD FORM 1413 (REV. 6-89)
Prescribed by GSA – FAR (48 CFR) 53.228(e)

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102
Phone (877) 871-0145 Fax (760) 437-3341

October 4, 2005

Department of the Navy
Connie Turner
Bldg 163 Curtis Road
Cherry Point, NC 28533-0006
Phone: 252-466-5930

RE: Contract Number N62470-05-C-7156, Extend Boat Ramps at Hancock Marina, Marine Corps Air Station, Cherry Point, NC.

Dear Connie,

I am sending you the Application and Certificate for Payment #2 for your files. If you need anything else please let me know.

Thank you,

*Jan Harris*

Jan Harris
Contract Administrator
jan@takota.com

Will resubmit
Sch of Prices
not approved

EXHIBIT
2

Takota Corporation
Our Project No. 194
Application for Payment No. 2
Application Date: 10/4/05

Project Name: Extend Boat Ramps @ Hancock Marina, Marine Corps Air Statio, Cherry Point, NC
Contract No. N62470-05-C-7156

| Line Item No. | Description of Work | Quantity | Percent of project | Scheduled Value | Previous Period | This Period | Stored Materials | Total Complete | % Complete | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bonds | | 1.72% | $7,945.00 | $7,945.00 | $0.00 | | $7,945.00 | 100.00% | $0.00 |
| 2 | Mobilization | | 5.83% | $27,000.00 | $0.00 | $27,000.00 | | $27,000.00 | 100.00% | $0.00 |
| 3 | Demobilization | | 3.89% | $18,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $18,000.00 |
| 4 | Coffer Dams Delivered and installed | 500 lf | 15.98% | $74,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $74,000.00 |
| 5 | Coffer Dams removed | 500 lf | 4.32% | $20,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $20,000.00 |
| 6 | Install 5 electrical poles | 5 | 1.19% | $5,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $5,500.00 |
| 7 | Install 4 new lighting fixtures | 4 | 1.30% | $6,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $6,000.00 |
| 8 | Install 1 new electrical panel | 1 | 0.86% | $4,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $4,000.00 |
| 9 | trench 700 lf and install new conduit and pull wire | 700 lf | 5.40% | $25,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $25,000.00 |
| 10 | Dredge approx. 30 tons of material | approx 30 | 1.62% | $7,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $7,500.00 |
| 11 | Install 1700 sy of asphalt | 1700 sy | 8.21% | $38,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $38,000.00 |
| 12 | Install 1700 sy of stone base | 1700 sy | 4.97% | $23,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $23,000.00 |
| 13 | Fine Grade 1700 sy for Asphalt | 1700 sy | 1.73% | $8,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,000.00 |
| 14 | Demo/Cleanup Ramps and Old Fuel Tank Area | | 4.10% | $19,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $19,000.00 |
| 15 | Concrete Ramp Prep of subgrade | | 1.96% | $9,055.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $9,055.00 |
| 16 | Install 200 tons of Rip Rap | 200 tons | 2.38% | $11,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $11,000.00 |
| 17 | Install 280 pieces of steel for concrete ramps | 280 piece | 0.86% | $4,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $4,000.00 |
| 18 | Placing 200 tons of stone on the prep subgrade | 200 tons | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 19 | Setting Forms and Stripping Form for Ramps | | 1.08% | $5,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $5,000.00 |
| 20 | Purchasing, Placing and Finishing Concrete for Ram | 100 yds | 6.70% | $31,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $31,000.00 |
| 21 | Approx. 1220 sf of New Docks installed | 1220 sf | 7.34% | $34,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $34,000.00 |
| 22 | Drive 40 piles for docks | 40 piles | 8.64% | $40,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $40,000.00 |
| 23 | 700 lf of Trubididity Barrier delivered to site | 700 lf | 5.40% | $25,000.00 | $0.00 | $25,000.00 | | $25,000.00 | 100.00% | $0.00 |
| 24 | 700 lf of Trubididity Barrier installed | 700 lf | 2.59% | $12,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $12,000.00 |
| 25 | 700 lf of Trubididity Barrier removed | 700 lf | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 26 | Demo old wooden Docks and Removal from Site | | 0.86% | $4,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $4,000.00 |
| 27 | Asbuilts O&M's | | 0.21% | $1,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $1,000.00 |
| | | | 0.00% | $0.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | Original Contract Amount | | 100.00% | $463,000.00 | $7,945.00 | $52,000.00 | $0.00 | $59,945.00 | 12.95% | $403,055.00 |
| | TOTAL with changes | | 100.00% | $463,000.00 | $7,945.00 | $52,000.00 | $0.00 | $59,945.00 | 12.95% | $403,055.00 |

