# In the United States Court of Federal Claims

No. 06-553C

(Filed: October 28, 2009)

```
* * * * * * * * * * * * * * * * * *
```
TAKOTA CORPORATION,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

Government Contracts; Construction Law; Differing Site Conditions; Breach of Contract; Summary Judgment

```
* * * * * * * * * * * * * * * * * *
```

    *Robert Symons*, Washington, DC, for plaintiff.

    *Jane C. Dempsey*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Tony West*, Assistant Attorney General, *Jeanne Davidson*, Director, and *Bryant Snee*, Deputy Director, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    Pending in this contract action are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").[1] The plaintiff, Takota Corporation ("Takota"), seeks to convert its default termination to a termination for convenience. The government seeks to have Takota's claim dismissed. The matter is fully

___

[1] Also pending is plaintiff's motion for sanctions pursuant to RCFC 11(c)(1)(A) regarding the government's previously withdrawn affirmative defense asserting fraud by Takota. The motion is not yet fully briefed.

1

briefed. Oral argument was held on September 10, 2009. For the reasons set out below, the government's motion is granted and the case is dismissed.

BACKGROUND[2]

On July 22, 2005, the United States Department of the Navy ("the Navy") awarded Contract No. N62470-05-7165 to Takota. The contract called for the extension of two boat ramps and dredging at the Hancock Marina, Marine Corps Air Station, Cherry Point, North Carolina. The contract was for a fixed price of $463,000[3] and provided a performance period of 150 days. Thus, the completion date was January 3, 2006.

Although the contract contemplated work on two boat ramps, the facts of this dispute center primarily around the boat ramp located in the Hancock Marina, a relatively small, lagoon-like basin opening into Hancock Creek and largely encircled by land. The sides of the lagoon consist of a preexisting seawall constructed of concrete and sheet metal. It is undisputed that prior to the time of performance the seawall encircling the lagoon was in disrepair. Indeed, the contract drawings note:

> Dewatering the lagoon will cause a significant unbalanced load condition of the already deteriorating steel sheet pile bulkhead (seawalls). Contractor shall monitor all existing bulkhead (seawalls) during the dewatering and construction process. Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction.

Contract drawing C-03, note 3 (Def.'s App. Tab 1).

---

[2] The background facts are drawn from the parties' Proposed Findings of Uncontroverted Facts and are undisputed unless otherwise noted.

[3] The Navy's cost estimate projected a total cost of $442,525. The other two bids received on the project were for $630,000 and $635,000. Although the solicitation invited offerors to visit and inspect the site prior to bidding, Takota did not conduct a pre-bid site visit. The Navy requested and received Takota's verification of its bid amount before awarding the contract.

> Bulkheads (seawalls) shall be carefully monitored during dewatering process. Contractor shall provide adequate shoring/bracing for bulkheads (seawalls). Should signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction.

Contract drawing C-04, note 3 (Def.'s App. Tab 1).

Additionally, the contract calls for various submittals, although the parties dispute which submittals were actually required. Of particular note, Section 02300 of the contract, entitled "Earthwork," states that the contractor must submit procedures for accomplishing dewatering work.[4] That section further states, "The Contractor shall submit a Shoring and Sheeting plan for approval 15 days prior to starting work." Section 02300 also requires the contractor "to hire a Professional Geotechnical Engineer to provide inspection" both before and during construction. At a pre-construction conference on August 18, 2005, Navy representatives reminded Takota of the various required submittals and instructed Takota to forward any technical submittals to the Navy's architectural and engineering firm, Dewberry & Davis.

On October 3, 2005, Takota began work at the job site. In order to remove and replace the boat ramp in the Hancock Marina, Takota was required to seal off the entrance to the lagoon using "sheet piles or other temporary measures" and pump out the water. Contract Section 01110N, 1.1.1(b). Takota planned to do so using a Portadam—a brand of temporary cofferdam generally designed for such applications.[5] At the time Takota began work, it had not submitted a shoring plan or a dewatering plan, nor had it hired a geotechnical engineer, although Takota disputes whether these steps were mandatory.