CERTIFICATION FOR PROGRESS PAYMENT

I hereby certify, to the best of my knowledge and belief that --

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; and

(3) This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

Arthur Caprario (signature)

(NAME) Arthur Caprario

President

(TITLE)

October 4, 2005

(DATE)

T19

Geotechnical Supply, Inc.
One Gateway Center
Suite 451
Newton, MA 02458

Phone: 617-965-0007
Fax: 617-965-0097
Email: sw@boomenviro.com
Web Site: www.boomenviro.com

GEOTECHNICAL SUPPLY INCORPORATED
BOOM® ENVIRONMENTAL PRODUCTS

# Invoice

Invoice Number: 010078
Invoice Date: 9/27/05
Page: 1

Sold To:
TAKOTA CORP.
3017 PALM SPRINGS WAY
LAS VEGAS, NV 89102

Ship to:
HANCOCK MARINA
MCAS, CHERRY POINT
HAVELOCK, NC

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| TAKOTA CORP. | 194P03 | WIRE | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| | TRUCK | 9/30/05 | 9/30/05 |

| Quantity | Description | Unit Price | Extension |
|---|---|---|---|
| 700.00 | LINEAR FEET TYPE 2 TURBIDITY CURTAIN, 9' DEEP (PER SPECIFICATIONS FAXED TO JOHN JONES) | 21.000 | 14,700.00 |
| 28.00 | 9.000Z WHITE FLASHING PHOTO MARKER LIGHTS | 230.000 | 6,440.00 |

All invoices paid after due date will be assessed a late payment service charge of 1.5% per month or the maximum allowable by law, whichever is lower.

"Any controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration in accordance with the rules of The American Arbitration Association, and judgement upon the award rendered by the arbitrator (s) may be entered in any court having jurisdiction thereof, hearings to be held in the city of Boston, MA"

| | |
|---|---|
| Subtotal | 21,140.00 |
| Sales Tax | |
| Freight | 2,300.00 |
| Total Invoice Amount | 23,440.00 |
| Payment/Credit Applied | 23,440.00 |
| TOTAL | 0.00 |

Check/Credit Memo No: WIRE

# APPLIC/ ! AND CERTIFICATE FOR PAYMENT



From Co r: Takota Corporation, 3017 Palm Springs Way, Las Vegas, NV 89102 (877) 8.,-0145
TIN: 88-0505848 EFT: Routing 122401778 Account 0120091569 Bank West of Nevada
DUNS: 040189909

TO OWNER:
Department of the Navy
Attn: Connie Turner
Bldg 163 Curtis Road
Marine Corps Air Station

Cherry Point, NC 28533-0006
Phone: 252-466-4751

PROJECT NAME: Extend Boat Ramps @ Hancock Marina, Marine Corps Air Statin, Cherry Point, NC
CONTRACT NO.: N62470-05-C-7156

Application Date: 11/23/05
INVOICE/APPLICATION #: 2
PERIOD TO: 10/31/05
PROJECT NO.: 194

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.

| | |
|---|---|
| 1 ORIGINAL CONTRACT SUM | $463,000.00 |
| 2 Net Change by Change Orders | $0.00 |
| 3 CONTRACT SUM TO DATE | $463,000.00 |
| 4 TOTAL COMPLETED & STORED TO DATE | $162,945.00 |
| 5 RETAINAGE this period | |
| a.______% of Completed Work $ | |
| b.______% of Store Material $ | |
| Total Retainage (Line 5a + 5b) | 0.00 |
| 6 TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total) | $162,945.00 |
| LESS PREVIOUS CERTIFICATES FOR PAYMENT 7 (Line 6 from prior Certificate) | 32,945.00 |
| CURRENT PAYMENT DUE | $130,000.00 |
| 8 BALANCE TO FINISH, INCLUDING RETAINAGE 9 (Line 3 less Line 6) | $300,055.00 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown is herein now due.