Takota installed the Portadam on October 19–20, 2005, and began dewatering the lagoon the next day, making sufficient progress to begin work

---

[4] Takota disputes the relevance of these provisions because it did not intend to perform earthwork excavations or use shoring and sheeting.

[5] The Navy questions whether the Portadam system was adequate for the task and whether it was properly installed.

3

demolishing and removing the boat ramp. During this process, water was flowing into the partially dewatered lagoon area. The parties disagree, however, about whether the leakage was coming through the deteriorated seawall or through a gap where the Portadam did not properly abut the seawall. The parties also dispute whether the volume of leakage was greater than the capacity of the pumps and, thus, whether the leakage precluded complete dewatering of the marina.

On October 28, 2005, Takota notified the Navy in writing that it was stopping work due to a differing site condition and requested direction. Specifically, Takota stated that when dewatering, it experienced "water flow behind the bulkheads/sheet piles from the top of our temporary cofferdams into the work area" causing erosion behind the seawall and jeopardizing its stability. When Navy representatives, including the Assistant Resident Officer in Charge of Construction ("AROICC"), visited the site and observed the marina filled with water, they requested Takota to dewater so the Navy representatives could observe the alleged differing site condition. Takota refused, stating that the seawall would fail if it attempted to dewater again.

The AROICC followed up on the site observation with an email on November 2, 2005, advising Takota that it was required to submit a sheeting and shoring plan and to employ a geotechnical engineer. In Takota's reply, it contested the need for a sheeting and shoring plan submittal, but the company agreed to hire a geotechnical engineer. The next day, Takota contacted two engineering firms, ultimately selecting QORE Property Sciences ("QORE") to visit the site and prepare a geotechnical report of its findings and recommendations.

Also on November 2, 2005, engineers from the Navy and Dewberry & Davis visited the Hancock Marina to investigate the claim of a differing site condition. They concluded that the dewatering problem was not due to a differing site condition, but rather to the selection of an unsuitable cofferdam system that was not properly sealed at the points where it was to abut the seawall. Accordingly, on November 13, 2005, the AROICC emailed Takota instructing it to use sheet piling rather than cofferdams.[6] This email also

---

[6] Takota disputes the AROICC's authority to dictate means and methods of work and whether this email constituted direction from the Contracting Officer as previously requested. In response, the Navy points to an internal "Letter of Authority" dated June 14, 2005, which authorized the

4

reminded Takota of the requirement to shore the seawall—a contractual interpretation disputed by Takota—and confirmed that the original completion date was still in effect.

QORE, Takota's geotechnical engineering firm, presented Takota with a preliminary field observation report on November 13, 2005, finding the seawall in a significant state of disrepair and suggesting relocating the placement of the Portadam to reduce the area being dewatered.[7] The report also suggested that for the second boat ramp, located in Hancock Creek, Takota trench behind the seawall and place concrete to form permanent groundwater cutoff walls. Shortly thereafter, Navy personnel forwarded QORE's report to Dewberry & Davis for comment on the proposed solutions.

On November 22, 2005, Takota informed the Navy that it was going to treat the situation as a constructive change and would proceed by ordering an additional cofferdam to enclose the area immediately around the boat ramp in the lagoon.  About a week later, the AROICC replied, stating that any change or additional work must be presented to the Navy through an equitable adjustment and be approved.  Takota immediately replied with a letter seeking confirmation that the Navy was directing Takota to stop work pending submission and approval of an equitable adjustment request.  This letter also requested a meeting with Navy representatives to discuss the problem.  In response, the Navy proposed a meeting for December 7, 2005.