CONTRACTOR:

By: [signature] Date: 11/23/2005
Arthur Caprario

EXHIBIT
3

**Takota Corporation**
**Our Project No.** 194
**Application for Payment No.** 2
**Application Date:** 11/23/05

**Project Name:** Extend Boat Ramps @ Hancock Marina, Marine Corps Air Statin, Cherry Point, NC
**Contract No.** N62470-05-C-7156

| Line Item No. | Description of Work | Quantity | Percent of project | Scheduled Value | Previous Period | This Period | Stored Materials | Total Complete | % Complete | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bonds | | 1.72% | $7,945.00 | $7,945.00 | $0.00 | | $7,945.00 | 100.00% | $0.00 |
| 2 | Mobilization | | 0.00% | $0.00 | $0.00 | $0.00 | | $0.00 | 100.00% | $0.00 |
| 3 | Demobilization | | 0.00% | $0.00 | $0.00 | $0.00 | | $0.00 | 100.00% | $0.00 |
| 4 | Coffer Dams Delivered and installed | 500 lf | 16.95% | $78,500.00 | $0.00 | $78,500.00 | | $78,500.00 | 100.00% | $0.00 |
| 5 | Coffer Dams removed | 500 lf | 5.29% | $24,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $24,500.00 |
| 6 | Install 5 electrical poles | 5 | 2.16% | $10,000.00 | $0.00 | $10,000.00 | | $10,000.00 | 100.00% | $0.00 |
| 7 | Install 4 new lighting fixtures | 4 | 2.27% | $10,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $10,500.00 |
| 8 | Install 1 new electrical panel | 1 | 1.84% | $8,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,500.00 |
| 9 | trench 700 lf and install new conduit and pull wire | 700 lf | 6.37% | $29,500.00 | $0.00 | $29,500.00 | | $29,500.00 | 100.00% | $0.00 |
| 10 | Dredge approx. 30 tons of material | 30 tons | 2.59% | $12,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $12,000.00 |
| 11 | Install 1700 sy of asphalt | 1700 sy | 8.21% | $38,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $38,000.00 |
| 12 | Install 1700 sy of stone base | 1700 sy | 4.95% | $23,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $23,000.00 |
| 13 | Fine Grade 1700 sy for Asphalt | 1700 sy | 1.73% | $8,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,000.00 |
| 14 | Demo/Cleanup Ramps and Old Ruel Tank Area | | 6.05% | $28,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $28,000.00 |
| 15 | Concrete Ramp Prep of subgrade | | 1.96% | $9,055.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $9,055.00 |
| 16 | Install 200 tons of Rip Rap | 200 tons | 2.38% | $11,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $11,000.00 |
| 17 | Install 280 pieces of steel for concrete ramps | 280 piece | 0.86% | $4,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $4,000.00 |
| 18 | Placing 200 tons of stone on the prep subgrade | 200 tons | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 19 | Setting Forms and Stripping Form for Ramps | | 1.08% | $5,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $5,000.00 |
| 20 | Purchasing, Placing and Finishing Concrete for Ramp | 100 yds | 6.70% | $31,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $31,000.00 |
| 21 | Approx. 1220 sf of New Docks installed | 1220 sf | 7.34% | $34,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $34,000.00 |
| 22 | Drive 40 piles for docks | 40 piles | 8.64% | $40,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $40,000.00 |
| 23 | 700 lf of Trubitidity Barrier delivered to site | 700 lf | 5.40% | $25,000.00 | $25,000.00 | $0.00 | | $25,000.00 | 100.00% | $0.00 |
| 24 | 700 lf of Trubitidity Barrier installed | 700 lf | 2.59% | $12,000.00 | $0.00 | $12,000.00 | | $12,000.00 | 100.00% | $0.00 |
| 25 | 700 lf of Trubitidity Barrier removed | 700 lf | 0.43% | $2,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $2,000.00 |
| 26 | Demo old wooden Docks and Removal from Site | | 1.84% | $8,500.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $8,500.00 |
| 27 | Asbuilts O&M's | | 0.22% | $1,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $1,000.00 |
| | | | | $0.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | | | | | $0.00 | $0.00 | | $0.00 | 0.00% | $0.00 |
| | Original Contract Amount | | 100.00% | $463,000.00 | $32,945.00 | $130,000.00 | $0.00 | $162,945.00 | 35.19% | $300,055.00 |
| | TOTAL with changes | | 100.00% | $463,000.00 | $32,945.00 | $130,000.00 | $0.00 | $162,945.00 | 35.19% | $300,055.00 |

# CERTIFICATION FOR PROGRESS PAYMENT

I hereby certify, to the best of my knowledge and belief that --

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; and

(3) This request for progress payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