The day prior to the scheduled meeting, Dewberry & Davis provided the Navy with comments on QORE's report and proposed solution, finding some of them to be meritorious but also noting that "dewatering is a means and methods issue and totally the responsibility of the contractor" and that "[d]ifferential loading—and support—on the seawall clearly should have been

---

AROICC to negotiate changes up to $100,000 including "requesting and receiving proposals and negotiating modifications." The Navy also points to minutes of the preconstruction meeting, which state, "[t]he AROICC is the primary point of contact for the contractor" and "[a]ll issues should first be addressed through the AROICC . . . ."  We need not resolve this dispute over the scope of the AROICC's authority because Takota did not comply with his instruction to replace the cofferdams nor did the Navy rely on this refusal in its decision to terminate.

[7] This proposal for limited dewatering did not address how Takota would dredge the lagoon "in the dry" as specified by the contract.

5

assumed based on a review of the contract documents during bidding." At the meeting on December 7, 2005, Navy personnel met with Takota representatives to discuss possible solutions. One such solution discussed was to excavate behind the lagoon seawall, then fill the trench with concrete. The parties disagree, however, about whether this was merely a proposal contingent on funding or a final agreed-upon solution. At this meeting, the Navy reminded Takota of the project completion date and the penalties for delays.

Following the meeting, the AROICC requested that Takota submit a cost proposal for the approach discussed at the meeting. On December 21, 2005, Takota replied via email that it was working on a proposal that would be ready in a few days. On that same day, however, Takota sent a letter to the Contracting Officer stating that Takota could not furnish a precise estimate and suggesting that the government issue a "Not to Exceed" change order for design efforts. On January 3, 2006, the original completion date, Takota sent a follow-up letter, again requesting a "Not to Exceed" change order for the design and construction efforts and seeking a time extension. The Navy replied several days later, stating that a design was not needed because the proposed solution did not actually involve repairing the seawall. The reply letter also stated that the Navy was aware that "a suitable time extension is needed, and it will be granted once we negotiate an appropriate equitable adjustment and an acceptable time schedule to perform the work."

On January 11, 2006, Takota sent another letter to the Navy stating that dewatering would likely cause the seawall to fail and informing the Navy that Takota had involved its attorney to assist in mitigating Takota's ongoing expenses. The Navy forwarded this letter to Dewberry & Davis the next day, requesting an evaluation of whether the project could be successfully completed as originally designed and specified. Dewberry & Davis replied to the Navy on February 1, 2006, that the contract could be completed as originally designed and noting that the deteriorated state of the seawalls was specifically mentioned on the contract drawings.

The Navy convened an internal strategy meeting on February 6, 2006. Takota contends that, at this meeting, the Navy decided to issue a termination for default, an allegation the Navy vigorously contests. On February 28, 2006, Navy personnel met with Takota representatives to discuss moving forward on the project. At that meeting, the Resident Officer in Charge of Construction offered to reset the project schedule and to provide payment for the temporary cofferdams but reiterated the Navy's position that there was no differing site condition and that the project could be completed as specified in the contract.

Takota maintained its position that a differing site condition existed and that dewatering could not be accomplished under the contract specifications.

On March 7, 2006, the Contracting Officer sent a letter to Takota directing it to resume work. The letter stated that all contract requirements remained in effect and requested various submittals and resubmittals. The letter further stated that the Navy had not waived the now-passed completion date and that a failure to prosecute the work could result in a termination. On March 22, 24, 29, and 30, 2006, Takota and the Navy exchanged correspondence regarding the timeline for the requested submittals and debating whether certain resubmittals were necessary.

The Contracting Officer issued a Show Cause Notice to Takota on April 20, 2006, stating that various required submittals were still outstanding and that the Navy was contemplating terminating Takota. The letter reminded Takota that the Navy had not waived the completion date and gave Takota ten days to respond in writing justifying its failure to prosecute the work. Twelve days later, on May 2, 2006, Takota replied, providing a status update regarding the outstanding submittals and projecting a new completion date of July 30, 2006. Also on May 2, 2006, Takota submitted its dewatering plan, one of the key requested submittals. The Navy, however, rejected the dewatering plan on May 16, 2006, concluding that the submittal was a geotechnical report and not a dewatering plan. In particular, the Navy reviewer stated the report failed to address how to seal the spaces where the cofferdams abutted the seawall and lacked specifics of how, where, and when the work could be done.