Arthur Caprario

(NAME) Arthur Caprario

President

(TITLE)

November 23, 2005

(DATE)

1030 NOV 29 2005

NAVAL FAICLITIES ENGINEERING COMMAND
CONTRACTOR'S INVOICE

INVOICE DATE: NOVEMBER 23, 2005
INVOICE NUMBER 02

FROM: TAKOTA CORPORATION
3017 PALM SPRINGS WAY
LAS VEGAS NV 89102

POC/Telephone/email for this invoice: ______

TO: CG MCAS CHERRY POINT
OIC, NAVFAC CONTRACTS
PSC BOX 8006
CHERRY POINT, NC 28533-0006

1. Below is a Statement of Performance under Contract N62470- 05-C-7156 for Extend Boat Ramps at Marine Corps Air Station, Cherry Point, NC 28533-0006.
(Complete Contract Title)

The enclosure provides breakdown of this statement of performance.

A. Total value of contract/task order through change $ 463,000.00
B. Percentage of performance complete 35.19
C. Value of complete performance $ 130,000.00
D. Less total of prior payment $ 0.00
E. Amount of this invoice $ 130,000.00

Signature and Title: Arthur Caprario
Signature of Authorized Representative President

FIRST ENDORSEMENT

7 DECEMBER 2005

FROM: CG MCAS CHERRY POINT, FACILITIES, OIC NAVFAC CONTRACTS, PSC BOX 8006, CHERRY POINT, NC 28533-0006
TO: DFAS-COLUMBUS

1. Payment is recommended as follows:

A. Amount of work complete to (date) $ 162,945.00
B. Less:
Retention $78,500.00 (LINE ITEM 4)
Other Deductions $______
C. Subtotal $ 78,500.00
D. Less previous payments $ 84,445.00
E. Certified amount for payment # 2 $ 32,945.00
F. Elapsed contract time (if applicable) $ 51,500.00

2. Prompt Payment Certification PAYMENT TERMS: NET 14 DAY PROGRESS PAY
A. Responsible Certifying UIC N62470
B. Invoice Receipt Date 11/29/05
C. Material/Services Receipt Date 11/29/05
D. Material/Services Acceptance Date 11/29/05
E. Date forwarded to paying office 12/7/05
F. The services billed for on this invoice are hereby approved.

3. I certify that the accounting data provided is accurate, funds have been obligated in appropriate accounting system and changes have been applied to the appropriate classification reference number (ACRN), available funds have been decremented for the amount approved for disbursement and will not be de-obligated and the above invoice is correct and proper for payment.

Signature: Marsha Temple Date: 12/7/05
Signature of Authorized Representative
Name and Title: MARSHA TEMPLE, CONTRACT SPECIALIST DSN: 582-5930
Phone and address: ROICC OFFICE, PSC BOX 8006, CHERRY POINT, NC 28533-0006

LINE(S) OF ACCOUNTING TO BE USED FOR THIS INVOICE SDN NO:
M0014605RCF0510
AA 1751106 27A0 000 00146 0 067443 2D 000000 FEFECICF0510 $51,500.00

**DEPARTMENT OF THE NAVY**
OFFICER IN CHARGE OF CONSTRUCTION
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION
OFFICER IN CHARGE OF FACILITIES SUPPORT CONTRACTS
MARINE CORPS AIR STATION
PSC BOX 8006
CHERRY POINT, NORTH CAROLINA 28533-0006

11000
N62470-05-C-7156
05 December 2005

Takota Corporation
3017 Palm Springs Way
Las Vegas, NV 89102

Ladies and Gentlemen:

Subject: CONTRACT N62470-05-C-7156, EXTEND BOAT RAMPS AT HANCOCK MARINA, MARINE CORPS AIR STATION, CHERRY POINT, NORTH CAROLINA

ROICC CHPT recently received and reviewed your Application of Payment Invoice. With all things considered, including a pending constructive change, line item four (4) is retained, an amount of $78,500.00. Though delivered and visibly installed, it fails to function properly. Payment of the line item, of course, will be processed and rendered if the situation is amended.

We appreciate your cooperation in accomplishing all contract work in a manner mutually beneficial to both you and the Government.

Sincerely,

Antoine Crite
LTJG, CEC, USNR
AROICC / Construction Project Manager
Resident Officer In Charge of Construction
Marine Corps Air Station Cherry Point