On May 24, 2006, the Navy issued a termination for default, asserting Takota's "failure to make progress to ensure completion of the contract and to perform the contract within the specified time." The contract was subsequently awarded to Cieszko Construction Company for $713,800[8]. On July 31, 2006, Takota filed suit here, seeking to have the termination for default converted into a termination for convenience.

---

[8] The Navy's cost estimate issued prior to re-awarding the contract projected a total cost of $651,492. This increase from the prior cost estimate reflects increased estimates for the cost of asphalt and concrete paving and a substantial increase in the estimated cost of the cofferdam to be used at boat ramp two, located in the river. Additionally, the 2006 estimate appears to include a 20.5% increase to reflect the passage of time. It reduced the total, however, to reflect electrical work performed by Takota.

DISCUSSION

*I. Legal Standard for a Default Termination*

A contracting officer possesses "broad discretion" when deciding whether to terminate a contract for default. *Consol. Indus., Inc. v. United States*, 195 F.3d 1341, 1343 (Fed. Cir. 1999). This discretion, however, is not boundless. A default termination will be overturned if it is "'arbitrary, capricious, or constitutes an abuse of discretion.'" *Id.* at 1343–44 (quoting *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999)); *see also McDonnell Douglass Corp. v. United States*, 567 F.3d 1340, 1354 (Fed. Cir. 2009) (upholding a default termination where "the contracting officer exercised reasoned judgment and did not act arbitrarily").

In evaluating the exercise of this discretion, relevant factors include "(1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation." *McDonnell Douglas*, 182 F.3d at 1326 (quoting *United States Fid. & Guar. Co. v. United States*, 230 Ct. Cl. 355, 676 F.2d 622, 630 (1982)). Here, there is no allegation of bad faith on the part of the Contracting Officer, no dispute about the scope of the Contracting Officer's authority and discretion, and no claim that any statute or regulation has been violated. Thus, only one of the *McDonnell* factors is in play, namely, whether there is a reasonable, contract-related basis for the official's decision.

*II. Takota's Failure to Follow Contract Specifications*

Of the various contract-related arguments raised by the parties, most are inappropriate grounds for summary judgment. Resolving the various allegations and defenses, many of which combine issues of fact and law, would necessarily entail deciding factual disputes. These include whether the AROICC's communications constituted direction from the Navy, whether the parties' proposed solution was a binding agreement or was contingent on subsequent action,[9] whether the Navy's termination for default was within a

---

[9] We note that even assuming the solution discussed at the December 7, 2005 meeting was a binding agreement, the outcome in this case remains the same. Even if the government permitted Takota to submit an estimate to

reasonable time after the original contract completion deadline, and ultimately whether there was a differing site condition.

Among the otherwise fact-dependent issues, however, one line of argument stands out as a question of law. In its cross-motion for summary judgment, the government argues that the Navy reasonably exercised its discretion to terminate for default because Takota failed to follow various contract specifications. A contractor's failure to meet contract specifications is a relevant consideration in determining whether a contractor is in default. *McDonnell*, 182 F.3d at 1328. Furthermore, interpreting the requirements of contractual language is a question of law and may be resolved by summary judgment. *See P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 918 (Fed. Cir. 1984).

As an initial matter, termination based on breach is a valid ground for termination even though the Navy did not rely on this justification when it issued the default termination. A court may sustain a "default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason." *Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed. Cir. 1994) (citing *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277 (Fed. Cir. 1985)). Accordingly, Takota's failure to comply with contract specifications could justify the termination despite the Navy's reliance on other grounds in the termination for default.

The government alleges several material breaches in justification of the default termination: (1) Takota's failure to provide "vital submittals," including a dewatering plan and a sheeting and shoring plan, (2) Takota's failure to hire a geotechnical engineer prior to beginning construction, (3) Takota's failure to provide shoring or bracing for the seawalls, and (4) Takota's failure to follow the procedures set out in the Disputes Clause, Changes Clause, and Changed Conditions Clause. *See* Def.'s Cross Mot. for Summ. J. at 15–17. Some of these allegations are subject to factual disputes, for example, whether Takota's May 2, 2006, purported dewatering plan was indeed a dewatering plan. Other alleged breaches, such as the requirement of a geotechnical engineer, were cured.

---

implement its proposal to trench and fill behind the seawall, Takota never submitted such a cost estimate and, in any event, never performed the work contemplated.

9

Two of the alleged breaches, however, are not inaccessible at this point: whether the contract required Takota to shore the seawalls and whether the contract required Takota to submit a sheeting and shoring plan. There is no dispute that Takota did not shore or brace the seawalls before attempting dewatering or later when the walls began to show signs of buckling during the dewatering process.[10] Similarly, there is no dispute that Takota did not submit a sheeting and shoring plan and instead repeatedly insisted that this submittal was not required. Thus, if Takota was contractually obligated to perform this work, failure to do so was a violation of the contract.

### A. Takota's Failure To Shore the Seawall

The shoring of the seawall raises two distinct issues. First, whether Takota was affirmatively required to shore the seawall prior to attempting dewatering. Second, whether Takota was required to provide additional shoring to the seawall upon observing instability during dewatering. Takota did not provide shoring and bracing either in advance of dewatering or after observing buckling. The key contractual provisions appear in contract drawings C-03 and C-04, quoted *supra*.

#### 1. Takota's Failure To Shore The Seawall Before Beginning Dewatering

The contract documents clearly required Takota to shore or brace the seawalls prior to dewatering. This requirement is found most clearly in the contract drawings previously quoted. Drawing C-03 warns that dewatering will put considerable strain on the seawalls and drawing C-04 mandates, "Contractor shall provide adequate shoring/bracing for bulkheads (seawalls)." This requirement contains no condition precedent or triggering event. It simply and expressly requires the contractor to shore the seawall.

Additionally, Section 02300 of the contract[11] anticipates the need for stabilizing the seawall against seepage, stating, "Groundwater flowing toward or into the excavation shall be controlled to prevent sloughing of excavation slopes and walls." That section further states, "Shoring, including sheet piling,

---

[10] Takota's claim at oral argument that the inflow of seawater constituted "additional shoring" is implausible. *See infra* Part II.A.2.

[11] The court disagrees with Takota's contention that this section of the contract does not apply. *See infra* Part II.B.

shall be furnished and installed as necessary to protect workmen, banks, adjacent paving, structures, and utilities."

Despite these multiple references to shoring, Takota focuses exclusively on one statement in note three of drawing C-03: "Should signs of movement or additional deterioration be observed, the contractor shall provide safe and adequate shoring and contact contracting officer for further direction." Takota construes this statement as creating an "if-then" condition, and, therefore, no mandate to shore the walls until after observing instability.

Takota, however, turns a blind eye to statements in note three of drawing C-04: "Contractor shall provide adequate shoring/bracing for bulkheads (seawalls)." Takota ignores this plain and unequivocal statement mandating adequate shoring and bracing—a statement devoid of any prerequisites or conditions. The drawing note continues, "[s]hould signs of weakening or movement of bulkheads be observed, contractor shall provide additional shoring, shall stop dewatering process, and shall contact contracting officer for further direction." One cannot provide additional shoring unless there is already some shoring in place. Accordingly, the contract unambiguously required Takota to provide shoring or bracing in advance of dewatering.

> 2. *Takota's Failure To Shore the Seawalls Upon Observing Instability During Dewatering*

Even assuming, *arguendo*, that shoring was not initially required, it was required, by Takota's own admission, when the seawalls began buckling during dewatering. At oral argument, counsel for Takota recognized the requirement for additional shoring once the contractor observed instability in the seawall. *See* Tr. of argument held September 9, 2009 (hereinafter "Transcript") 3, 25. Takota's counsel asserted that Takota complied with this provision, supporting this assertion with the novel argument that the encroaching seawater was itself the "additional shoring" required by the contract.[12] *See id.* at 7, 11.

---

[12] In its briefing prior to oral argument, Takota had not advanced this creative theory, instead stating that the unchecked inflow of water was to allow the situation to "stabilize." The court notes, however, that in contrast to either of these explanations, internal Takota correspondence indicates that an overnight storm had overtopped the temporary cofferdam, thus filling the

11

This contention is irreconcilable with the contract's purpose and with common sense. Section 01110N summarizes the work covered by the contract, and specifically states that "lagoon dredging will be accomplished in the dry." That section also contemplates that the removal and replacement of the boat ramps will occur after dewatering. Obviously, neither of these tasks can be successfully executed in a lagoon full of water. Thus, "shoring" with water is clearly antithetical to the two primary goals of the contract.[13] Because Takota failed to provide any, much less additional, shoring upon observing the seawall's instability, Takota was in violation of the contract's requirements.

### 3.  The Limits of Construction

At oral argument, plaintiff advanced for the first time a claim that the seawalls were outside the limits of construction and, hence, that there was no requirement to shore or brace the seawalls. *See* Tr. 5, 25. Although this is a new argument we will briefly address it.

Takota relies on markings on the contract drawings that purport to delineate the limits of construction and, in some instances, appear to exclude the seawalls. Plaintiff's reliance on these markings, however, is misplaced. The very contract drawings relied upon by plaintiff contain explicit statements that undermine plaintiff's argument. Drawing C-03 note one states that "project limits extend to the edge of asphalt access road and contractor work area is the *entire area* inside area bounded by access road, Hancock Creek, wooded area, and reparian [sic] buffer limits." (Emphasis added.) Additionally, Section 01110N states that the "[c]ontractor will be given control of the entire project site [and] boat basin."

---

lagoon, and Takota did not again attempt to dewater. *See* Def.'s App. Tab 20.

[13] Furthermore, the very definition of "shoring" rebuts plaintiff's contention. The Dictionary of Architecture & Construction defines a "shore" as a "piece of timber to support a wall" and defines" shoring" as a "number of shores acting collectively." Cyril M. Harris, *Dictionary of Architecture & Construction* 883 (4th ed. 2005). Similarly, Means Illustrated Construction Dictionary defines "shoring" as "[p]rops or posts of timber or other material in compression." *Means Illustrated Construction Dictionary* 581 (3d ed. 2000). Both of these dictionaries provide illustrations depicting wooden or metal bracing propping up a wall. Neither dictionary mentions or depicts water as shoring.

12

Furthermore, even if the seawall is outside the marked limits of construction, this does not excuse Takota's failure to provide shoring. Just because the work was not "construction" does not mean it was not required. As noted by defendant at oral argument, the seawall was not under construction. Indeed, it was not being removed, replaced or otherwise modified, but merely being braced.[14] Even if the seawall was beyond the limits of construction, this does not relieve Takota of the obligation to brace the seawall. In sum, when the requirements of shoring discussed above are combined with the contract statements regarding the limits of construction, plaintiff's argument falls short. The contract drawings are insufficient to overcome the otherwise clear contractual intent to require shoring and bracing of the seawalls.[15]

## B. *Takota's Failure to Submit a Shoring and Sheeting Plan*

In addition to its failure to shore the seawall, Takota failed to submit a shoring and sheeting plan. Despite clear contractual language and reminders by the Navy, Takota repeatedly refused to submit a shoring and sheeting plan, persisting in this position up until the time of termination. This constitutes a violation of contractual terms and justifies the Contracting Officer's decision to terminate for default. The requirement of a shoring and sheeting plan is found in section 02300, entitled "Earthwork":

> The Contractor shall submit a Shoring and Sheeting plan for approval 15 days prior to starting work. Submit drawings and calculations, certified by a registered professional engineer, describing the methods for shoring and sheeting of excavations. Shoring, including sheet piling, shall be furnished and installed as necessary to protect workmen [and] banks . . . .

Section 02300, 3.6.1 General Requirements (Def.'s App., Tab 1).

---

[14] The contract supports this distinction between construction and bracing when Section 01110N notes "[i]t is assumed the lagoon retaining walls will not be repaired."

[15] We note, in any event, that the lines counsel drew the court's attention to coexist with a number of other similar lines making it far from clear that the seawall is outside the limits of construction.

Takota asserts that this submittal was not necessary because the requirement is contained in a section labeled "Earthwork" and Takota did not intend to perform earthwork excavations. This assertion, however, is flatly contradicted by the contract's terms, which clearly indicate the applicability of Section 02300 and the importance of its requirements. For example, Contract Section 01110N, the project description, explicitly lists "sheet piling, dewatering, [and] earthwork"—all of which are requirements found in Section 02300—among the types of work entailed by the contract. Furthermore, various other requirements of Section 02300, such as grading and concrete paving, are clearly relevant and necessary to contract performance.

Furthermore, Takota's assertion that the requirements of Section 02300 were not mandatory is contradicted by its compliance with other provisions contained in the same section. For example, the paragraph immediately following the shoring and sheeting requirement mandates that the contractor hire a geotechnical engineer, a provision Takota immediately complied with when reminded. Takota thus recognized the significance of various requirements located in the section broadly titled "Earthwork."

Takota's insistence that a shoring and sheeting plan was unnecessary ignores the clear relevance of this submittal. Indeed, the absence of shoring and sheeting is precisely what brought the project to a halt. Additionally, Takota's contention that it did not intend to shore the seawall misunderstands the contract's requirements as discussed above. The contract documents warned of the seawall's deteriorated condition and notified the contractor of the importance of shoring. The shoring and sheeting plan was neither optional nor incidental.

Despite this contractual requirement, Takota persisted in refusing to submit a shoring and sheeting plan. Over the course of the parties' negotiations, the Navy reminded Takota of this requirement on at least five occasions. Takota, however, maintained its insistence that a shoring and sheeting plan was not required, reiterating this position as late as May 2, 2006, three weeks before the default termination.[16]

---

[16] Takota briefly appeared poised to submit a sheeting and shoring plan, then reverted to its otherwise consistent position of refusal. Specifically, in correspondence dated March 30, 2006, Takota's president stated the sheeting and shoring plan "was submitted and approved on September 27, 2005 as part of Takota's safety plan. Because things have now changed, it will be

14

In their briefs and at oral argument, both Takota and the government cited *Aptus Co. v. United States*, 61 Fed. Cl. 638 (2004), *aff'd sub nom. Lin v. United States*, 159 Fed. Appx. 186 (2005), for legal support. That case involved a contract to update equipment at a government hydroelectric plant in Michigan. *Aptus*, 61 Fed. Cl. at 640. The contract was awarded to Aptus, Co., a one-man operation. *Id.* at 641. Almost immediately, "Aptus displayed difficulty meeting [contract] requirements" and "failed to take into account at least two significant contract provisions. *Id.* Of particular note here, Aptus Co. provided numerous "delayed and/or delinquent submittals." *Id.* at 642. Ultimately, the government terminated for default. *Id.* at 640.

In *Aptus*, the government asserted five separate grounds for termination, including "failure to comply with the submittal requirements," *see id.* at 647, which the court discussed as a "violation[] of contract requirements." *Id.* at 661–62. The court distinguished between administrative submittals and technical or product submittals, noting that "[a]dministrative submittals . . . are of lesser import." *Id.* at 662. The court stated that failure to comply with an isolated submittal requirement did not necessarily constitute a breach of contract; however, Aptus Co.'s systemic failure to comply with important submittal requirements, together with other contract and staffing violations, justified the termination. *Id.* at 662–63.

Here, Takota seizes upon the language in *Aptus* that failure to comply with an isolated submittal requirement is not, of itself, a material breach. *See* Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 16 (citing *Aptus*, 61 Fed. Cl. at 662). Takota further argues that its conduct is "in no way even close to the situation from *Aptus*." *Id.* In contrast, the government asserts that *Aptus* is directly parallel because, like Aptus Co., Takota "failed to follow the submittal requirements, ignored an essential technical requirement [shoring the seawall], and failed to hire a mandatory professional geotechnical engineer." Def.'s Reply in Support of Mot. for Summ. J. 3.

*Aptus*, however, does not set out a bright-line rule of law that compels a particular result in this case. Rather, the trial judge in *Aptus* merely considered the submittal issue in light of the totality of the circumstances and

---

resubmitted." Pl.'s App. Tab 23. It is unclear whether Takota did in fact submit a sheeting and shoring plan as part of its safety plan, because neither party provided the court with a copy of that document. In any event, as of May 2, 2006, Takota stated that a shoring and sheeting plan "would not be required."

15

decided that, in that specific case, the failure to supply a submittal constituted a material breach of the contract. *Aptus* acknowledges, however, that in some circumstances, failure to submit a peripheral document would not be grounds for termination.

The situation here, however, involves a submittal that is not peripheral. The contract mandated shoring and bracing and required Takota to submit a shoring and sheeting plan. Neither was incidental, tangential, or merely administrative. Indeed, shoring and sheeting went to the heart of the project, and failure to comply with this requirement caused gridlock and ultimately a complete failure of the contract's purpose. Accordingly, Takota's repeated refusal to comply with this contractual requirement constitutes a material breach of the contract and justifies the Contracting Officer's decision to terminate for default.

III.   *Various Other Arguments Advanced by Takota Do Not Excuse Its Breaches of Contract*

Although the reasons stated above, standing alone, are sufficient to support the court's determination of this matter, we note two additional arguments raised by plaintiff. Specifically, Takota believes it is being unjustly penalized for the Navy's own inaction and, similarly, that the Navy's delays amount to a waiver of the original completion date. For the reasons set out below, these arguments prove unavailing.

Takota argues that it cannot be terminated for default because the delay and ultimate stagnation of this project is, at least in part, attributable to the Navy.[17] Even if the Navy was slow to respond to Takota's claim of a differing site condition and evidenced willingness to entertain a request for an adjustment, this does not excuse Takota's failure to comply with contract requirements. The termination for default was ultimately within the Contracting Officer's discretion. Takota was terminated for failure to comply with contractual provisions, not because of delay in performance. At the end

---

[17] Takota, however, is not entirely accurate when it claims that the Navy did not respond for four months. Although the Contracting Officer did not personally and directly communicate with Takota until March 7, 2006, there were multiple meetings and dozens of letters and emails exchanged between Navy representatives and Takota.

16

of the day, the issue of delay becomes irrelevant because Takota's termination was for reasons unrelated to delay.

Nor do the asserted facts surrounding the delay indicate a waiver by the Navy of its right to insist on performance. Like Takota's argument regarding the Navy's delays, this contention does not affect the validity of the reasoning supporting this opinion. The Navy's decision to terminate for default was justified for reasons other than Takota's failure to meet the completion deadline. Additionally, throughout the several months of correspondence after the work stoppage, the Navy repeatedly stated that it had not waived the original completion date.

In any event, Takota does not meet the two-part test for waiver. The government waives its right to terminate a contractor only if (1) it indicates forbearance by failing to terminate within a reasonable time after the default and (2) the contractor relies on this failure to terminate and continues performance under the contract with the government's knowledge and consent. *See Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1354 (Fed. Cir. 2004) (citing *DeVito v. United States*, 413 F.2d 1147, 1153–54 (Fed. Cir. 1969)). The court need not speculate regarding the first prong because Takota clearly does not satisfy the second. The record makes clear that Takota did not continue performance after the completion date in reliance of the government's failure to terminate. Accordingly, Takota fails to prove waiver.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. Dismissal of the case is deferred until resolution of the motion for sanctions.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge